# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| | : | |
| | : | |
| ELECTION TRUTH ALLIANCE, | : | Case No.: 1:25-cv-00329 |
| NICHOLAS BRUNO, EMILY CRAIG- | : | |
| MCCURDY, LAUREN HOFFMAN, | : | |
| KIMBERLY MINARDI, JENNIFER | : | COMPLAINT |
| REESE, CHRISTOPHER MACK, JOHN | : | |
| PECZE, and GRACE HOHMAN, | : | |
| | : | |
| Plaintiffs | : | Filed on behalf of: Plaintiffs |
| | : | |
| v. | : | Counsel of Record: |
| | : | |
| AL SCHMIDT, in his official capacity as the | : | Timothy D. McNair, Esquire |
| SECRETARY OF COMMONWEALTH OF | : | PA ID No.: 34304 |
| PENNSYLVANIA, BOARD OF | : | tmcnair@mcnairlaw.com |
| ELECTIONS OF ALLEGHENY COUNTY, | : | |
| BOARD OF ELECTIONS OF CAMBRIA | : | McNair Law Offices, PLLC |
| COUNTY, BOARD OF ELECTIONS OF | : | 821 State Street |
| ERIE COUNTY, | : | Erie, PA 16501 |
| | : | Phone: (814) 452-0700 |
| Defendants | : | Fax: (814) 454-2371 |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| | : | |
| | : | |
| ELECTION TRUTH ALLIANCE, | : | Case No.: 1:25-cv-00329 |
| NICHOLAS BRUNO, EMILY CRAIG- | : | |
| MCCURDY, LAUREN HOFFMAN, | : | |
| KIMBERLY MINARDI, JENNIFER | : | COMPLAINT |
| REESE, CHRISTOPHER MACK, JOHN | : | |
| PECZE, and GRACE HOHMAN, | : | |
| | : | |
| Plaintiffs | : | *Electronically Filed* |
| | : | |
| v. | : | |
| | : | |
| AL SCHMIDT, in his official capacity as the | : | |
| SECRETARY OF COMMONWEALTH OF | : | |
| PENNSYLVANIA, BOARD OF | : | |
| ELECTIONS OF ALLEGHENY COUNTY, | : | |
| BOARD OF ELECTIONS OF CAMBRIA | : | |
| COUNTY, BOARD OF ELECTIONS OF | : | |
| ERIE COUNTY, | : | |
| | : | |
| Defendants | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |

**<u>COMPLAINT</u>**

NOW COME the Plaintiffs, Election Truth Alliance, Nicholas Bruno, Jennifer

Reese, Kimberly Minardi, Emily Craig-McCurdy, Lauren Hoffman, Christopher Mack,

John Pecze, and Grace Hohman, by counsel, and bring this Complaint for redress of

violations of 42 U.S.C. § 1983 and other statutes, respectfully representing:

## I.    INTRODUCTION

This case will demonstrate that the voting systems and practices used in the Western District of Pennsylvania in the General Election of November, 2024 deprived voters of equal protection under the law arising out of use and misuse of voting equipment and methods of administering elections.

The General Election of November 2024 ("Election") was the culmination of a number of hard-fought contests. The margins deciding those elections were so small that any mishandling of the ballots or equipment, whether malicious or not, resulting from partisan ill intent or resulting from irregularities and breakdowns in the administration of the Election, more likely than not changed the outcome.

In some counties, there were failures to properly or completely test and calibrate the equipment used. In several counties in the Western District, patterns of votes were observed that were inconsistent with a fair election under generally accepted interpretations by academics who study and comment on elections. Most ominously, there were last-minute changes to the software used to count and report votes made through software updates that were claimed to be "de minimis" and not able to affect the outcome when in fact some of these changes affected the counting and reporting functions of the voting machines, enabling manipulation of the counting and reporting of votes to favor one party or the other.

Substantial evidence exists to demonstrate that these are genuine, valid concerns. Rather than seeking to invalidate the 2024 Election outcome, however, this lawsuit demands full accountability from election officials regarding the discrepancies, anomalies, and weaknesses in the election system found by Plaintiffs after the 2024 Election. Such accountability will ensure that election systems have not been and will not be exploited, thus ensuring that citizens will be guaranteed their constitutional rights to equal protection under the law to validly express their will through the ballot box.

Plaintiffs seek a declaration that proper elections procedures were not followed and seek injunctive relief requiring an examination and comparison of the physical ballots with the machine generated tallies.

## II.    PARTIES

1.    Plaintiff Election Truth Alliance ("ETA") is a nonprofit corporation comprised of individual citizens who are registered voters in the various states, including Pennsylvania. Its mission is to protect and enhance the integrity of elections as required by the Constitution and laws of the United States and the States, including the Commonwealth of Pennsylvania. ETA and its members have expended substantial resources in Pennsylvania to investigate, respond to, and publicize election irregularities. As voters, the members of ETA share an interest in making sure their votes are accurately tabulated. This is central to ETA's mission. ETA seeks to vindicate the rights of its members, all of whom would suffer a deprivation of Equal Protection if elections were not properly administered.

2.     Plaintiff Nicholas Bruno is an adult citizen residing in and registered to vote in Erie County, Pennsylvania, who voted in the 2024 General Election in that County.

3.     Plaintiff Kimberly Minardi is an adult citizen residing in and registered to vote in Allegheny County, Pennsylvania, who voted in the 2024 General Election in that County.

4.     Plaintiff Jennifer Reese is an adult citizen residing in and registered to vote in Cambria County, Pennsylvania, who voted in the 2024 General Election in that County.

5.     Plaintiff Emily Craig-McCurdy is an adult citizen residing in and registered to vote in Allegheny County, Pennsylvania, who voted in the 2024 General Election in that County.

6.     Plaintiff Lauren Hoffman is an adult citizen residing in and registered to vote in Allegheny County, Pennsylvania, who voted in the 2024 General Election in that County.

7.     Plaintiff Christopher Mack is an adult citizen residing in and registered to vote in Cambria County, Pennsylvania, who voted in the 2024 General Election in that County.

8.     Plaintiff John Pecze is an adult citizen residing in and registered to vote in Cambria County, Pennsylvania, who voted in the 2024 General Election in that County.

9.     Plaintiff Grace Hohman is an adult citizen residing in and registered to vote in Cambria County, Pennsylvania, who voted in the 2024 General Election in that County.

10.     Defendant Al Schmidt ("Secretary Schmidt," or "SOC") is the Secretary of the Commonwealth of Pennsylvania, having been appointed Acting Secretary of the Commonwealth by Governor Shapiro on January 17, 2023 and confirmed as Secretary of the Commonwealth on June 29, 2023.

11.     Defendant, Allegheny County Board of Elections ("Allegheny"), is a County Board of Elections established pursuant to 25 P.S. 2641, having jurisdiction over the conduct of primaries and elections in such county, in accordance with the provisions the Pennsylvania Election Code, 25 P.S. 2600 *et seq*.

12.     Defendant, Cambria County Board of Elections ("Cambria"), is a County Board of Elections established pursuant to 25 P.S. 2641, having jurisdiction over the conduct of primaries and elections in such county, in accordance with the provisions the Pennsylvania Election Code, 25 P.S. 2600  *et seq*.

13.     Defendant, Erie County Board of Elections ("Erie"), is a County Board of Elections established pursuant to 25 P.S. 2641, having jurisdiction over the conduct of primaries and elections in such county, in accordance with the provisions the Pennsylvania Election Code, 25 P.S. 2600  *et. seq*.

## III.    JURISDICTION AND VENUE

14.    This Court has jurisdiction of this matter pursuant to 28 U.S.C. §1343, which provides for original jurisdiction in all suits authorized by 42 U.S.C. §1983 for redress of deprivation under color of state law of Constitutional rights, privileges, or immunities or of rights under federal law, including the right to vote. *Meisel v. Kremens*, 405 F. Supp. 1253, 1254 (E.D. Pa. 1975).

15.    This Court further has jurisdiction of this matter pursuant to 28 U.S.C. §1331, since this case arises under the Constitution, treaties, and laws of the United States and in particular the Fifth and Fourteenth Amendments to the Constitution and, *inter alia*, 42 U.S.C.§1983

16.    This Court has jurisdiction under 28 U.S.C. § 2201(a), because Plaintiffs are requesting a declaration of rights and other legal relations, especially regarding an actual controversy regarding the accuracy of the vote count in counties located within the Western District of Pennsylvania.

17.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in counties in this District.

18.    Venue is proper in this District per 28 U.S.C. § 1391(b)(1) because all Defendants reside in Pennsylvania, and Allegheny, Erie, and Cambria reside in this District.

19.     Defendants are "persons acting under the color of state law" in that they are Pennsylvania County Boards of Elections to which 52 U.S.C. § 10101 applies. See *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690–91 (1978) (recognizing § 1983 claim against units of local government); *Rogin v. Bensalem Twp.*, 616 F.2d 680, 686 (3d Cir. 1980) (same); *United States v. Holmes Cnty., Miss.*, 385 F.2d 145, 148 (5th Cir. 1967) (holding that "person" bears same meaning in both 52 U.S.C. § 10101 (formerly 42 U.S.C. § 1971) and 42 U.S.C.A. § 1983).

20.     Section 101(a) of the Civil Rights Act of 1964, as amended, protects the right to vote. The right to vote protected by the statute is defined to include: "all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast with respect to candidates for public office and propositions for which votes are received in an election." 52 U.S.C § 10101(a)(3)(A), 10101(e).

## IV.     STATEMENT OF FACTS

### Software Modification Without Adequate Testing

21.     Cambria and Allegheny utilize election equipment provided by Elections Systems and Software ("ES&S"), consisting of machines ("hardware") operated by software programs provided exclusively by ES&S. Erie utilizes election equipment provided by Dominion Voting Systems ("Dominion"), consisting of machines operated by software programs provided exclusively by Dominion.

22.     The software utilized by ES&S and Dominion and provided to Pennsylvania counties is certified by Pro V&V, a "test laboratory" accredited by the Election Assistance Commission ("EAC"). Pro V&V is supposed to determine if the machines and software provided by vendors such as ES&S and Dominion accurately tabulate and report the results of voter choices at the various polling places.

23.     On April 4, 2024, Pro V&V approved ECO 1167 for EVS 6.4.0.0 (ES&S), modifying semi-static file lists as "De Minimis – No testing required."

24.     On September 10, 2024, Pro V&V approved ECO 1188 for EVS 6.5.0.0 (ES&S), moving configuration files from semi-static to dynamic lists, again classified as "De Minimis – No Additional Testing Required."

25.     Between March and September 2024, Pro V&V approved modifications to Dominion's D-Suite 5.20 system as part of a "system modification campaign." The updates affected ballot scanners, audit files, and other components used in Erie.

26.     Under NOC 19-01, the Voting System Test Laboratory ("VSTL") has discretion to determine whether any testing is "necessary" for de minimis changes. ECO 1167 approved changes with only documentation review and 'no testing required,' while ECO 1188 approved changes with source code review and limited functional testing—demonstrating inconsistent application of even minimal testing standards.

### Cambria County Certification and Machine Issues

27.     On September 28, 2024, Cambria County officials certified completion of the Logic & Accuracy ("L&A") testing certifying that all voting equipment had been tested and verified as functioning properly. The certification explicitly stated the Central Count Scanner as well as its backup were tested.

28.     Email communications dated after the L&A certification contradict these sworn statements, with the former Director of Elections writing: "We do not test our central count we test the DS200. So moving forward we should test our Central Count and Express Vote."

29.     An ES&S representative responded to this email stating: "According to the guidance, yes," confirming that Central Count Scanner testing was required but had not been performed.

30.     The false certification was signed by the same election official who later admitted in writing that the required testing had never been conducted.

31.     No Express Vote cards were ordered prior to election day.

32.     Cambria has not disclosed the number of ballots tabulated using Express Vote machines on Election Day.

33.     Cambria did not provide ballot accounting or chain of custody documentation despite statutory obligations.

34.     On November 5, 2024, the United States held its Presidential Election.

35.     During the Election, Cambria was unable to scan completed ballots. Cambria asserted the Express Votes machines were available and in working order.

36.     Cambria initially reported the issue as a software glitch but later clarified the issue was that ballots were missing the Time in Security ("TIS") box and could not be read by the machines. Cambria confirmed that this issue affected all precincts within the County.

37.     Because votes had already been cast but could not be read, Cambria requested and was granted an order of court extending poll closures from 8 PM to 10 PM. Some voters who showed up to the polls were told to either return later or were told to give their completed ballots to poll workers to be scanned at a later time.

38.     Poll workers were instructed to store the completed, unscannable ballots in "emergency storage bins," meant to hold ballots in the event of an emergency. However, when these bins reached their capacity, the poll workers had to remove the ballots. No chain of custody documentation was completed for these ballots.

39.     In response to the unscannable ballots, Cambria ordered an additional 74,075 ballots with the TIS marks. Channel 6 announced they would broadcast from Cambria County Courthouse (Ebensburg) at noon Election Day. Their subsequent video feed showed the reprinted ballots had already arrived from William Penn Printing and in the process of being distributed to precincts. These arrived at Cambria's election headquarters in the afternoon of Election Day, where volunteers assisted in dividing and packing them for transport to individual precincts. No chain of custody documentation was provided for these ballots.

40.     After the closure of the polls, Board officials began to hand count the ballots that could not be read. However, the decision was ultimately made to duplicate all unscannable ballots onto ballots that could be scanned. According to Cambria BOE, there is no record as to which ballots were individually copied or how many ballots this affected.

41.     Cambria has not publicly documented a tally of how many ballots cast were unable to be scanned on Election Day versus how many ballots were able to be scanned successfully.

## Cambria County Ballot Discrepancies

42.    In advance of the election, Cambria County ordered a total of 112,655 ballots. Of these 87,050 were election day ballots, 15,855 mail-in (absentee) ballots, 6,250 provisional ballots, 500 specimen ballots and 3,000 test ballots from William Penn Printing.

43.    In response to the unscannable ballots on Election Day, Cambria ordered 74,075 regular ballots, 35,000 ExpressVote cards and 24,000 BOD stock.

44.    Cambria stated that volunteers and poll workers initially hand-counted the ballots that voters completed but then duplicated them at the suggestion of Election Systems & Software ("ES&S").

45.    Cambria solicited County employees who were registered voters to volunteer to perform ballot duplication.

46.    Cambria has not provided documentation showing these volunteers were sworn in, deputized, or otherwise authorized to handle ballots, despite Pennsylvania law requiring counties to maintain such records.

47.    According to Cambria County Solicitor Ron Repak Jr., "they expected about 35,000 ballots originally that would have to be hand counted or duplicated, but it turned out to be about 65,000 ballots."

48.    Official county results indicate 55,661 Election Day votes, over 9,000 fewer than the number of ballots duplicated. Official Cambria results include 164 write-in candidates which are excluded in the official results published on the state website.

49.    On the Election Day 7 PM report, Cambria reported 16,827 mail-in ballots were requested.

50.     On the Pennsylvania Mail Ballot Dashboard, Cambria reported distributing 16,816 total mail-in ballots.

51.     Cambria participated in Act 88 for the 2024 November General Election, which mandates that counties report the number of mail in ballots received and processed at poll closure. Cambria reported 16,645 mail in ballots requested and 15,121 mail-in ballots received, creating a third distinct total received that matches neither the 7 PM report (15,258) nor the official results (15,022). No explanation has been provided for these discrepancies.

52.     However, Cambria only ordered 15,855 mail in ballots which leaves a deficit of 972, or 961, or 790 mail-in ballots depending on which report is referenced.

53.     On December 4, 2024, Cambria election official Nicole Burkhardt informed the Director of Elections that provisional ballots were not properly documented or entered into the Statewide Uniform Registry of Electors system (SURE).

54.      Burkhardt reported discovering provisional ballots "in the back that were not entered by Maryanne in the SURE system" and stated, "I do not have access to enter them nor do I have the SURE portal which they would need to be entered into." Burkhardt further noted that "all this verification needs to be done within the portal" but indicated the work remained incomplete as of December 4, 2024, nearly one month after the election. Cambria did not provide provisional ballot documentation despite formal records requests.

55.    Cambria ordered 176,980 total ballots against 88,508 registered voters — an excess of 88,472 ballots — and subsequently duplicated approximately 65,000 ballots, with only a final documented count of 55,661 Election Day votes. Cambria has no available records showing ballots issued to each precinct and unused ballot accounting despite statutory requirements and formal appeals.

## Cambria County Statistical Anomalies

56.    Statistical analyis of Cambria County precinct-level data from Pennslyvania Department of State Website was conducted using expert methodologies of Roman Udot, Peter Klimek, and Sergei Sphilkin. The analysis, omitting precints with fewer than 50 registered voters, demonstrates divergence in candidate vote shares at higher turnout levels in the Presidential Election, inconsistent with patterns observed in fair elections. The analysis identified statistically significant abnormal correlations between turnout and Republican vote share ($r \approx 0.78$), indicating that as turnout increased, the Republican Candidate's vote share systematically increased in patterns inconsistent with normal electoral variance and matching peer-reviewed fraud signatures.



## Erie County Mail-in Ballot Issues and Discrepancies

57.    Prior to the election, between 13,000 and 17,000 mail-in ballots had been requested but not delivered to in-state voters who requested them.

58.    Judge David Ridge found that approximately 1,200 out-of-state voters registered in Erie who requested mail-in ballots did not receive them.

59.    In an attempt to rectify the issues, Erie was ordered to extend its operating hours to the public for Friday, November 1, and Saturday, November 2; add an additional printer to their office to reduce wait times; ensure that an adequate number of ballots and provisional ballots were available at all polling locations; release to the parties the names and email addresses of out-of-state voters; and contact all voters who received a duplicate ballot and any voter whose name appeared on a duplicate ballot for another voter.

60.    On October 28, 2024, Erie issued guidance stating that any voter who requested a mailin ballot but had not yet received it could email the office to cancel the outstanding ballot and request a new ballot be sent via priority express. However, the cancellation request had to be submitted by the next day.

61.    365 voters registered in Erie received incorrect ballots and were subsequently sent corrected ballots.

62.    As of 7 PM EST on November 5, 2024, Erie publicly reported 35,291 total returned and processed mail-in ballots: 21,372 from registered Democrats, 10,560 from registered Republicans, and 3,359 from unaffiliated / other party voters.

63.    After 7 PM EST on November 5, 2024, Erie reported 36,573 mail-in votes received and counted: 24,728 for Harris, 11,442 for Trump, 314 for other party candidates, and 89 write-ins.

## Erie County Statistical Anomalies

64.    Statistical analyis of Erie County precinct-level data from the Pennslyvania Department of State Website was conducted using expert methodologies of Roman Udot, Peter Klimek, and Sergei Shpilkin.

65.    The analysis, omitting precints with fewer than 50 registered voters, demonstrates divergence in candidate vote shares at higher turnout levels in the Presidential Election, inconsistent with patterns observed in fair elections. The analysis identified statistically significant abnormal correlations between turnout and Republican vote share ($r \approx 0.67$), indicating that as turnout increased, the Republican Candidate's vote share systematically increased in patterns inconsistent with normal electoral variance and matching peer-reviewed fraud signatures.



## Allegheny County Mail-in Discrepancies

66.    As of 7 PM EST on November 5, 2024, Allegheny publicly reported 219,221 total returned and processed mail-in ballots: 144,417 from registered Democrats, 50,519 from registered Republicans, and 24,285 from unaffiliated / other party voters.

67.    After 7 PM EST on November 5, 2024, Allegheny reported 227,611 mail-in votes received and counted: 164,979 for Harris, 59,740 for Trump, 1,968 for other party candidates, and 924 write-ins.

68.    Unlike the 43 counties that experienced reductions in overall reported ballots, Allegheny showed a net addition of 1,203 mail-in ballots between 7 PM EST and final results. Nonetheless, other party and unaffiliated votes decreased by 23,155 relative to the number of ballots returned by registered voters in those categories, reflecting unexplained variances in ballot accounting procedures observed statewide.

## **Allegheny County Statistical Anomalies**

69.    Statistical analyis of Allegheny County precinct-level data from
Pennsylvania Department of State Website was conducted using expert methodologies
of Roman Udot, Peter Klimek, and Sergei Shpilkin .

70.    The analysis, omitting precints with less than 50 registered voters,
demonstrates divergence in candidate vote shares at higher turnout levels in the
Presidential Election, inconsistent with patterns observed in fair elections. The analysis
identified statistically significant abnormal correlations between turnout and
Republican vote share (r ≈ 0.66), indicating that as turnout increased, Trump's vote
share systematically increased in patterns inconsistent with normal electoral variance
and matching peer-reviewed fraud signatures.



71.    In the Spring of 2025, the results of the vote in Pennsylvania were forensically analyzed by Walter Mebane, Ph.D. a Professor of Political Science at University of Michigan and a recognized expert in detecting election fraud. Dr. Mebane has forensically analyzed numerous elections and his work has been recognized and relied upon by experts in the field.

72.    Dr. Mebane's *eforensics* model identified Allegheny County with a manufactured votes parameter of 0.238 [0.089, 0.340], where the entirely positive credible interval indicates patterns inconsistent with normal electoral behavior and warrants investigation for potential malevolent distortions.

### Statewide Vote Reconciliation

73.    As of 7 PM EST on November 5, 2024, the Counties of the State of Pennsylvania ("Counties") publicly reported 1,912,676 total returned and processed mail-in ballots:1,053,971 from registered Democrats, 629,505 from registered Republicans, and 229,200 from unaffiliated / other party voters.

74.    After 7 PM EST on November 5, 2024, the Counties reported 1,946,206 mail-in votes received and counted: 1,263,611 for Harris, 664,982 for Trump, 17,613 for other party candidates.

75.    The change in total votes added after 7 PM EST is a net of 35,477 mail-in votes: 210,040 changed to or from Harris, 211,587 were lost from unaffiliated / other party candidates, 52,379 changed to or from Trump.

| reconciliation between counts published at 7PM and final counts | | | | | |
|---|---|---|---|---|---|
| **COUNTY** | **Δ TOT** | **Δ DEM** | **Δ OTH** | **Δ REP** | |
| ALLEGHENY | 1203 | 16655 | -23155 | 7703 | |
| CAMBRIA | -279 | -55 | -1077 | 853 | |
| ERIE | 1193 | 3356 | -3045 | 882 | |
| PHILADELPHIA | 11091 | 20051 | -17294 | 8334 | |
| STATE TOTAL | 33530 | 209640 | -211587 | 35477 | net change |
| | 43094 | 210040 | 211587 | 52379 | absolute change |

76. The change in total votes added after 7 PM EST is a net of 33,530 mail-in votes; however, 43 counties experienced a reduction in overall ballots.[1]

77. Ballots registered to unaffiliated / other party candidates had low incidence of realized votes for unaffiliated / other party candidates in every county.

**<u>Votes Recorded in Excess of Registered Voters</u>**

78. In several voting districts, per official state reports, more votes for President were recorded than there were voters registered to vote, as follows:

| COUNTY | PRECINCT | # REG VOTERS | # VOTES | TURNOUT |
|---|---|---|---|---|
| Allegheny | 11760 | 474 | 485 | 102.32% |
| Berks | 392 | 933 | 1168 | 125.19% |
| Berks | 830 | 1126 | 1421 | 126.20% |
| Centre | 150 | 776 | 905 | 116.62% |
| Elk | 110 | 328 | 767 | 233.84% |
| Lehigh | 490 | 708 | 2258 | 318.93% |
| Luzerne | 157 | 329 | 1166 | 354.41% |
| Montgomery | 1130 | 619 | 985 | 159.13% |
| Montgomery | 1700 | 255 | 1029 | 403.53% |
| Northampton | 760 | 164 | 715 | 435.98% |
| Northumberland | 865 | 29 | 367 | 1265.52% |
| Susquehanna | 160 | 405 | 934 | 230.62% |
| Venango | 720 | 76 | 211 | 277.63% |
| Wayne | 235 | 535 | 938 | 175.33% |
| Westmoreland | 820 | 225 | 626 | 278.22% |
| Wyoming | 300 | 261 | 407 | 155.94% |
| York | 415 | 1130 | 2456 | 217.35% |

### ETA Statistical Analysis Of Select Counties and Statewide Voting Behavior

79.    The statistical methodologies employed by Klimek, Yegorov, Hanel, and Thurner (Klimek et al) identify patterns and anomalies that constitute indicators of potential electoral irregularities. These methods detect deviations from expected statistical distributions but do not, standing alone, constitute proof of fraud or vote manipulation. Rather, they identify voting patterns warranting comprehensive investigation and examination of physical ballots, chain of custody records, and other supporting evidence to determine the nature and extent of any irregularities.

80.    In 2012, Dr. Klimek, Yegorov, Hanel and Thurner published research demonstrating that fraudulent elections exhibit distinctive statistical patterns. In fair or normal elections, vote share for winning candidates remains relatively stable across different turnout levels. Fraudulent elections show unusual clustering at high turnout/high vote percentages.

81.    Instead of tight clustering around typical values, fraudulent elections show data spreading or smearing toward the upper-right corner of vote-turnout plots.



82.    ETA conducted independent statistical analysis of certified results from Allegheny, Cambria, Erie using Klimek, Thurner, et al., methodology.

83.    Vote-turnout fingerprints for the State of Pennsylvania exhibit turnout characteristics of electoral irregularities documented in peer-reviewed research. Precinct-level data shows that candidate vote shares follow more statisticaly normal trends at lower turnout levels (below ~50-60%) but diverge significantly at higher turnout levels, with Trump's vote share increasing and Harris's vote share decreasing as turnout rises above this threshold.

84.    This effect is observered across all Pennsylvania counties that contain a large amount of precincts above and below 60% turnout.







85.    State-level data from Pennsylvania demonstrates divergence in candidate vote shares at higher turnout levels, inconsistent with patterns observed in fair elections. The correlation analysis reveals statistically significant relationships between Republican Presidential candidate vote shares and turnout levels ($r \approx 0.609$) that exceed normal variance thresholds and warrant investigation.

### Independent Statewide Analysis

86.    In 2015, the United States Agency for International Development (USAID) funded the development of an "Election Forensics Toolkit" (EF) through subaward #DFG-10-APS-UM to the University of Michigan.

87.    EF detects multimodal anomalies in vote distributions using Markov Chain Monte Carlo ("MCMC") methods to ascertain hidden voting patterns indicative of electoral manipulation.

88.    EF Toolkit analysis identified statistical anomalies in Kenya's 2017 presidential election, and the Kenya Supreme Court subsequently annulled the election due to multiple electoral irregularities.

89.    EF Toolkit analysis of Pennsylvania's 2024 presidential election identified 1,804 precincts with material fraud indicators and 8 precincts with extreme fraud indicators across 9,157 precincts statewide. The estimated total irregular votes were 210,392 with a 99.5% credible interval of [190,750–236,940], exceeding the certified margin of victory by approximately 90,000 votes.

### COUNT I – ALL PLAINTIFFS VS. ALL DEFENDANTS

90.    Plaintiffs incorporate by reference herein the averments of the preceding paragraphs.

91.     Plaintiffs ETA, Nicholas Bruno, Emily Craig-McCurdy, Lauren Hoffman, Kimberly Minardi, Jennifer Reese, Christopher Mack, John Pecze, and Grace Hohman have the right to vote and to have their votes accurately tabulated and reported, so that their votes be given the same effect no matter where they reside, as guaranteed by the U.S. Constitution Amendments V and XIV, and 52. U.S.C. §10101, in violation of 42 U.S.C. §1983.

92.     Defendant Schmidt is charged with:

a. the duty to "examine and reexamine voting machines, and …not approve any voting machine for any election, Federal or State, in this Commonwealth, that does not comply with the requirements of section 301 of the Help America Vote Act of 2002 (Public Law 107-252, 42 U.S.C. § 15481). ((b) amended July 14, 2009, P.L. 86, No. 20)". PA Election Code § 201(b);

b. The duty to "receive from county boards of elections information on voting system errors or difficulties or other election data pursuant to regulation." Id. at § 201(e.1);

c. To receive such reports from county boards of elections as are required by the Election Code, and to demand such additional reports on special matters as he may deem necessary. PA Election Code § 201(e.1);

d. The duty to receive from county boards of elections information on voting system errors or difficulties or other election data pursuant to regulation. PA Election Code § 201(e);

e. The duty to "compute the votes cast for candidates "…to proclaim the results of such primaries and elections". Id. at § 201(f); and

f. The duty to order a county board to conduct a recount or recanvass of an election under Section 1404 for a public office which appears on the ballot in every election district in this Commonwealth or for a ballot question which appears on the ballot in every election district in this Commonwealth. PA Election Code § 201(f.2);

g.  Defendant SOC's refusal to examine any ballot boxes, to order the county boards of elections to submit additional reports, or to order from the county boards their reports of system errors and difficulties, violates the Plaintiffs' right to Equal Protection guaranteed by the Fifth and Fourteenth Amendments of the U.S. Constitution, the Help America Vote Act, and the PA Election Code.

93.  ETA requested the SOC to direct a hand count of ballots in suspicious precincts. The SOC declined this equest based on its reliance on a post-election audit of the Pennsylvania Treasurers's race.

94.  Defendant SOCs' refusal to examine any ballot boxes, to order the County Boards of Elections to submit additional reports, or to order from the County Boards their reports of system errors and difficulties, violates the Plaintiffs' right to Equal Protection guaranteed by the Fifth and Fourteenth Amendments of the U.S. Constitution, the Help America Vote Act, and the PA Election Code.

95.  Defendant Schmidt's refusal to direct the examination of any ballot boxes, to order the County Boards of Elections to submit additional reports, or to order from the county boards their reports of system errors and difficulties, violates the Plaintiffs' right to Equal Protection guaranteed by the Fifth and Fourteenth Amendments of the U.S. Constitution, the Help America Vote Act, and the PA Election Code.

96.  The actions of the Defendants in failing to follow the statutory requirements for elections in Pennsylvania deprived Plaintiffs of the Equal Protection of the Laws, since the manner and effectiveness of their votes was dependent on where they live.

97.  The Defendants deprived Plaintiffs of the Equal Protection of the Laws in violation of 42 U.S. C. §1983 in failing to test the accuracy of the counting and tabulating equipment and associated software used to count the votes cast in the election.

98.    The failure to test and verify the accuracy of the counting machinery led to the manufacture or theft of a number of votes sufficient to change the outcome of the elections in Pennsylvania.

99.    Plaintiff ETA has requested Defendant Schmidt to order examination of the contents of several balllot boxes and manually count the ballots in order to determine if there are discrepancies between the actual votes and the reported votes as suggested by the statistical analysis described above.

100.    The refusal of Defendant Schmidt to examine any ballot boxes to discern whether the votes cast match the reported outcomes violates the Plaintiffs' right to Equal Protection guaranteed by the Fifth and Fourteenth amendments to the United States Constitution.

101.    As a result of their actions and inactions in failing to test and verify the accuracy of the counting machinery, Defendant County Boards of Elections for Cambria, Erie, and Allegheny reasonably caused and did cause the manufacture, disappearance, manipulation and/or theft of a number of votes resulted sufficient to affect the outcome of the 2024 election.

102.    As a result of all of their actions and inactions, Plaintiffs have been caused harm and deprivation of their constitutionally protected rights.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court grant the following relief forthwith:

      a. That the Court declare that Defendant SOC and all Defendants BOEs failed to follow proper elections procedures in the 2024 presidential election;

      b. That the Court mandate and require the Defendant SOC to direct the Defendant County Boards of Elections hand count physical ballots cast

in 2024 presidential election in the Defendant Counties;

    c. That the Court mandate that these hand counts be compared to the machine-generated tallies in the 2024 presidential election;

    d. That the Court require that the Defendant BOEs explain any discrepancies and statements about their voting machine and software updates in the 2024 Presidential Election;

    e. That the Court require that the Defendant BOEs explain the mismatches and disappearances of ballots in the 2024 presidential election;

    f.  That the Court enjoin the Defendant SOC and all Defendant BOEs to ensure compliance with the statutes and laws regarding vote counting in all counties in future elections; and

    g.  That the Court grant the Plaintiffs their attorney fees, expert witness fees, and costs in this action, and such other and further relief that the Court deems just.

### Count II. Jennifer Reese,  Christopher Mack, John Pecze, and Grace Hohman  v. Al Schmidt in his Official Capacity as the Secretary of the Commonwealth and Cambria County Board of Elections 52 U.S.C. §10101; 42 U.S.C. § 1983 - Violation of Section 101 of the Civil Rights Act of 1964

103.   Plaintiffs incorporate by reference the preceding averments of this

Complaint as though fully set forth at length.

104.   Each County's Board of Election has the following duties:

    a. To select and equip polling places that meet the requirements of the Election Code, PA Election Code §302(b);

    b. To ascertain any errors in vote counting, and "[i]f any error is detected, the cause of it shall be ascertained and corrected and an errorless count shall be made and certified to by the county board of elections prior to election day." Id. at §1401-A(a) (modified);

    c. The duty to "compare the signature on [a] provisional ballot envelope with the signature on [an] elector's registration form and, if the signatures are determined to be genuine, shall count the ballot if the county board of elections confirms that the individual did not cast any other ballot, including an absentee ballot, in the election. Id. at § 1210(a.3)(5)(1); and

27

    d.  The duty to "investigate election frauds, irregularities and violations of [Pennsylvania's Election Code], and to report all suspicious circumstances to the district attorney. Id. at § 302.

105.    Defendant Cambria BOE filed a false Logic and Accuracy certification in the 2024 election.

106.    Defendant Cambria BOE used untested election machinery and equipment in the 2024 election.

107.    Upon information and belief, Defendant Cambria BOE did not create or maintain documentation regarding handling and custody of ballots and votes in the 2024 election.

108.    Defendant Cambria BOE did not scan all provisional ballots submitted in the 2024 election.

109.    Defendant Cambria BOE did not explain ballot discrepancies in the 2024 election.

110.    Defendant Cambria BOE inexplicably ordered 88,472 more ballots than registered votes in the 2024 election.

111.    The data from Defendant Cambria BOE exhibited statistically improbable numerical coincidences, precinct-level divergence patterns, and vote-turnout clustering in the 2024 election.

112.    Defendant SOC failed to examine, re-examine, and approve of voting machinery equipment and software used by Defendant Cambria BOE in the 2024 Election.

113.    The false L&A certification, untested equipment, missing chain of custody documentation, unscanned provisional ballots, unexplained ballot discrepancies, ordering of 88,472 more ballots than registered voters, statistical precinct-level divergence patterns and vote-turnout clustering, demonstrate that Cambria systematically deprived voters of their rights under 52 U.S.C. §10101 to have ballots counted and included in appropriate totals.

114.    As a direct result of their actions and inactions, Defendant Cambria BOE systemically impaired Plaintiffs' ability to determine the accuracy of the count and reporting of those votes, depriving them their rights under the laws, in violation of 52 U.S.C. §10101 under 42 U.S.C. §1983.

WHEREFORE, Plaintiffs respectfully demand that this Honorable Court:

e.    Enjoin and require Defendants SOC and Cambria BOE to conduct a full hand recount of all ballots case in the 2024 election in Cambria County;

f.    Enjoin and require that Defendants SOC and Cambria BOE determine the accuracy of all vote counts and reports in Cambria County in the 2024 election;

g.    Enjoin and require that Defendants SOC and Cambria BOE implement procedures satisfactory to the Plaintiffs and to the Court that will ensure all vote counts and reports will be accurate in the future;

h.    Grant Plaintiffs their attorney fees, expert witness fees and costs in this action, and such other and further relief that the Court deems just.

**COUNT III – Election Truth Alliance and Nic Bruno v. Al Schmidt in his Official Capacity as the Secretary of the Commonwealth and Erie County Board of Elections - 52 U.S.C. §10101; 42 U.S.C. § 1983 - Violation of Section 101 of the Civil Rights Act of 1964**

115.    Plaintiffs incorporate by referrence the preceding averments of this Complaint.

116.    Each County's Board of Election has the following duties:

    i.    To select and equip polling places that meet the requirements of the Election Code, PA Election Code §302(b);

    j.    To ascertain any errors in vote counting, and "[i]f any error is detected, the cause of it shall be ascertained and corrected and an errorless count shall be made and certified to by the county board of elections prior to election day." Id. at §1401-A(a) (modified);

    k.    The duty to "compare the signature on [a] provisional ballot envelope with the signature on [an] elector's registration form and, if the signatures are determined to be genuine, shall count the ballot if the county board of elections confirms that the individual did not cast any other ballot, including an absentee ballot, in the election. Id. at § 1210(a.3)(5)(1); and

    l.    The duty to "investigate election frauds, irregularities and violations of [Pennsylvania's Election Code], and to report all suspicious circumstances to the district attorney. Id. at § 302.

117.    Defendant Erie BOE failed to fulfill its duties mandated by statute.

118.    Defendant Erie BOE exhibited mail-in ballot delivery failures affecting up to 17,000 voters in the 2024 election

119.    Defendant Erie BOE sent ballots incorrectly to 365 voters in the 2024 election.

120.    Defendant Erie BOE used mail-in ballots which listed candidates for Pennsylvania State House races applicable for different election districts than those in which the voter was registered in the 2024 election.

121.    The data from Defendant Erie BOE exhibited ballot count discrepancies, precinct-level divergence patterns, and vote-turnout clustering in the 2024 election.

122.    Defendant SOC failed to examine, re-examine, and approve of voting machinery equipment and software used by Defendant Erie BOE in the 2024 election.

123.    The mail-in ballot delivery failures affecting up to 17,000 voters , incorrect ballots sent to 365 voters , ballot count discrepancies , precinct-level divergence patterns , demonstrate that Erie systematically deprived voters of their rights under 52 U.S.C. §10101 to have ballots counted and included in appropriate totals.

124.    As a direct result of their actions and inactions, Defendant Erie BOE systematically impaired Plaintiffs' ability to determine the accuracy of the count and reporting of those votes, depriving them their rights under the laws, in violation of 52 U.S.C. §10101 under 42 U.S.C. §1983.

WHEREFORE, Plaintiffs respectfully demand that this Honorable Court:.

a.    Enjoin and require Defendants SOC and Erie BOE to conduct a full hand recount of all ballots cast in the 2024 election in Erie County;

b.    Enjoin and require that Defendants SOC and Erie BOE determine the accuracy of all vote counts and reports in Erie County in the 2024 election;

c.    Enjoin and require that Defendants SOC and Erie BOE implement procedures satisfactory to the Plaintiffs and to the Court that will ensure all vote counts and reports will be accurate in the future; and

d.    Grant Plaintiffs their attorney fees, expert witness fees and costs in this action, and such other and further relief that the Court deems just.

**COUNT IV – Election Truth Alliance, Kimberly Minardi, Emily Craig-McCurdy, and Lauren Hoffman v. Al Schmidt in his Official Capacity as the Secretary of the Commonwealth and Allegheny County Board of Elections - 52 U.S.C. §10101; 42 U.S.C. § 1983 - Violation of Section 101 of the Civil Rights Act of 1964**

125.    Plaintiffs incorporate by reference the preceding averments of this Complaint.

126.    Each County's Board of Election has the following duties:

e.    To select and equip polling places that meet the requirements of the Election Code, PA Election Code §302(b);

31

    f.   To ascertain any errors in vote counting, and "[i]f any error is detected, the cause of it shall be ascertained and corrected and an errorless count shall be made and certified to by the county board of elections prior to election day." Id. at §1401-A(a) (modified);

    g.   The duty to "compare the signature on [a] provisional ballot envelope with the signature on [an] elector's registration form and, if the signatures are determined to be genuine, shall count the ballot if the county board of elections confirms that the individual did not cast any other ballot, including an absentee ballot, in the election. Id. at § 1210(a.3)(5)(1); and

    h.   The duty to "investigate election frauds, irregularities and violations of [Pennsylvania's Election Code], and to report all suspicious circumstances to the district attorney. Id. at § 302.

127.   Defendant Allegheny BOE exhibited statistically significant fraud parameters in the 2024 Election.

128.   Defendant SOC failed to examine, re-examine, and approve of voting machinery equipment and software used by Defendant Allegheny BOE in the 2024 election.

129.   The ballot count discrepancies, precinct-level divergence patterns and statistically significant fraud parameters identified by expert analysis, demonstrate that Allegheny systematically deprived voters of their rights under 52 U.S.C. §10101 to have ballots counted and included in appropriate totals.

130.   As a direct result of their actions and inactions, Defendant Allegheny BOE systematically impaired Plaintiffs' ability to determine the accuracy of the count and reporting of those votes, depriving them their rights under the laws, in violation of 52 U.S.C. §10101 under 42 U.S.C. §1983.

WHEREFORE, Plaintiffs respectfully demand that this Honorable Court:.

    a.   .Enjoin and require Defendants SOC and Allegheny BOE to conduct a full hand recount of all ballots cast in the 2024 election in Allegheny

County;

b. Enjoin and require that Defendants SOC and Allegheny BOE determine the accuracy of all vote counts and reports in Allegheny County in the 2024 election;

c. Enjoin and require that Defendants SOC and Allegheny BOE implement procedures satisfactory to the Plaintiffs and to the Court that will ensure all vote counts and reports will be accurate in the future; and

d. Grant Plaintiffs their attorney fees, expert witness fees and costs in this action, and such other and further relief that the Court deems just.

Respectfully submitted,

MCNAIR LAW OFFICES, PLLC

By:   _s/ Timothy D. McNair_
          Timothy D. McNair, Esquire
          Pa. ID# 34304
          821 State Street
          Erie, PA 16501
          (814) 452-0700
          (814) 454-2371 (fax)
          tmcnair@mcnairlaw.com