**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ELECTION TRUTH ALLIANCE,** *et al.,* | : | **ELECTRONICALLY FILED** |
| **Plaintiffs,** | : | **CIVIL NO. 1:25-cv-00329** |
| | : | |
| **v.** | : | **HONORABLE SUSAN PARADISE** |
| | : | **BAXTER** |
| **AL SCHMIDT,** in his official capacity as | : | |
| **Secretary of Commonwealth of Pennsylvania,** *et* | : | |
| *al,* | : | |
| **Defendants.** | : | |

**SECRETARY SCHMIDT'S MEMORANDUM OF LAW IN SUPPORT OF**
**HIS MOTION TO DISMISS**

Defendant, Secretary of the Commonwealth Al Schmidt, by and through his undersigned counsel, hereby files this Brief in Support of his Motion to Dismiss the Amended Complaint for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) and failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).

## I.    INTRODUCTION

More than a year after the Secretary's certification of the 2024 Presidential Election and the December 17, 2024 meeting of the 60th Electoral College, Plaintiffs—eight Pennsylvania voters and a purported election integrity group—file their amended complaint against Secretary Schmidt and the Boards of Election ("BOEs") of Allegheny, Cambria, and Erie counties ("County Defendants") to litigate that election based on perceived "anomalies." They allege no particularized injuries, instead alleging only generalized interests that election systems should not be exploited. They seek, *inter alia*, declaratory judgment that the election systems used in the 2024 Presidential Election are not capable of accurately counting and reporting the votes cast and that Defendants failed to follow proper procedures in conducting the election, as well as a hand-count

of ballots cast and an injunction to ensure that Defendants follow the laws in future elections.

Plaintiffs filed this Amended Complaint instead of responding to the arguments in the Secretary's Motion to Dismiss the original complaint, but this attempt, like the first, is legally deficient. First, Plaintiffs have not and cannot establish standing, which divests this Court of subject matter jurisdiction. Second, the case is moot, as the 2024 Election has already been certified. Third, Secretary Schmidt is immune from suit under the Eleventh Amendment. Finally, even if Plaintiffs were to somehow surmount these other fatal defects, Plaintiffs fail to state any claims for which relief can be granted. Accordingly, the Amended Complaint should be dismissed.

## II.    **BACKGROUND**

### A. **Allegations of Amended Complaint**

Plaintiff Election Truth Alliance ("ETA") claims a mission to "protect and enhance the integrity of elections" and purports to have an interest in ensuring that its members' votes are accurately tabulated. Amended Complaint ("Am. Compl."), Dkt. No. 26, ¶ 1. Individual Plaintiffs reside in Allegheny, Cambria, or Erie counties and all claim to have "attempted to cast a vote" in the 2024 Election that was "not given its proper weight" due to "improper manipulation of the counting and reporting of votes." *Id.* ¶¶ 2-9. Plaintiffs allege there to be an "actual controversy regarding the conduct of the vote count" in these counties. *Id.* ¶ 18. Yet absent from the 126-paragraph Complaint is any non-generalized allegation pertaining to the 2024 or upcoming 2026 election. Instead, Plaintiffs assert various perceived issues in each county and then claim there to be "statistically significant abnormal correlations" between turnout and Republican vote share. *Id.* ¶ 58 (Cambria), ¶ 70 (Erie), ¶ 76 (Allegheny).

With respect to state-wide numbers, Plaintiffs make a variety of claims, including asserting that reported unofficial returns changed on the evening of November 5, 2024 and claiming that

there are anomalies that "constitute indicators of potential electoral irregularities." *Id.* ¶¶ 80-85. Plaintiffs make no specific claims of misconduct as to Secretary Schmidt. Indeed, they allege the County Defendants installed software updates certified by a test laboratory accredited by the federal Election Assistance Commission, and that the test laboratory had discretion as to testing the updates. *Id.* ¶¶ 26, 30-32. Nonetheless, Plaintiffs claim that their statistical analysis demonstrates manipulation of the vote count and/or reporting functions, *Id.* ¶¶ 89, 91, which must have resulted "from the improper programming of the voting and counting machines." *Id.* ¶ 92. Plaintiffs then go so far as to request that Defendants examine the software and devices used, conduct a full hand recount of all ballots cast in Plaintiffs' precincts, "determine the accuracy of all vote counts and reports" in Plaintiffs' precincts, and implement procedures that they find satisfactory. *See, e.g.*, *id.* at 29.

Plaintiffs allege that ETA requested that Secretary Schmidt direct a hand count of ballots in Plaintiffs' precincts, and that the Secretary's refusal to do so violated (a) their constitutional right to Equal Protection, (b) the Help America Vote Act and (c) the Pennsylvania Election Code. *Id.* Count I, ¶¶ 95, 98-99. Plaintiffs further assert a claim against Cambria BOE and Secretary Schmidt asserting that Cambria used "untested election machinery and equipment" and that the Secretary failed to "examine, re-examine, and approve" such equipment in violation of Section 101 of the Civil Rights Act of 1964, 52 U.S.C. § 10101, and 42 U.S.C. § 1983. *Id.* Count II, ¶¶ 106, 112-113. Count III asserts a claim that Erie BOE made mistakes with respect to mail ballots and that the Secretary failed to "examine, re-examine, and approve" voting equipment used by Erie in violation of Section 101 of the Civil Rights Act of 1964, 52 U.S.C. § 10101, and 42 U.S.C. § 1983. *Id.* Count III, ¶¶ 115-121. Finally, Count IV claims that Allegheny BOE exhibited "statistically significant fraud parameters" and that the Secretary failed to "examine, re-examine,

and approve" voting equipment used by Allegheny in violation of Section 101 of the Civil Rights Act of 1964, 52 U.S.C. § 10101, and 42 U.S.C. § 1983. *Id.* Count IV, ¶¶ 123-126.

Plaintiffs seek a declaration that the Commonwealth-approved counting and reporting systems used by Defendants (and across the Commonwealth) are not capable of accurately counting and reporting the vote and that Defendants failed to follow proper procedures. Plaintiffs also seek to enjoin: (a) the Secretary to determine the cause of the alleged discrepancies and to direct the Defendant Counties to demonstrate the accuracy of the equipment used; (b) the Defendant Counties to determine the cause of the alleged discrepancies and alleged "mismatches and disappearances of ballots," and take steps to avoid the same in 2026; and (c) all Defendants to ensure compliance with the law.

### B. The 2024 Election

The 2024 Election took place on November 5, 2024. As required by the Pennsylvania Election Code, 25 P.S. § 3031.5(a), all voting systems used for that election by Pennsylvania's 67 counties, including those used in Cambria, Erie and Allegheny, were certified by the United States Election Assistance Commission and approved for use by the Secretary.[1] The Pennsylvania Election Code provides counties with the authority to decide which approved voting system to use. 25 P.S. § 2642(c).

Two post-election audits conducted prior to certification confirmed the accuracy of the unofficial returns for the 2024 Election.[2] On December 4, 2024, Secretary Schmidt certified the

---

[1] The Department of State website provides links to the certifications for the voting systems used in each and every county. *See* Ex 1, Pa. Dep't of State, Voting Systems in Pennsylvania, https://www.pa.gov/agencies/dos/resources/voting-and-elections-resources/voting-systems (last visited Feb. 19, 2026).

[2] Ex. 2, Press Release, Pa. Dep't of State, Post-Election Audits Confirm Accuracy of 2024 General Election (Dec. 2, 2024), *available at* https://www.pa.gov/agencies/dos/newsroom/post-election-audits-confirm-accuracy-of-2024-general-election.

results from Pennsylvania's 67 counties, pursuant to 25 P.S.§ 2621(c). On December 10, 2024, Governor Josh Shapiro signed a Certificate of Ascertainment as required by Federal and Pennsylvania law. 3 U.S.C. § 5; 25 P.S. § 3166.[3] On December 17, 2024, again as required by Federal and Pennsylvania law, 3 U.S.C. § 7; 25 P.S. § 3192, the presidential electors of Donald Trump and JD Vance gathered for the Commonwealth's 60th Electoral College and cast their ballots.[4]

### III.    **STANDARD OF REVIEW**

Under Fed. R. Civ. P. 12(b)(1), a court lacking subject matter jurisdiction over a case must dismiss it. *Kerchner v. Obama*, 612 F.3d 204, 207 (3d Cir. 2010) ("It is axiomatic that standing to sue is a prerequisite to Article III jurisdiction."). The burden of showing that jurisdiction is proper rests upon the party asserting that jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

In ruling on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court must "accept as true the factual allegations in the complaint and draw all reasonable inferences in favor of [the plaintiff]," but "need not accept bald assertions or inferences drawn by the plaintiff if they are unsupported by the facts set forth in the complaint." *Odd v. Malone*, 538 F.3d 202, 207 (3d Cir. 2008). *See also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-57, 570 (2007) (rejecting the "no set of facts" standard); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009) (finding that a complaint must do more than allege the plaintiff's entitlement to relief but rather

---

[3] Ex. 3, Press Release, Pa. Dep't of State, Governor Shapiro Certifies 2024 Presidential Election Results (Dec. 10, 2024), *available at* https://www.pa.gov/agencies/dos/newsroom/governor-shapiro-certifies-2024-presidential-election-results.

[4] Ex. 4, Press Release, Pa. Dep't of State, Nineteen Electors Cast Their Ballots for President-Elect Trump and Vice President-Elect Vance during 60th Pennsylvania Electoral College (Dec. 17, 2024), *available at* https://www.pa.gov/agencies/dos/newsroom/nineteen-electors-cast-their-ballots-during-60th-pennsylvania-el.

'show' such an entitlement via its facts.). The Court need not accept legal conclusions or inferences drawn by a plaintiff if unsupported by the facts set forth in the complaint. *Twombly,* 550 U.S. at 555-56.

### IV.   ARGUMENT

### A. Plaintiffs lack standing.

The Complaint should be dismissed because Plaintiffs lack standing to bring this action. Inquiry into standing "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560 (1992). Standing is a threshold jurisdictional question which a court must address prior to and independent of the merits of a party's claims. *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 102 (1998). Thus, a court only has jurisdiction over a case if the plaintiff has standing to sue. *See Kerchner,* 612 F.3d at 207.

To establish standing, the plaintiff must show he has suffered or will suffer an injury in fact that is caused by the conduct of the defendant and that can be redressed by the court. *Berg v. Obama,* 586 F.3d 234, 239 (3d Cir. 2009) (citing *Taliaferro v. Darby Tp. Zoning Bd.,* 458 F.3d 181, 188 (3d Cir. 2006)). An "injury in fact" is "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan,* 504 U.S. at 560 (internal citations and quotations omitted). A generalized grievance that is "undifferentiated and common to all members of the public" is insufficient to establish standing. *Id.* at 575. As the Supreme Court noted in *Lujan*, a plaintiff lacks standing when he alleges "only harm to his and every citizen's interest in proper application of the Constitution and laws, and seek[s] relief that no more directly and tangibly benefits him than it does the public at large." *Id.* at 573-74. *See also Food and Drug Admin. v. All. for Hippocratic Med.,* 602 U.S. 367, 382 (2024) ("Article III does not contemplate a system where 330 million citizens can come to federal court

whenever they believe that the government is acting contrary to the Constitution or other federal law."); *Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("[W]hen the asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction."). As the Third Circuit has recognized, "[w]hen the alleged injury is undifferentiated and common to all members of the public, courts routinely dismiss such cases as 'generalized grievances' that cannot support standing." *Bognet v. Sec'y Commw. of Pa.*, 980 F.3d 336, 349 (3d Cir. 2020) (citing *United States v. Richardson*, 418 U.S. 166, 173-75 (1974)), *vacated as moot* by *Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021).

 Plaintiffs here do no more than cite generalized and vague grievances about election integrity. These generalized grievances are incapable of conferring standing because the supposed disadvantage derives from claimed actions of state government that affect all voters equally. *See Bognet*, 980 F.3d at 352 (dismissing voters' claim that their votes were "diluted" by certain mailed ballots for lack of standing). *See also Christie v. President of the U.S.*, 532 Fed. Appx. 88, 89 (3d Cir. 2013) (Plaintiff lacked standing to assert claims that President committed treason); *Wood v. Raffensperger,* 981 F.3d 1307, 1314-15 (11th Cir. 2020) (dismissing claim based on interest that "only lawful ballots are counted" as generalized grievance insufficient for standing); *Samuel v. Virgin Islands Joint Bd. of Election*s, Civ. No. 2012-0094, 2013 WL 842946, at *4-5 (D. V.I. March 7, 2013) (dismissing claims regarding alleged failure to use non-certified voting machine).

 Individual Plaintiffs attempt to avoid this problem by averring that each of their votes "was not given its proper weight" due to manipulation of the vote. Am. Compl. ¶¶ 2-9. They also claim that President Trump's vote share in high-turnout precincts (above 50-60%) "demonstrates manipulation" of the vote count, *id.* ¶¶ 89-91, that these statistical "anomalies" resulted in their votes not receiving "appropriate weight," *id.* ¶ 96, and that if the alleged manipulation is not

corrected, voters in lower-turnout precincts "will not be subjected to the same treatment as Plaintiffs." *Id.* ¶ 100. Even if Plaintiffs had actually alleged that they all live in high-turnout precincts with evidence of vote manipulation (they have not), this would still be insufficient to confer standing for an Equal Protection claim. Where the challenged action operates to "'dilute' the influence of all voters in Pennsylvania equally and in an 'undifferentiated' manner and [does] not dilute a certain group of voters particularly," this is a generalized grievance rather than a particularized injury sufficient to confer standing. *Bognet*, 980 F.3d at 356. Here, Plaintiffs' allegations pertain specifically to the 2024 Presidential contest. *See* Am. Compl. ¶¶ 58, 70, 76, 89-91; *see also* Am. Compl. charts at 15, 17, 19, 21-23. The 2024 Presidential contest was a winner-take-all statewide contest, meaning that any alleged vote manipulation would have diluted all voters' votes throughout the state, regardless of where they lived or what the turnout was in their particular precinct. "Put another way, '[a] vote cast by fraud . . . has a mathematical impact on the final tally and thus on the proportional effect of every vote, but no single voter is specifically disadvantaged,'" and thus the alleged dilution is not particularized for standing purposes. *Bognet*, 980 F.3d at 356 (citing *Martel v. Condos*, 487 F. Supp. 3d 247, 253 (D. Vt. 2020)). "The courts to consider this issue are in accord." *Bognet*, 980 F.3d at 357 (collecting cases).

ETA also does not come close to alleging that it has associational or organizational standing. ETA alleges that "[a]s voters," its members "share an interest in making sure their votes are accurately tabulated." Am. Compl. ¶ 1. Again, this is no more than a generalized grievance incapable of creating standing. *See Berg*, 586 F.3d at 239-40. And even if it were sufficient, ETA has not alleged facts sufficient for associational standing. All eight named Plaintiffs aver that they are members of ETA. ETA generally avers that it has members who are registered voters in Pennsylvania, but it does not state whether it has any members who are registered voters in

Pennsylvania—let alone registered voters in the Defendant Counties—other than the named Plaintiffs. To have associational or representational standing, an organization must show that "(1) the organization's members must have standing on their own; [sic] (2) the interests the organization seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires individual participation by its members." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 279 (3d Cir. 2014). If participation by members is required—such as because they are already serving as individual Plaintiffs—then ETA cannot meet the third prong necessary for associational or representational standing.

ETA also alleges that its mission "is to protect and enhance the integrity of elections" and that it and its members have "expended substantial resources in Pennsylvania to investigate, respond to, and publicize election irregularities." Am. Compl. ¶ 1. But this vague statement is insufficient to allege that ETA has sustained an injury in fact, as opposed to having tried to "spend its way into standing." *See All. for Hippocratic Med.*, 602 U.S. at 394; *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 280 (3d Cir. 2014) ("[W]e have also held that a plaintiff by making expenditures to advance litigation does not suffer sufficient damage to support standing."). Without an injury in fact, a "mere interest in a problem, no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to render the organization adversely affected or aggrieved." *Blunt*, 767 F.3d at 279 (internal quotations omitted).

Plaintiffs lack Article III standing. Accordingly, the Complaint should be dismissed.

## B. Challenge to 2024 Election Is Moot

Even if Plaintiffs somehow had standing to contest the 2024 Election, their attempt to do so now is moot. "A case is moot when 'the issues presented are no longer live or the parties lack a

legally cognizable interest in the outcome.'" *United Steel Paper & Forestry Rubber Mfg. Allied Indus. & Serv. Workers Int'l Union AFL-CIO-CLC v. Gov't of Virgin Islands*, 842 F.3d 201, 208 (3d Cir. 2016) (quoting *Cnty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)).

If Plaintiffs believed that ballots were miscounted or that there were discrepancies, they could have filed a petition for recount under the Election Code, 25 P.S. §§ 3154(e), 3261-3263, or an election contest pursuant to 25 P.S. §§ 3291, 3351. The time for doing so has long passed.[5] Moreover, to the extent Plaintiffs contest the race for President, the Electoral Count Act establishes the process by which Congress, not the courts, resolves disputed Electoral College results. 3 U.S.C. § 15. Although "'[t]he power to judge [] the legality of the votes is a necessary consequent of the power to count,'" *Bush v. Gore*, 531 U.S. 98, 154 (2000) (Breyer, J., dissenting) (quoting 18 Cong. Rec. 30 (1886) (remarks of Rep. Caldwell)), under both the Twelfth Amendment and the Electoral Count Act, the power to count and judge belongs solely to Congress. U.S. CONST., Amend. XII; 3 U.S.C. § 15. Plaintiffs' attempt to relitigate the 2024 Election is moot. Secretary Schmidt has certified the results of the 2024 Election; the Electoral College has met and cast their votes, U.S. CONST. Amend. XII; 3 U.S.C. § 7; 25 P.S. § 3192; and Congress has counted the electoral votes. 3 U.S.C. § 15.

Relatedly with respect to justiciability concerns, the relief Plaintiffs seek—"full accountability" from election officials and a hand-count of votes for offices that were filled a year ago—is nothing more than a request for an advisory opinion and therefore "not properly suited for resolution by" the courts. *Rucho v. Common Cause*, 588 U.S.684, 691 (2019)*; see also* Bognet v.

---

[5] A petition for recount must be made to the County BOE prior to the completion of the computation of all returns. 25 P.S. § 3154(e). A petition to open a ballot box or to recanvass must be made no later than five days after completion of the computational canvassing of all returns by the County BOE. 25 P.S. § 3263. An election contest for all offices but Governor and Lieutenant Governor must be filed within twenty days of election day. 25 P.S.§ 3456.

Degraffenreid, 141 S.Ct. 2508 (2021) (directing court of appeals to dismiss constitutional challenge to 2020 General Election as moot); *Ioannidis v. Wolf*, No. 635 M.D. 2020, 260 A.3d 1091, 2021 WL 2834611, at \*6 (Pa. Commw. Ct. July 8, 2021)*, aff'd* No. 56 MAP 2021, 270 A.3d 1110 (Feb. 23, 2022) (dismissing petition challenging results of certified election as moot where petitioner "utterly failed to avail himself" of statutory remedies under Election Code).

## C. The Eleventh Amendment Bars Any Claims Against Secretary Schmidt.

It has been long established that the Eleventh Amendment of the United States Constitution bars all private lawsuits against non-consenting states in federal court. *Karns v. Shanahan*, 879 F.3d 504, 512 (3d Cir. 2018) (citing *Hans v. Louisiana*, 134 U.S. 1 (1890)). Eleventh Amendment immunity "is designed to preserve the delicate and 'proper balance between the supremacy of federal law and the separate sovereignty of the States.'" *Id.* (quoting *Alden v. Maine*, 527 U.S. 706, 757 (1999)). This immunity bars suits against the states and state agencies "regardless of the relief sought." *Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993). A claim against a state government official, in his or her official capacity, is "no different from a suit against the State itself" because it "is not a suit against the official but rather is a suit against the official's office." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).

A plaintiff can overcome Eleventh Amendment immunity in three ways. First, a state may consent to be sued. *Downey v. Pa. Dep't of Corr.*, 968 F.3d 299, 310 (3d Cir. 2020). Pennsylvania, however, has generally withheld its consent to be sued. *Lavia v. Pa. Dep't of Corr.*, 224 F.3d 190, 195 (3d Cir. 2000) (citing 42 Pa. C.S. § 8521(b)). There is no colorable argument here that Pennsylvania has consented to suit.

Second, Congress can, as part of the statute enabling a particular cause of action in certain circumstances, abrogate the states' immunity pursuant to Section 5 of the Fourteenth Amendment.

*Downey*, 968 F.3d at 310. Any such abrogation must be done via a clear legislative statement from Congress and pursuant to a valid exercise of Congress's power over the states. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 55, 58 (1996). However, Section 1983—the vehicle through which all of Plaintiffs' claims here are brought—does not abrogate state officials' Eleventh Amendment immunity, because "states and state officials sued in official capacities are not 'persons' capable of being sued for civil rights violations under § 1983." *Robinson v. Pennsylvania Dep't of Corr.*, 851 Fed. Appx. 289, 291 (3d Cir. 2021) (citing *Will*, 491 U.S. at 71).

Third, under the *Ex parte Young* doctrine, a plaintiff can pursue certain kinds of forward-looking injunctive relief against state officials, notwithstanding Eleventh Amendment immunity, to stop a current violation of federal law. *Will*, 491 U.S. at 71 n.10. This judicially-created doctrine provides a "narrow exception" to Eleventh Amendment immunity. *Seminole Tribe*, 517 U.S. at 76. A claim under the *Ex parte Young* exception allows only prospective declaratory or injunctive relief addressing an ongoing violation of federal law. *MCI Telecomm. Corp. v. Bell Atl. Pa.*, 271 F.3d 491, 506 (3d Cir. 2001). It does not apply to suits for retroactive relief, *Edelman v. Jordan*, 415 U.S. 651, 678 (1974), suits based in state law, *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984), or "where Congress has prescribed a detailed remedial scheme for the enforcement against a State" of the claimed federal right, *Seminole Tribe*, 517 U.S. at 74.

Here, Plaintiffs' claims against Secretary Schmidt cannot fit into the *Ex parte Young* exception because the Complaint does not seek forward-looking relief to address a current and ongoing violation of any Plaintiff's constitutional rights. The Complaint is, at its core, backward-looking—it raises concerns about what Plaintiffs (falsely) believed happened in the 2024 election. But no Plaintiff is suffering ongoing, cognizable harm from the 2024 election that could be remedied by a court order today. In addition to failing to allege any ongoing harms, the

Complaint's requests for relief are backward-looking. Specifically, Plaintiffs seek a recount of 2024 votes and injunctive relief related to the results of that recount. *See* Am. Compl. at 27, 29, 30-31, 32. Needless to say, vote counting for the 2024 Election is over. Neither the facts alleged nor relief sought concern ongoing conduct.[6]

Plaintiffs attempt to plead around immunity by speculating that a hand recount of 2024 ballots *might* reveal an issue, and that issue *might* reoccur in future elections. For example, they aver that they "requested [Secretary Schmidt] to direct a hand count of ballots," which they believe "will demonstrate that the anomalies . . . resulted from improper programming or manipulation of the voting and counting machines." *Id.* ¶ 95. And they further contend that "[i]f the cause of the discrepancies is identified, [Secretary] Schmidt can (and should be required to) . . . ensure that the voting machines . . . comply with the requirements of [federal law]." *Id.* ¶ 97. But speculation about possible ongoing harm is not sufficient for purposes of the *Ex parte Young* exception to immunity. *See Rothermel v. Dauphin Cnty.*, No. 1:16-cv-1669, 2017 WL 4347522, at *6 (M.D. Pa. Sept. 29, 2017) (allegation "postulating that 'some type of breakdown must have occurred'" to allow prior harm did not "articulate an ongoing constitutional harm").

Plaintiffs have attempted to end-run around Eleventh Amendment immunity before by alleging that past harm will be repeated in the future, but courts have consistently rejected it. For example, in *Haagensen v. Pennsylvania State Police*, a plaintiff sought an injunction against a harassment statute that had been used to prosecute her previously and, she alleged, would be used

---

[6] The only relief sought which arguably might relate to ongoing conduct is the request for an order "to ensure compliance with the statutes and laws regarding vote counting in all counties in future elections." *See* Am. Compl. at 27. Aside from being untethered to any alleged ongoing conduct, this vague request for injunctive relief is inappropriate and should be denied. *Louis W. Epstein Family P'ship v. Kmart Corp.*, 13 F.3d 762, 771 (3d Cir. 1994) (noting that "[b]road, non-specific language that merely enjoins a party to obey the law" does not comply with Rule 65).

against her again in violation of her First Amendment rights. No. 08-cv-727, 2009 WL 3834007 (W.D. Pa. Oct. 22, 2009), *report and recommendation adopted as modified*, 2009 WL 3834004 (W.D. Pa. Nov. 16, 2009), *aff'd*, 490 Fed. Appx. 447 (3d Cir. 2012). Dismissing on Eleventh Amendment immunity grounds, the Court held that the plaintiff failed to sufficiently aver that she faced an ongoing threat of prosecution of First Amendment protected conduct and thus there was no "ongoing practice for the Court to enjoin." *Haagensen*, 2009 WL 3834007, at *14-15. More recently, in *Diamond v. Pennsylvania State Education Association*, the Court dismissed a constitutional challenge to a statute requiring teachers to pay union dues in light of new Supreme Court case law, holding that the challengers had "not alleged that Commonwealth Defendants have enforced or continue to enforce [the challenged statute] in an unconstitutional manner." 399 F.Supp.3d 361, 379 (W.D. Pa. 2019), *aff'd* 972 F.3d 262 (3d Cir. 2020). The consistent thread in these cases is that the requirement that harm is ongoing should be read strictly; it requires more than allegations of past harm combined with a belief of future similar harm.[7]

Because of longstanding constitutional limits, federal courts can only enjoin ongoing state conduct that is actively interfering with a plaintiff's rights. Plaintiffs have presented no such ongoing conduct here, so this Court lacks jurisdiction over their complaint against state actors.

**D. The Complaint Fails to State Any Cognizable Claims for Relief.**

Even if Plaintiffs could somehow overcome the defects of their Complaint as detailed above, they have not stated any claim upon which relief can be granted. It is well-established that "'a plaintiff must demonstrate standing for each claim he seeks to press' and 'for each form of

---

[7] Further, stopping another end-run around this end-run, a plaintiff cannot revive a challenge to state conduct that is no longer ongoing by using the "capable of repetition yet evading review" exception to mootness. *See Surina v. S. River Bd. of Educ.*, No. 20-2804, 2022 WL 264464, at *3 (3d Cir. Jan. 27, 2022).

relief that is sought.'" *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)).

While Plaintiffs' precise contentions are unclear, what is clear is that they have not alleged sufficient facts to support a claim against Secretary Schmidt under any of the statutes referenced in the Complaint. Plaintiffs simply claim unspecified "anomalies" in connection with the 2024 Election, along with conclusory allegations that Secretary Schmidt and the County Defendants violated Constitutional and statutory requirements, but without any averments as to how. As the Third Circuit has emphasized, such "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are plainly insufficient. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

1. Plaintiffs fail to state a claim under the Civil Rights Act of 1964.

Title I of the Civil Rights Act of 1964 was "designed to meet problems encountered in the operation and enforcement of the Civil Rights Act of 1957 and 1960, by which the Congress took steps to guarantee to all citizens the right to vote without discrimination as to race or color." H.R. Rep. 88-914 (1963), *reprinted in* 1964 U.S.C.C.A.N. 2391, 2394. Subsection 101(a), relied on by Plaintiffs, Am. Compl. ¶ 22, prohibits: denying the right to vote on account of "race, color, or previous condition of servitude," 52 U.S.C. § 10101(a)(1); applying unequally any "standard, practice, or procedure" to determine voter qualifications "within the same county, parish, or similar political subdivision," *id.* at 10101(a)(2)(A); denying the right to vote based on an immaterial error or omission, *id.* at 10101(a)(2)(B); and most literacy tests, *id.* at 10101(a)(2)(C). For purposes of subsection 101(a), the statute defines the word "vote" as "all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite

to voting, casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast[.]" 52 U.S.C. §§ 10101(a)(3)(A), (e).

Plaintiffs cite generally to Section 101(a), Am. Compl. ¶ 22, so it is unclear which specific subsection they complain has been violated. Nonetheless, it is evident that none of these four provisions are relevant to Plaintiffs' allegations or claims.

Plaintiffs claim that Section 101 guarantees them a "right to vote." Individual Plaintiffs aver that they "attempted to cast a vote" in the 2024 election, but also that their "vote was not given its proper weight." Am. Compl. ¶¶ 2-9. The obvious implication is that they did in fact vote; otherwise, their attempt to vote would have been given no weight at all. Plaintiffs do not allege that they were denied the right to vote on the basis of "race, color, or previous condition of servitude," *see* 52 U.S.C. § 10101(a)(1), or due to an immaterial "error or omission on any record or paper." *See* 52 U.S.C. § 10101(a)(2)(B). Nor do Plaintiffs allege any violation related to determining their qualifications to vote. *See* 52 U.S.C. § 10101(a)(2)(A). And of course, the final provision under Section 101(a)—prohibiting most literacy tests—is clearly inapplicable to anything in the Complaint.

Likewise, ETA avers that its members are registered voters, including in Pennsylvania. Am. Compl. ¶ 1. ETA makes no allegations that its members faced literacy tests or unequal procedures with regard to registration, or that they were denied the right to vote, let alone denied the right to vote based on race or due to an immaterial error or omission.

Plaintiffs next claim a right under Section 101 to "have their votes accurately tabulated and reported," *id.* ¶ 94, or similarly to "have ballots counted and included in appropriate totals." *Id.* ¶ 113. Section 101 confers no such general right. The most that can be said for this claim is that the definition of "vote" for purposes of subsection 101(a) includes "having [one's] ballot counted and

included in the appropriate totals of votes cast." 52 U.S.C. § 10101(e). But the definition does not create a new right or cause of action; it simply tells this court how to construe the word "vote" when used in the statute. *See id.* ("When used in the subsection, the word "vote" includes . . . ."). Thus, for example, Section 101(a)(1)'s prohibition on racial discrimination in voting means that it is not enough for a jurisdiction to allow minority registrants to complete a ballot; the jurisdiction must actually count those ballots, rather than setting them aside and counting only ballots that are completed by white voters.

Finally, Plaintiffs' claimed right "to determine the accuracy of the count and reporting" of votes cast is even further afield. *See* Am. Compl. ¶¶ 121, 126. Section 101 confers no such right, and Secretary Schmidt cannot hazard a guess as to the statutory basis for the claim.

2. Plaintiffs fail to state an Equal Protection claim under the Fifth and Fourteenth Amendments to the United States Constitution.

The Fifth and Fourteenth Amendments' equal protection obligations are treated as indistinguishable. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 217 (1995). "[I]n any equal protection case," plaintiffs must "prove the existence of purposeful discrimination" and "demonstrate that they received different treatment from that received by other individuals similarly situated." *Batson v. Kentucky*, 476 U.S. 79, 93 (1986); *Chambers ex rel. Chambers v. Sch. Dist. of Philadelphia Bd. of Educ.*, 587 F.3d 176, 196 (3d Cir. 2009). "To meet the *prima facie* elements, [a p]laintiff must allege that he was: (1) a member of a protected class; (2) similarly situated to members of an unprotected class; and (3) treated differently from members of the unprotected class." *Green v. Chester Upland Sch. Dist.*, 89 F. Supp. 3d 682, 693 (E.D. Pa. 2015) (citing *Oliveira v. Twp. Of Irvington*, 41 Fed. Appx. 555, 559 (3d Cir. 2002); *Keenan v. City of Philadelphia*, 983 F.2d 459, 465 (3d Cir. 1992)), *aff'd sub nom. A.G. v. Chester Upland Sch. Dist.*, 655 F. App'x 125 (3d Cir. 2016).

Alternatively, a "class of one" theory is available where a plaintiff does not allege membership in a class or group. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). In that case a plaintiff must at least allege that "(1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment." *Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006). *See also Tatel v. Mt. Lebanon Sch. Dist.*, 637 F. Supp. 3d 295, 330-31 (2022) (applying the same elements in a "class of one" case involving a fundamental right).

Plaintiffs allege that they are (a) an organization concerned with election integrity, which has some unspecified number of members who are registered voters in unspecified locations in Pennsylvania, and (b) registered voters living in Allegheny, Cambria, and Erie Counties. Am. Compl. ¶¶ 1-9. Plaintiffs fail to allege that they: (a) have been subject to purposeful discrimination; (b) are members of a protected class, are similarly situated to members of an unprotected class, and have been treated differently from members of an unprotected class; or (c) have been intentionally and without rational basis treated differently from others who are similarly situated. Accordingly, Plaintiffs have failed to allege any necessary predicate for an equal protection claim under either the Fifth or Fourteenth Amendments.

Plaintiffs also fail to allege facts that are relevant and necessary to their claims of vote manipulation. Plaintiffs allege that EAC-accredited test laboratory Pro V&V approved Election Change Orders related to EVS 6.4.0.0 and 6.5.0.0, Am. Compl. ¶¶ 27-28, but they do not allege that Allegheny and Cambria Counties used EVS 6.4.0.0 and 6.5.0.0 in the 2024 general election. Nor could they, as EVS 6.4.0.0 is not certified for use in Pennsylvania, and EVS 6.5.0.0 was examined in June 2025, with the Secretary's certification report issued in February 2026.[8]

---

[8] Ex. 1, Pa. Dep't of State, Voting Systems in Pennsylvania, "Certified Voting Systems -

Plaintiffs allege that Pro V&V approved modifications to Dominion's D-Suite 5.20 system, Am. Compl. ¶ 29, but they do not allege that Erie County used D-Suite 5.20 in the 2024 general election. Nor could they, as only Dominion Democracy Suites 5.17 and 5.5A are approved for use in Pennsylvania, and the Election Assistance Commission did not certify D-Suite 5.20 until February 2025.[9] And Plaintiffs allege that the voting machines used by the County Defendants "contain cellular modems permitting communication with the machines over cellular networks," Am. Compl. ¶ 29, but they do not allege that the machines were actually connected to cellular networks. Nor could they, as the conditions imposed by the Secretary of the Commonwealth for electronic voting system certification include a prohibition that components may not be connected to the Internet or any other modem or network (except a standalone local wired networks), and that all wireless access points (including wireless LAN cards and network adapters) must be uninstalled or disabled.[10]

---

Certified after January 1, 2018," https://www.pa.gov/agencies/dos/resources/voting-and-elections-resources/voting-systems (last visited Feb. 19, 2026); Ex. 5, Pa. Dep't of State, "Report Concerning the Examination Results of Elections Systems and Software EVS 6.5.0.0 . . ." at 1 (Feb. 2, 2026), *available at* https://www.pa.gov/content/dam/copapwp-pagov/en/dos/programs/voting-and-elections/voting-systems/certification/ess%20evs%206.5.0.0%20secretary%27s%20certification.pdf.

[9] Ex. 1, Pa. Dep't of State, Voting Systems in Pennsylvania, "Certified Voting Systems - Certified after January 1, 2018," https://www.pa.gov/agencies/dos/resources/voting-and-elections-resources/voting-systems (last visited Feb. 19, 2026); Ex. 6, U.S. Election Assistance Commission, Democracy Suite 5.20, https://www.eac.gov/voting-equipment/democracy-suite-520 (last visited Feb. 19, 2026).

[10] *See, e.g.*, Ex. 7, Pa. Dep't of State, "Report Concerning the Examination Results of Elections Systems and Software EVS 6300 . . ." at 26 (Jan. 13, 2023), *available at* https://www.pa.gov/content/dam/copapwp-pagov/en/dos/programs/voting-and-elections/voting-systems/certification/EVS-6300-Report-Final-for-website.pdf; Ex. 8, Pa. Dep't of State, "Report Concerning the Examination Results of Elections Systems and Software EVS 6110 . . ." at 24-25 (Feb. 24, 2021), *available at* https://www.pa.gov/content/dam/copapwp-pagov/en/dos/programs/voting-and-elections/voting-systems/certification/Final-Report-EVS-6110-Signed.pdf; Ex. 9, Pa. Dep't of State, "Report Concerning the Examination Results of Dominion Voting Systems Democracy Suite 5.5A . . ." at 41 (Jan. 17, 2019), *available at* https://www.pa.gov/content/dam/

Further, Plaintiffs fail to allege any facts as to how the Secretary engaged in any conduct that would state a claim for relief. Such "bare-bones" allegations are not sufficient. *Fowler,* 578 F.3d at 210. And generalized equal protection claims relating to elections are routinely dismissed. *See, e.g.*, *Rucho v. Common Cause,* 588 U.S. 684, 709, 721 (2019) (redistricting); *Bognet v. Secretary Commonwealth of Pennsylvania,* 980 F.3d 336, 352-60 (3d Cir. 2020) (vote dilution), *vacated as moot* by *Bognet v. Degraffenreid,* 141 S. Ct. 2508 (2021); *Mancini v. Delaware County, PA,* No. 24-2425, 2024 WL 4123785, at *3-4 (E.D. Pa. Sept. 9, 2024) (testing of electronic voting systems); *Pa. Voters Alliance v. Centre Cnty.*, 496 F. Supp. 3d 861, 868-69 (M.D. Pa. 2020) (grant payments for election expenses).

3.  Plaintiffs fail to state a claim under the Help America Vote Act.

There is no private right to enforce a federal statute unless Congress has unambiguously conferred such a right. *Gonzaga Univ. v. Doe,* 536 U.S. 273, 283 (2002). HAVA contains no such provision, instead allowing actions by the Attorney General for declaratory and injunctive relief, 52 U.S.C. § 21111, and requiring states to establish state-based administrative complaint procedures, 52 U.S.C. § 21112.[11]

As the Third Circuit has explicitly recognized, HAVA does not include a private right of action for aggrieved parties. *American Civil Rights Union v. Philadelphia City Commissioners,* 872 F.3d 175, 181 (3d Cir. 2017) ("HAVA does not include a private right of action that allows aggrieved parties to sue nonconforming states."); *id.* at 185 ("[T]he fact that the NVRA provides for a private right of action while the HAVA does not clearly indicates Congress's intent to limit HAVA's enforcement mechanism to preclude a private suit."). *See also Brunner v. Ohio*

---

copapwp-pagov/en/dos/programs/voting-and-elections/voting-systems/certification/Dominion-Democracy-Suite-Final-Report-scanned-with-signature-020119.pdf.

[11] Pennsylvania has established an administrative complaint process. *See* 25 P.S. § 3046.2.

*Republican Party*, 555 U.S. 5 (2008) (per curiam) (respondents were "not sufficiently likely to prevail" on whether HAVA Section 303 contained a private right of action); *Reschenthaler v. Schmidt*, 776 F. Supp. 3d 280, 293-94 (M.D. Pa. 2024) (dismissing HAVA claim for lack of a private cause of action); *Taylor v. Onorato*, 428 F. Supp. 2d 384, 387 (W.D. Pa. 2006) (holding HAVA neither contains private right of action to enforce Section 301 nor creates action against state officials under Section 1983); *Samuel v. Virgin Islands Joint Bd. of Elections,* 2013 WL 842946, at *6 (D. V.I. March 7, 2013) (dismissing claim based upon HAVA requirements).

Furthermore, even if HAVA were privately enforceable, Plaintiffs have not adequately pled any HAVA violations. Plaintiffs point only to Section 301, Am. Compl. ¶¶ 10a, 97, which itself contains numerous requirements. *See* 52 U.S.C. § 21081. Because Plaintiffs claim that machines will not comply with Section 301 in the future if they do not accurately tabulate Plaintiffs' votes, Am. Compl. ¶ 97, Secretary Schmidt assumes that Plaintiffs intend to allege a violation of Section 301(a)(5), pertaining to error rates. That subsection requires a voting system's error rate in counting ballots to "comply with the error rate standards established under section 3.2.1 of the voting systems standards issued by the Federal Election Commission which are in effect on October 29, 2002." 52 U.S.C. § 21081(a)(5). Plaintiffs make no allegations pertaining to the allowable error rate or to the error rate of the systems used by the three County Defendants in the 2024 general election. Instead, they broadly support their claim with "statistical anomalies" based around Republican vote share in the three Defendant Counties, Am. Compl. ¶¶ 58, 70, 76, in a contest that was won statewide and nationwide by a Republican.

Plaintiffs also claim that Secretary Schmidt violated HAVA by not examining or directing the examination of ballot boxes and by not ordering reports from the County Boards of Elections. Am. Compl. ¶¶ 11, 98-99. However, Plaintiffs have not pointed to any such

requirement in HAVA. Instead, Plaintiffs claim that the Secretary's alleged lack of action "prevent[s] the correction of errors affecting the votes Plaintiffs attempted to register." *Id.* ¶ 99. Secretary Schmidt again understands this to be a reference to Section 301(a)(5)'s requirements as to error rates. But Section 306 of HAVA—also in Title III, Subtitle A—is clear that "the specific choices on the methods of complying with the requirements of this subchapter shall be left to the discretion of the State." 52 U.S.C. § 21085. Thus, the methods by which Secretary Schmidt chooses (or does not choose) to comply with Section 301's requirements cannot give rise to any violation of HAVA.

    4.  Plaintiffs fail to state a claim under Pennsylvania's Election Code.

    As stated above at page 10, while the Election Code does provide certain methods by which Plaintiffs could have requested a recanvass of the ballot box or contested an election in the event of suspected fraud or error, Plaintiffs do not and could not aver that they took advantage of any such provisions. The closest they come is an allegation that "ETA requested the [Secretary of the Commonwealth] to direct a hand count of ballots in accordance with PA Election Code § 201(e.1) of the precincts in which Plaintiffs voted." Am. Compl. ¶ 95. But hand counts are neither mentioned in nor required by Section 201, and Section 201(e.1) pertains to receiving information from the county boards "pursuant to regulation." 25 P.S. § 2621(e.1). Pennsylvania law provides specific methods to petition for a recount or contest an election, none of which Plaintiffs availed themselves of. *See* 25 P.S. §§ 3154(e), 3261(b), 3262(a.1), 3263, 3291, 3351.

    Further, Plaintiffs claim that the Secretary violated the Pennsylvania Election Code by failing "to [examine or] direct the examination of any ballot box, to order the County Boards of Elections to submit additional reports, to require the Defendant Counties to identify the cause of the inaccurate reports of votes cast, or to order from the county boards their reports of system

errors and difficulties." Am. Compl. ¶¶ 98-99. As to the first, Plaintiffs cite to no such requirement in the Election Code, The Secretary believes Plaintiffs may intend to refer to Section 201(b) or 201(f.2), cited at Am. Compl. ¶¶ 10(a), 10(f). Section 201(b) confers a duty to "examine and reexamine voting machines, and to approve or disapprove them for use in this state, in accordance with the provisions of this act." 25 P.S. § 2621(b).[12] That provision has nothing to do with the counting of voted ballots, and Plaintiffs fail to cite any provisions of the Election Code that would support the duty alleged, let alone allege that the Secretary violated such a provision. As for Section 201(f.2), it confers a duty "[t]o order a county board to conduct a recount or recanvass of an election under section 1404." But Section 1404 applies only when unofficial returns reflect that a statewide race has a vote margin of 0.5% or less. ; . Plaintiffs have included no allegations that the statewide unofficial returns for the 2024 Presidential election reflected the requisite vote margin.[13]

    As to the remaining complaints, Section 201 gives the Secretary a duty to "receive such reports from county boards of elections as are required by this act, and to demand such additional reports on special matters as he may deem necessary," 25 P.S. § 2621(e), and to receive from them "information on voting system errors or difficulties or other election data pursuant to regulation." 25 P.S. § 2621(e.1). But a duty to receive reports and information does not mean that the Secretary must demand them; rather, the duty to demand additional reports "as [the Secretary] may deem

---

[12] No counties in Pennsylvania use voting machines. All counties use electronic voting systems governed by Article XI-a of the Election Code. See 25 P.S. §§ 3031.1-3031.22.

[13] The Department of State's website shows only the official returns once they are available, but the official vote margin was well over 0.5%. See Ex. 10, Pa. Dep't of State, 2024 Presidential Election (Official Returns), https://www.electionreturns.pa.gov/General/SummaryResults?ElectionID=105&ElectionType=G&IsActive=0 (last visited Feb. 19, 2026) (showing Donald Trump with 50.37% of the vote and Kamala Harris with 48.66% of the vote). There was an automatic recount in the U.S. Senate race between Bob Casey and Dave McCormick. See Ex. 11, Pa. Dep't of State, "Unofficial Results in U.S. Senate Race Trigger Legally Required Automatic State Recount," https://www.pa.gov/agencies/dos/newsroom/unofficial-results-in-u-s--senate-race-trigger-legally-required- (last visited Feb. 19, 2026).

necessary" is permissive rather than mandatory. *See, e.g.*, *U.S. v. Geiser*, 527 F.3d 288, 294 (3d Cir. 2008) ("When determining a statute's plain meaning, our starting point is 'the ordinary meaning of the words used.'"); *A. Scott Enterprises, Inc. v. City of Allentown*, 142 A.3d 779, 787-88 (Pa. 2016) (holding that use of the word "may" is generally permissive, except where the "ends of justice" or "constitutional requirements" demand otherwise). Neither the "ends of justice" nor "constitutional requirements," *id.*, justify finding that the Election Code imposes a duty on the Secretary to require special reports from county boards of elections upon receiving vague, unsubstantiated and untimely allegations of "statistical anomalies."

     5.   Plaintiffs fail to state a claim under Section 1983.

     Section 1983 does not provide any substantive rights to individuals. Rather, it authorizes a person to file a private cause of action against those acting under color of state law for deprivation of rights protected by a federal statute or the U.S. Constitution. *See Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011).

     As an initial matter, Section 1983 grants a cause of action for violations of federal rights, not state law. *See, e.g.*, *Medina v. Planned Parenthood South Atlantic*, 606 U.S. 357, 365 (2025) ("[Section] 1983 allows private parties to sue state actors who violate their rights under the Constitution and laws of the United States.") (internal quotations omitted); *Roman v. County of Chester*, No. 23-1662, 2023 WL 3868371, at *3 n.3 (E.D. Pa. June 7, 2023) ("[S]ection 1983 is a vehicle through which a plaintiff asserts violations of federal statutory and constitutional rights, not violations of state law."). Plaintiffs have pled no other theories for how this Federal Court has jurisdiction to hear a state law claim, so the Court must dismiss Plaintiffs' Election Code claims.

     Furthermore, Plaintiffs' sparse allegations as to supposed irregularities in the 2024 Election constitute no more than "garden variety election irregularities" that are not actionable under

Section 1983. *See Acosta v. Democratic City Comm.*, 288 F.Supp.3d 597, 643-44 (E.D. Pa. 2018) (collecting cases). Only intentional acts or "willful conduct [that] 'undermines the organic process by which candidates are elected'" can be held to violate Section 1983. *Id.* at 644. Plaintiffs claim that Secretary Schmidt's refusal to do certain acts, such as examining ballot boxes and conducting a hand-count of ballots in precincts they deemed to be suspicious, deprived them of their right to Equal Protection guaranteed by the Fifth and the Fourteenth Amendments of the U.S. Constitution, HAVA, and the Pennsylvania Election Code. Am. Compl. ¶¶ 98-99. Yet, as explained throughout this brief, Plaintiffs have not alleged any facts to show any misconduct on the part of Secretary Schmidt or the County Defendants. Nor can Plaintiffs explain how any Constitutional right they have was infringed upon, nor have they identified any provisions of any of the substantive laws they cite to demonstrate that the Secretary failed to take any required action.

## V.    CONCLUSION

Having taken the opportunity to amend their original Complaint, Plaintiffs' Amended Complaint fares no better and is legally deficient for a number of reasons detailed above. First, Plaintiffs lack Article III standing. Second, the attempt to contest an election that has been certified for over a year is moot. Third, the Secretary is immune from suit. Finally, Plaintiffs have not (and cannot) plead any facts to show they are entitled to relief under any cause of action they conclusorily allege. For all of these reasons, the Amended Complaint should be dismissed.

Respectfully submitted,

Date:  February 23, 2026            */s/ Kathleen A. Mullen*
                                    Kathleen A. Mullen (Pa. 84604)
                                    Executive Deputy Chief Counsel
                                    Michelle Rupp (Pa. 337463)
                                    Assistant Counsel
                                    Pennsylvania Department of State

306 North Office Building
Harrisburg, PA 17120
Tel: 717-783-0736
Fax: 717-214-9899
Email: kamullen@pa.gov
        mirupp@pa.gov

## CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2026, I caused the foregoing document to be filed with the United States District Court for the Western District of Pennsylvania via the Court's CM/ECF system, which will provide electronic notice to all counsel and parties of record.

*/s/ Kathleen A. Mullen*
Kathleen A. Mullen