**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ELECTION TRUTH ALLIANCE, *et al.,*** | : | **ELECTRONICALLY FILED** |
| **Plaintiffs,** | : | **CIVIL NO. 1:25-cv-00329** |
| | : | |
| **v.** | : | **HONORABLE SUSAN PARADISE** |
| | : | **BAXTER** |
| **AL SCHMIDT, in his official capacity as** | : | |
| **Secretary of Commonwealth of Pennsylvania, et** | : | |
| **al.,** | : | |
| **Defendants.** | : | |

**ALLEGHENY COUNTY BOARD OF ELECTIONS' MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS**

## I.    INTRODUCTION

The 2024 Presidential Election was held on November 5, 2024. Following the law and standard procedures, Allegheny County conducted required equipment testing before the election and published initial returns in stages as batches of ballots were processed. Democratic nominee Kamala Harris received a majority of votes in Allegheny County, but Republican nominee Donald Trump ultimately won the Commonwealth of Pennsylvania and was elected President. Following Election Day, the Allegheny County Board of Elections conducted a rigorous audit process, as required by the Commonwealth, to ensure the results were accurate. It then certified the County's election results. The Secretary of the Commonwealth subsequently certified the results state-wide. On December 17, 2024, the Electoral College formally elected President Trump as the 47th President of the United States, and he was sworn into office on January 20, 2025.

More than a year after Election Day 2024, more than 11 months after the election was certified, and nearly ten months after President Trump took office, Plaintiffs filed a Complaint apparently seeking to cast doubt on the election results. As explained in Allegheny County's prior motion to dismiss, Dkt. No. 15, the original Complaint failed to establish Plaintiffs' Article III standing to pursue claims against Allegheny County, failed to plausibly allege claims sufficient to show that Plaintiffs were entitled to relief, as required by Rule 8, and failed to allege sufficient facts to state a claim under 42 U.S.C § 1983 or 52 U.S.C § 10101(a). When confronted with this reality, Plaintiffs declined to defend their original filing and instead filed an Amended Complaint. But the Amended Complaint does nothing more than add a few conclusory allegations and seek to recast the requested relief as redressing a future risk, without remedying the fundamental flaws in the original Complaint. As such, Plaintiffs have still failed to demonstrate Article III standing, to plausibly allege claims sufficient to show that they are entitled to relief, and to allege sufficient facts to state a claim under 42 U.S.C § 1983 or 52 U.S.C § 10101(a). For these reasons, the Amended Complaint should be dismissed.

## II.     BACKGROUND

### A. The 2024 Election

The Allegheny County Board of Elections ("the County") is responsible for administering all federal, state, county, and local elections in Allegheny County. The County carries out logic and accuracy testing, canvasses ballots, and conducts any post-election audits or recounts required by statute or directed by the Department of State, among many other duties of election administration.

The County conducts logic and accuracy testing of its election equipment consistent with statutory requirements and the Directive of the Pennsylvania Department of State.[1] Logic and accuracy testing is a set of pre-election processes that ensures that voting machines and other components of a county's voting system are correctly configured before the polls open.[2] Representatives of political parties and organizations that advocate for fair elections can observe logic and accuracy testing. 25 P.S. § 3031.10(d). For the 2024 General Election, Allegheny County's election equipment used Election Systems and Software Inc's (ES&S) EVS 6.3.0.0. The County is only permitted to use software that has been certified by the Secretary of the Commonwealth. 25 P.S. § 3031.5(b)-(c). As of the November 2024 election, EVS 6.3.0.0 was the latest certified version of ES&S software, as EVS 6.5.0.0 was not examined by the Secretary until June 2025 and EVS 6.4.0.0. has never been certified.[3]

In the 2024 General Election, the County canvassed ballots and published initial returns consistent with state statutory requirements. In the Commonwealth, county boards of elections may begin to review and count mail-in and absentee ballots as part of a "pre-canvass" no earlier

---

[1] Ex. 1, *Directive on Logic & Accuracy Testing,* Pennsylvania Department of State (March 7, 2024), https://www.pa.gov/content/dam/copapwp-pagov/en/dos/resources/voting-and-elections/directives-and-guidance/2024-Directive-on-Logic-Accuracy-Testing-3.0.pdf [https://perma.cc/S8RK-5ZJZ].

[2] *Id.*

[3] Ex. 2, *Voting Systems in Pennsylvania*, Commonwealth of Pennsylvania (last visited Feb 22, 2026), https://www.pa.gov/agencies/dos/resources/voting-and-elections-resources/voting-systems (excerpt showing dates of certifications of various voting system software by the Pennsylvania Department of State). The court may take judicial notice of the fact that the Secretary had certified EVS 6.3.0.0 as of November 2024 but had not certified EVS 6.4.0.0 or EVS 6.5.0.0 until after November 2024. *See, e.g.*, *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1223 n.2 (9th Cir. 2004) ("We may take judicial notice of a record of a state agency not subject to reasonable dispute.").

than 7:00 AM on election day. 25 P.S. § 3146.8(g)(1.1).[4] At this pre-canvass, the county board reviews the outer envelope of these mail ballots to evaluate the sufficiency of the declaration of eligibility that the voter must complete and affirms the voter's eligibility. 25 P.S. § 3146.8(3). The board also confirms that the ballots are enclosed in the secrecy envelope. 25 P.S. § 3150.16. The eligible ballots are counted, computed, and tallied by the county board. 25 P.S. § 3146.8(g)(4). The county board must publish those initial returns following the close of the polls at 8:00 P.M. *Id*. However, although counties may begin the pre-canvass at 7:00 AM, voters may return mail ballots until 8:00 PM on election day, 25 P.S. § 3146.8(g)(1)(ii), so any initial returns posted immediately following the close of polls at 8:00 PM are followed by updates as the canvass continues. Thus, as it has in the past, on Election Day in 2024 (hereinafter, "Election Day"), the County posted its first batch of mail ballot results shortly after the polls closed at 8:00 PM. The County then continued to canvass mail ballots that arrived prior to the close of polls at 8:00 PM, and posted those returns online later in the evening or the following day.

Following Election Day, the County participated in two audit processes required by the Commonwealth to affirm the results. First, as required by law, it conducted a 2% statistical recount. 25 P.S. § 3031.17. During this audit, all county boards of elections pull a random sample of either 2% of all ballots cast in all races or a random sample of 2,000 ballots, whichever

---

[4] The term "canvass" refers to the post-election process that aggregates and confirms that all valid ballots cast in the election are accurately counted and included in the final election results. *See Canvassing & Certifying an Election*, U.S. Election Assistance Administration (May 1, 2022), attached as Ex. 3, https://www.eac.gov/sites/default/files/electionofficials/QuickStartGuides/Canvass_and_Certification_EAC_Quick_Start_Guide_508.pdf [https://perma.cc/8GZX-4MLA]. Mail-in and absentee ballots are treated the same for the purposes of the pre-canvass and canvass processes carried out by county boards of elections, and so this brief will refer to both absentee and mail-in ballots as "mail ballots."

number is fewer. *Id*. For Allegheny County it is always 2,000 ballots. The county boards of elections then count those ballots using a different method than they used for the election results, *id*., to ensure the results match with those obtained using the election equipment. Second, the Secretary of the Commonwealth oversees a statewide risk-limiting audit, which is designed to confirm the results of an election with a high degree of statistical confidence.[5] To begin the risk-limiting audit, the Secretary randomly selects one race—in 2024, the race for State Treasurer—and randomly selects specific batches of ballots to audit—in 2024, this included four batches in Allegheny County.[6] For those batches selected in Allegheny County, the County conducted a full hand count to ensure the results matched with those obtained using the election equipment. By employing these two processes, Allegheny County and Pennsylvania ensure that any significant error in the counting of ballots would be identified. Following the audits, the County certified the election results. Nearly a year later, Plaintiffs filed their lawsuit.

### B. Plaintiffs' Allegations Regarding Allegheny County Board of Elections

Plaintiffs make four categories of factual allegations that potentially relate to Allegheny County. First, Plaintiffs allege that the County uses election equipment provided by ES&S. Am. Compl. ¶ 24. They further allege that "software utilized by ES&S . . . and provided to Pennsylvania counties is certified by Pro V&V," and that Pro V&V approved new software versions including ECO 1167 for EVS 6.4.0.0 (ES&S) and ECO 1188 for EVS 6.5.0.0 (ES&S)

---

[5] Ex. 4, *Risk Limiting Audit Directive*, Pennsylvania Dep't of State (Sept. 30, 2022), https://www.pa.gov/content/dam/copapwp-pagov/en/vote/elections/2022-09-30-Risk-Limiting-Audit-Directive.pdf [https://perma.cc/K5JQ-5KCN].

[6] Ex. 5, *November 5, 2024, Risk-Limiting Audit Report*, Pennsylvania Dep't of State, https://www.pa.gov/agencies/vote/elections/post-election-audits/2024-general-rla-report [https://perma.cc/HS48-SSZZ]  which includes a link to a results spreadsheet that shows the results for four Allegheny precincts, not reproduced here due to its large size).

prior to the 2024 General Election. Am. Compl. ¶¶ 26–28. They now allege that "[t]he changes made by the software modifications identified above enabled the introduction of malicious code that changed and/or misreported votes cast" and that "Allegheny Count[y] installed the software updates." Am. Compl. ¶ 31. Contrary to these threadbare allegations and as discussed above,[7] Allegheny County did not use these software versions, and indeed could not have done so because they had not been certified by the Secretary of the Commonwealth at the time of the 2024 election.[8] Plaintiffs do not allege that Allegheny County used non-approved software, and the County did not do so. The judicially-noticeable state agency records contradict Plaintiffs' threadbare allegation that Allegheny County installed software that was not available under state law. Plaintiffs also now allege that "the voting machines operated by Allegheny . . . Count[y] contain cellular modems permitting communication with the machines over cellular networks." Am. Compl. ¶ 23. But they do not allege that the voting machines were actually connected to cellular networks, nor could they.[9]

Second, Plaintiffs allege that certain numbers of ballots and votes were reported at particular times. Specifically, they allege that as of 7:00 PM on November 5, 2024, the County reported mail ballots cast by 219,221 voters, including 144,417 from registered Democrats, 50,519 from registered Republicans, and 24,285 from unaffiliated and other party voters. Am. Compl. ¶ 72. They further allege that after 7:00 PM on November 5, 2024, the County reported

---

[7] *Supra* footnote 3 and accompanying text.

[8] After Allegheny County pointed out in its prior motion that it in fact used EVS 6.3.0.0, Plaintiffs amended their complaint to allege—despite all evidence to the contrary—that Allegheny County "installed the[se] software updates," apparently intending to imply that the updates were not only installed but used.

[9] *See* Brief of Secretary Schmidt in Support of Motion to Dismiss, ECF 28, p. 19, and n. 10, incorporated here by reference.

227,611 mail-in votes counted, including 164,979 votes for Harris, 59,740 for Trump, 1,968 for

other party candidates, and 924 write-ins. Am. Compl. ¶ 73. The Amended Complaint describes

a "net addition of 1,203 mail-in ballots between 7 PM EST and final results." Am. Compl. ¶ 74.

Plaintiffs also allege that "[o]ther party and unaffiliated votes decreased by 23,155 relative to the

number of ballots returned by registered voters in those categories," Am. Compl. ¶ 74, an

apparent reference to the fact that most unaffiliated and third-party voters did not cast votes for

unaffiliated and third-party candidates.

Third, Plaintiffs allege statistical anomalies. They allege that an unnamed statistical

analysis identified abnormal correlations between turnout and Republican vote share, Am.

Compl. ¶¶ 75-76, and, unlike in the original Complaint, add the conclusory statement that

"[t]hese discrepancies resulted from improper programming of the voting machines and

manipulation of the voting and reporting processes resulting from manipulation of the software

used, and affected Plaintiffs' votes." Am. Compl. ¶ 77. In addition, Plaintiffs allege that an

unnamed analysis model developed by Professor Walter Mebane identified Allegheny County as

having a "manufactured votes parameter of 0.238 [0.089, 0.340]," Am. Compl. ¶¶ 78-79.

Plaintiffs do not explain what a manufactured vote parameter represents. The Amended

Complaint pleads in conclusory fashion, without explanation or justification, that this result

"indicat[es] improper counting of the votes cast." Am. Compl. ¶ 79.

Fourth, Plaintiffs allege that the statewide election results exhibit statistical irregularities,

including trends similar to those it alleges in Allegheny County, with a correlation between

turnout and Republican presidential candidate vote share across the state. Am. Compl. ¶¶ 85-91.

The Amended Complaint includes the conclusory assertion that these findings "demonstrate

manipulation of the vote count or reporting," Am. Compl. ¶ 91, an upgrade from the prior

assertion that they warrant investigation, Original Compl. ¶ 79. The Amended Complaint goes

on to allege, upon information and belief, that these alleged anomalies "result from the improper

programming of the voting and counting machines, and altered the manner in which the

Plaintiffs' votes were counted. The counting of fraudulent votes diminished the weight of

Plaintiffs' votes and altered the outcome of the election." Am. Compl. ¶ 92.

## III.    LEGAL STANDARD

A court lacking subject matter jurisdiction over a case must dismiss it pursuant to Federal

Rule of Civil Procedure 12(b)(1). *Kerchner v. Obama,* 612 F.3d 204, 207 (3d Cir. 2010) ("It is

axiomatic that standing to sue is a prerequisite to Article III jurisdiction."). "The person asserting

jurisdiction bears the burden of showing that the case is properly before the court." *Packard v.

Provident Nat. Bank*, 994 F.2d 1039, 1045 (3d Cir. 1993).

When deciding a motion to dismiss a complaint for failure to state a claim pursuant to

Federal Rule of Civil Procedure 12(b)(6), a court must accept as true all well-pled facts in the

complaint but may disregard legal conclusions. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210

(3d Cir. 2009). The court need not assume the truth of "mere conclusory statements" *Iqbal*, 556

U.S. at 678, or "unwarranted factual inferences," *Children's Health Def., Inc. v. Rutgers, the

State Univ. of New Jersey*, 93 F.4th 66, 74 (3d Cir. 2024).

A complaint must be dismissed if it does not allege "enough facts to state a claim to relief

that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 570 (2007). In other

words, a claim must be not merely "conceivable" but "plausible." *Ashcroft v. Iqbal*, 556 U.S. 662,

680 (2009). Thus, it is not sufficient to allege facts that could be consistent with unlawful action,

where the alleged facts are "more likely explained by[] lawful" action. *Id.* (citing *Twombly*, 550

U.S. at 567).

## IV.    ARGUMENT

### A.  Plaintiffs Lack Standing

To invoke this Court's jurisdiction, a plaintiff must meet the "irreducible constitutional minimum" of Article III standing by establishing three elements: (1) "that she has suffered an 'injury in fact' which is 'concrete and particularized' and 'actual or imminent'"; (2) "that the injury is 'fairly traceable to the challenged action of the defendant'"; and (3) "that it is likely 'that the injury will be redressed by a favorable decision.'" *Potter v. Cozen & O'Connor*, 46 F.4th 148, 154 (3d Cir. 2022) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). Plaintiffs fail to allege that they meet any of these three elements.

#### 1.  *Plaintiffs Have Failed to Allege a Concrete and Particularized Injury*

To be particularized, an injury must "affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1. A mere "generalized grievance" that affects the plaintiff no differently from the public at large is not sufficient. *Common Cause of Pennsylvania v. Pennsylvania*, 558 F.3d 249, 258 (3d Cir. 2009). In the election context, courts have made clear that although a "person's right to vote is individual and personal in nature[,] . . . this right does not give plaintiffs carte blanche to challenge any action that conceivably infringes upon that right." *Pennsylvania Voters All. v. Ctr. Cnty.*, 496 F. Supp. 3d 861, 868 (M.D. Pa. 2020) (collecting cases). An allegation that a Defendant's policy could result in the inclusion of fraudulent votes is insufficient to establish a particularized injury where there is a theoretical "mathematical impact on the final tally and thus on the proportional effect of every vote, but no single voter is specifically disadvantaged.'" *Bognet v. Sec'y Commonwealth of Pennsylvania*,

980 F.3d 336, 356 (3d Cir. 2020) (vacated as moot[10]) (collecting cases); *see also*, *Bowyer v. Ducey*, 506 F. Supp. 3d 699, 712 (D. Ariz. 2020).

Here, Plaintiffs' theory of harm is not that the County prevented them from casting their ballots or failed to count their ballots. Although Plaintiffs' Amended Complaint adds a few conclusory assertions that Plaintiffs' votes were inaccurately counted and reported, Am. Compl. Introduction, their apparent theory of harm remains that because they observed certain purported anomalies in the Allegheny County results, fraudulent votes must somehow have been included in the count and diluted the "weight" of Plaintiffs' votes. Am. Compl. ¶¶ 3, 5, 6, 18, 92. This generalized grievance falls short of a particularized harm sufficient to establish an injury in fact. *See Forman v. Schmidt*, No. 2:24-CV-266, 2025 WL 1207739, at *2 (W.D. Pa. Apr. 25, 2025) (concluding that allegations about vulnerable voting machines and the possibility of disenfranchisement were generalized grievances where plaintiff failed to allege that she was prevented from voting or that her vote was not counted). Even an allegation that fraudulent votes were included in the count falls short of establishing particularized harm because such inclusion would dilute the votes of all Pennsylvania voters equally. *Bognet*, 980 F.3d at 356 (3d Cir. 2020); *Bowyer*, 506 F. Supp. 3d at 712.

Under the Equal Protection Clause of the Fourteenth Amendment, "[t]he key inquiry for standing is whether the alleged violation of the right to vote arises from an invidious classification—including those based on 'race, sex, economic status, or place of residence within

---

[10] A decision vacated as moot does not bind this court, but its analysis may still provide persuasive authority. *See Polychrome Int'l Corp. v. Krigger*, 5 F.3d 1522, 1534 & n.30 (3d Cir. 1993) (noting that a prior decision vacated as moot was not binding, but finding it persuasive); *In re W.R. Grace & Co.*, 475 B.R. 34, 156 (D. Del. 2012) ("Vacation of a decision only affects its binding authority on subsequent courts—the internal discussion remains useful for persuasive authority purposes.").

a State'—to which the plaintiff is subject and in which 'the favored group has full voting strength and the groups not in favor have their votes discounted.'" *Bognet*, 980 F.3d at 358 (quoting *Reynolds v. Sims*, 377 U.S. 533, 555 n.29, 561 (1964)). In other words, for standing purposes "a disadvantage to the plaintiff exists only when the plaintiff is part of a group of voters whose votes will be weighed differently compared to another group." *Id.*

Here, Plaintiffs never allege that they were part of a disadvantaged group. The closest they come is their allegation that in future elections, "the manner and effectiveness of their votes will be *dependent on where they live*." Am. Compl. ¶ 100 (emphasis added). Plaintiffs' theory appears to be that if a county failed to adequately test its equipment, its voters would be more susceptible to inclusion of fraudulent votes. Plaintiffs also appear to believe that such inclusion is more likely in precincts with high turnout. Am. Compl. ¶ 100. This is insufficient to allege a concrete and particularized injury for at least three reasons. First, Plaintiffs never allege any specific failure to test equipment, nor any other violation of state election law, by the County, nor could they.[11] Thus, Allegheny voters have no basis to allege they were treated unequally or will be treated unequally in the future. Second, Plaintiffs allege that the same statistical irregularities that purportedly occurred in Allegheny County, occurred "across all Pennsylvania counties that contain a large number of precincts above and below 60% turnout." Am. Compl. ¶¶

---

[11] Plaintiffs include the conclusory allegation that "[a]s a result of their actions and inactions in failing to test and verify the accuracy of the counting machinery and to identify the causes of the inaccurately reported results, Defendant County Boards of Elections for Cambria, Erie, and Allegheny will permit the manufacture, disappearance, manipulation and/or theft of votes in the 2026 election in which Plaintiffs will again attempt to vote, offsetting and rendering null and void the votes they will attempt to cast." Am. Compl. ¶ 102. However, given that Plaintiffs have not alleged the County failed to test its equipment in 2024, it is, at best, highly speculative to suggest that the County will fail to do so in future elections. Such an allegations falls far short of establishing the "imminent" harm required for an injury in fact. *See, e.g.*, *Lake v. Fontes*, 83 F.4th 1199, 1204 (9th Cir. 2023).

89-90. This allegation undermines any suggestion that fraud was more likely in some counties than others, and therefore could impact Plaintiffs differently depending on where they live. And third, even if the software used in some counties or precincts had increased the risk that fraudulent ballots could be included in the results, the addition of such fraudulent ballots would have "impact[ed] the entire electorate equally; not just voters in the county [or precinct] where it occur[ed]," rendering Plaintiffs' allegations a generalized grievance rather than a particularized harm. *Donald J. Trump for President, Inc. v. Boockvar*, 493 F. Supp. 3d 331, 387 (W.D. Pa. 2020).

In their Amended Complaint, Plaintiffs add a new alleged harm: the prospective future harm of having their votes "offset" or "render[ed] null" by manipulation of the votes in 2026. Am. Compl. ¶ 102. Although future harm can sometimes rise to the level of an injury in fact, it must be "imminent" and "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Here, where Plaintiffs have not alleged that Allegheny County failed to adequately test its equipment prior to the 2024 election and have provided no reason to believe it will fail to do so prior to the 2026 election, that alleged future harm is too speculative to rise to the level of "certainly impending" or even to demonstrate that a "substantial risk that the harm will occur," *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). *See also Lake v. Fontes*, 83 F.4th 1199, 1203 (9th Cir. 2023).

Because Plaintiffs have failed to allege a concrete and particularized injury, they lack standing and their claims against Allegheny County must be dismissed.

### 2. *Plaintiffs Have Failed to Allege that Any Injury was Caused by Allegheny County Board of Elections.*

Even if Plaintiffs had alleged an injury in fact, they would still lack standing to bring claims against the County because they have failed to allege that such injury was *caused* by Allegheny County Board of Elections.

Causation, for purposes of Article III standing, "requires the alleged injury to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Finkelman v. Nat'l Football League*, 810 F.3d 187, 193 (3d Cir. 2016) (internal quotation marks omitted). "This requirement is akin to but for causation in tort." *Id.* (internal quotation marks omitted).

Here, Plaintiffs have failed to allege any action or inaction by the County that in any way caused injury to Plaintiffs. The Amended Complaint includes the conclusory assertion that "[a]s a result of their actions and inactions in failing to test and verify the accuracy of the counting machinery and to identify the causes of the inaccurately reported results, Defendant County Boards of Elections for Cambria, Erie, and Allegheny will permit the manufacture, disappearance, manipulation and/or theft of votes in the 2026 election in which Plaintiffs will again attempt to vote, offsetting and rendering null and void the votes they will attempt to cast." Am. Compl. ¶ 102. But Plaintiffs do not actually allege that the County failed to test and verify the accuracy of the counting machinery prior to the election or that they have any reason to believe it will do so in the future. Plaintiffs also do not allege that any action or inaction by the County caused the alleged "statistical anomalies," or that the County's reporting of election results on or after Election Day in any way caused injury to Plaintiffs.

Because Plaintiffs fail to allege that any action or inaction by the Allegheny County Board of Elections caused them any injury, they lack standing to bring claims against the County and those claims must be dismissed.

### 3. *A Favorable Decision Would Not Redress Plaintiffs Alleged Injuries*

Plaintiffs filed their original Complaint more than a year after Election Day 2024, and more than eleven months after the election was certified. Even if Plaintiffs had legitimate concerns about the conduct of the 2024 General Election, they waited far too long to file their Complaint. There is no longer a live controversy and a favorable decision from this Court would not redress any injury to Plaintiffs.[12]

The redressability prong of Article III standing "looks forward to determine whether the injury will be redressed by a favorable decision." *Freeman v. Corzine*, 629 F.3d 146, 153 (3d Cir. 2010) (internal quotation marks omitted). "Redressability is not a demand for mathematical certainty, but it does require a substantial likelihood that the injury in fact can be remedied by a judicial decision." *Id.* (internal quotation marks omitted).

To the extent Plaintiffs believed that their votes had not been properly counted or that the election results were somehow fraudulent, they could have filed a petition for recount under the Election Code, 25 P.S. §§ 3154(e), 3261-3263, or an election contest pursuant to 25 P.S. §§ 3291, 3351. But they did not, and the time to do so has long since passed.[13]

---

[12] The analysis here is similar to that for mootness. "[A]n issue is moot if changes in circumstances that prevailed at the beginning of the litigation have forestalled any occasion for meaningful relief." *Ordonez-Tevalan v. Att'y Gen. of United States*, 837 F.3d 331, 339–40 (3d Cir. 2016). Here, however, there was no occasion for meaningful relief at the time the original Complaint was filed. As such, exceptions to mootness are not applicable. *See Renne v. Geary*, 501 U.S. 312, 320 (1991) ("While the mootness exception for disputes capable of repetition yet evading review has been applied in the election context, . . . that doctrine will not revive a dispute which became moot before the action commenced."); *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 191 (2000) ("[I]f a plaintiff lacks standing at the time the action commences, the fact that the dispute is capable of repetition yet evading review will not entitle the complainant to a federal judicial forum.").

[13] A petition for recount must be made to the county board of elections prior to the completion of the computation of all returns. 25 P.S. § 3154(e). A petition to recanvass must be made no later than five days after completion of the computational canvassing of all returns by the County

Plaintiffs tacitly acknowledge that it is too late to correct any errors they perceive to have occurred in the 2024 election, instead seeking primarily forward-looking relief that would not redress their past alleged injuries. The relief Plaintiffs request against the County reinforces the conclusion that they are not entitled to any relief that could redress their alleged harms.

The requested relief falls roughly into five buckets. First, Plaintiffs request that "the Court declare . . . the counting and reporting systems used by Defendants in the 2024 general election are not capable of accurately counting and reporting the votes cast" and that "all Defendants BOEs failed to follow proper procedures in conducting the 2024 general election which failures affected the weight of the votes attempted to be cast by Plaintiffs." Am. Compl. ¶ 103. For standing purposes, a declaratory judgment can provide redress only where it "completely resolve[s] a concrete controversy susceptible to conclusive judicial determination." *Lutter v. JNESO*, 86 F.4th 111, 128 (3d Cir. 2023)). Here, Plaintiffs have not even alleged that the County failed to follow proper election procedures. But regardless, such a declaration at this late stage would do nothing to redress any alleged errors that occurred in the conduct of the 2024 election let alone to completely resolve any alleged harm.

Second, Plaintiffs request that the Court "direct the Defendant County Boards of Elections to perform [an] examination" "to determine the cause of the discrepancies between votes cast and votes reported" "including, if necessary, the hand counting of sufficient ballots to demonstrate the accuracy of the equipment used." Am. Compl. ¶ 103 But Plaintiffs cite no statutory or constitutional provision entitling them to this relief.[14] As discussed, Pennsylvania

---

BOE. 25 P.S. § 3263. An election contest must be filed within twenty days of election day. 25 P.S.§ 3456.

[14] As noted, state law does create mechanisms for requesting a recount. *See supra* Footnote 13. But Plaintiffs do not request relief under those state statutes and the deadlines to do so have long since passed.

law requires rigorous post-election audit processes that ensure the voting systems tabulated the paper ballots correctly. Plaintiffs' requested relief would be duplicative of the audit process already conducted and required by law. Regardless, given that the election has long since been certified, President Trump has taken office, and Plaintiffs do not seek to have the election decertified, any errors identified in a hand count could not be remedied and such a hand count would to nothing to redress any injury Plaintiffs allege.

Third, Plaintiffs request that the Court "require that the Defendant BOEs determine the cause of the discrepancies between votes actually cast and votes reported and take all necessary steps to avoid a repetition of the inaccurate recording and reporting of votes in the 2026 general election," Am. Compl. ¶ 103, and "require that the Defendant BOEs explain the mismatches and disappearances of ballots in the 2024 presidential election and enjoin the Defendant BOEs to undertake all necessary steps to avoid repetition of the conditions that led to the inaccurate recording and reporting of votes in the 2024." Am. Compl. ¶ 103. But neither an explanation of Defendants' conduct nor steps to avoiding inaccuracies in 2026 would do anything to remedy any alleged vote dilution or denial, and, as explained above, Plaintiffs allegations of risks to the 2026 election are too speculative to amount to an injury in fact that could be redressed by this Court.

Fourth, Plaintiffs request that the Court "enjoin and require that . . . Allegheny BOE implement procedures satisfactory to the Plaintiffs and to the Court that will ensure all vote counts and reports will be accurate in the future." Am. Compl. ¶ 126. Plaintiffs provide no legal justification, nor could they, for their assertion that they should be permitted to determine the procedures that the County will follow in future elections. Such a request is patently absurd—the

County is required to follow the procedures dictated by state law, including mandatory directives of the Pennsylvania Department of State, not those concocted by an outside organization or even well-meaning Allegheny County voters. Moreover, Plaintiffs have not alleged that the County failed to follow proper procedures and even if they had, enjoining the County to follow proper procedures in the future would not redress any alleged harm that occurred in the 2024 General Election.

Finally, Plaintiffs request that the Court enjoin "all Defendant BOEs to ensure compliance with the statutes and laws regarding vote counting in all counties in future elections." Am. Compl. ¶ 103. Again, Plaintiffs do not allege that the County violated any law. The County is already required to comply with all statutes and laws regarding vote counting, and such a general injunction to follow the law in future elections would not redress any alleged harm that occurred in the 2024 General Election.

As demonstrated by the requested relief, Plaintiffs do not seek, nor could they seek, relief that would redress any alleged injury they experienced as a result of the administration of the 2024 General Election. Plaintiffs did not follow state law procedures for requesting a recount or challenging an election and instead waited a year to file this case in federal court. Nor can they manufacture redressability by pointing to the speculative risk that fraud will occur in 2026. Because this Court cannot meaningfully redress any alleged injury in fact, Plaintiffs lack standing and the Amended Complaint must be dismissed.

**B. Plaintiffs Have Not Plausibly Alleged Claims Sufficient to Show that They Are Entitled to Relief, as Required by Rule 8.**

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This pleading standard "does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-

harmed-me accusation." *Iqbal*, 556 U.S. at 678 (2009) (internal quotation marks omitted). "Conclusory" allegations are "not entitled to be assumed true." *Id.* at 681. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* at 678 (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

Here, Plaintiffs' Amended Complaint contains no allegation that the County took any action or adopted any policy that caused harm to Plaintiffs or that violated any law. Thus, the alleged facts do not allow the court to draw the reasonable inference that the County is liable for any misconduct and Plaintiffs claims are facially insufficient.

But even setting aside Plaintiffs' failure to allege misconduct by the County, Plaintiffs' factual allegations are insufficient to meet the plausibility standard set out by the Supreme Court. In *Twombly*, the Supreme Court considered a claim that telecommunications providers had engaged in a conspiracy not to compete in violation of the Sherman Act. The complaint alleged that the defendants' "parallel course of conduct . . . to prevent competition and inflate prices was indicative of the unlawful agreement alleged." *Iqbal*, 556 U.S. at 679–80 (describing *Twombly*). The Court, however, concluded that the factual allegation of a parallel course of conduct was not sufficient to render the claim of conspiracy plausible because parallel conduct was "not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior." *Id.* at 680. The same is true here. Even if Plaintiffs' factual allegations could be

consistent with fraud or misconduct, they are also consistent with, and indeed more likely explained by, lawful conduct. Further, it does not help Plaintiffs that, in their Amended Complaint, they have added several new assertions that votes were improperly counted. These assertions amount to mere conclusory allegations and are not entitled to be assumed true.

To start with, Plaintiffs' factual allegations related to the timing of reported votes, Am. Compl. ¶¶ 72–74, are likely explained by—and indeed are the clear result of—lawful conduct. Plaintiffs allege that Allegheny County reported most mail ballots around the time the polls closed, and that the number of votes increased somewhat in the final tally. This is clearly explained by the fact that the County received additional mail ballots on the afternoon of Election Day that were not processed until after the polls had closed. Similarly, Plaintiffs' allegation that "other party and unaffiliated votes decreased by 23,155 relative to the number of ballots returned by registered voters in those categories," Am. Compl. ¶ 74—an apparent reference to the fact that most unaffiliated and third-party voters did not cast their votes for unaffiliated or third-party candidates—is entirely consistent with most third-party and unaffiliated voters casting their votes for the Republican and Democratic party nominees, as is typical in most presidential elections. These allegations do not even suggest misconduct, let alone render it plausible.

Next, to the extent that Plaintiffs attempt to explain the alleged "statistical anomalies" identified in the Amended Complaint, those supposed "anomalies" are also consistent with and more likely explained by lawful conduct. The allegation that turnout was positively correlated with Republican vote share, Am. Compl. ¶ 76, appears entirely consistent with an election in which Republican voters turned out at higher rates than Democratic voters. Without more, this correlation does not suggest fraud or misconduct. Plaintiffs' new conclusory allegation that

"[t]hese discrepancies resulted from improper programming of the voting machines and manipulation of the voting and reporting processes resulting from manipulation of the software used, and affected Plaintiffs' votes," Am. Compl. ¶ 77, does not change this analysis. Plaintiffs provide no basis for their assertion that the discrepancies *resulted from* voting machine and software manipulation, and the court need not credit it. *See, e.g.*, *In re Hansen Nat. Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1155–56 (C.D. Cal. 2007) (Rejecting the inferences plaintiffs suggested should be drawn from statistical analysis and granting motion to dismiss where plaintiffs failed to explain why the statistical results should give rise to the alleged inference).

Similarly, Plaintiffs' allegation that an unnamed model created by Professor Walter Mebane identified Allegheny County with "a manufactured votes parameter of 0.238 [0.089, 0.340], where the entirely positive credible interval indicates patterns inconsistent with normal electoral behavior," Am. Compl. ¶¶ 78–79, appears to be consistent with lawful conduct. No related misconduct is alleged, aside from the new assertion that this statistical result indicates "improper counting of the votes cast." Am. Compl. ¶ 79. Plaintiffs do not even attempt to explain what a "manufactured vote parameter" represents, what study it came from, or how or to what extent it could indicate improper counting of votes. The conclusory allegation that this particular statistic indicates improper counting of votes is not entitled to the presumption of truth. *See, e.g.*, *Wynn v. NBC, Inc.* 234 F.Supp.2d 1067, 1102 (C.D.Cal.2002) ("It is inappropriate . . . for a party to make a conclusory statistical inference as the foundation for its claim, and not provide the Court with any indication of the basis for that inference."); *In re Passenger Vehicle Replacement Tires Antitrust Litig.*, 767 F. Supp. 3d 681, 735 (N.D. Ohio 2025) ("Plaintiffs do not . . . cite any cases in which a court has accepted as true an unsupported legal conclusion

20

simply because it was alleged to be the end-result of an undisclosed statistical analysis. This Court is not inclined to be the first.").[15]

Even assuming the unnamed study correctly identified unusual statistical results, this is hardly surprising or evidence of misconduct in a presidential election that was far from "normal." Anyone who lived through the 2024 election in Pennsylvania—which featured novel campaign tactics, the withdrawal of a major party nominee shortly before the election, and significant shifts in voting coalitions, among other anomalies—could have predicted that the 2024 results would not perfectly match with past "normal electoral behavior." Without more, a single unexplained statistic affirming that the 2024 election was not "normal" is entirely consistent with and likely explained by lawful election administration.

Because the alleged facts do not allow the Court to draw the reasonable inference that the County is liable for any misconduct, and because all of Plaintiffs' factual allegations are consistent with and likely explained by lawful conduct, Plaintiffs have not plausibly alleged claims sufficient to show that they are entitled to relief. Their claims must be dismissed.

### C. Plaintiffs Have Failed to State a Claim Under 42 U.S.C § 1983.

---

[15] *See also In re Hansen Nat. Corp. Sec. Litig.*, 527 F. Supp. 2d at 1155–56 (Rejecting the inferences plaintiffs suggested should be drawn from statistical analysis and granting motion to dismiss where plaintiffs failed to define their terms or explain why the statistical results should give rise to the alleged inference); *Wolfe v. Aspenbio Pharma, Inc.*, No. 11-cv-165, 2012 WL 4040344, at *7 (D. Colo. Sept. 13, 2012) (rejecting statistical conclusion at the pleadings stage because it was "wholly conclusory and unsupported by any actual facts"), aff'd, 587 F. App'x 493 (10th Cir. 2014); *United States ex rel. Customs Fraud Investigations, LLC. v. Victaulic Co.*, 839 F.3d 242, 269–70 (3d Cir. 2016) (Fuentes, J. concurring) ("[W]e act contrary to *Twombly* and *Iqbal* when we refuse to ask whether statistical evidence actually supports a plausible inference of wrongdoing at all, particularly when a complaint rests on statistical evidence alone. In the words of one observer, '[s]tatistical studies are neither magic nor snake oil, and the experts neither sorcerers nor (generally speaking) charlatans. Rather, what legal actors need to do is treat statistical studies critically.' Just so—even at the motion to dismiss stage.").

A claim under Section 1983 must include two essential elements: "(1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Schneyder v. Smith*, 653 F.3d 313, 319 (3d Cir. 2011). "[G]arden variety election irregularities" are not actionable under 42 U.S.C. § 1983. *See Acosta v. Democratic City Comm*., 288 F.Supp.3d 597, 643 (E.D. Pa. 2018) (collecting cases). Only intentional acts or "willful conduct [that] undermines the organic process by which candidates are elected" can be held to violate Section 1983. *Id.* (internal quotation marks omitted). Furthermore, where a claim is against a local government, "it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997). Rather, the plaintiff must also show that "through its deliberate conduct, the municipality was the moving force behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.* (internal quotation marks omitted).

Here, Plaintiffs have not alleged that the Allegheny County Board of Elections undertook any intentional acts or willful conduct that undermined the election process. They similarly have not alleged that the County engaged in deliberate conduct that in any way caused an injury to Plaintiffs, let alone that the County's conduct was the "moving force" behind such injury. As such, Plaintiffs have failed to state a claim against the County under 42 U.S.C § 1983.

**D.  Plaintiffs Have Failed to State a Claim Under 52 U.S.C § 10101(a).**

It is unclear in Plaintiffs' Amended Complaint whether they seek to state a claim independently under 52 U.S.C § 10101(a).[16] Regardless, they have failed to allege facts sufficient to support such a claim against the County.

The Amended Complaint does not specify to which portion of Section 10101(a) it refers. Because the Amended Complaint contains no allegations relating to determinations about eligibility or qualification to vote or about the use of literacy tests, 52 U.S.C § 10101(a)(2) is irrelevant. Therefore, Plaintiffs must be seeking to state a claim under 52 U.S.C § 10101(a)(1). That section provides:

> All citizens of the United States who are otherwise qualified by law to vote at any election by the people in any State, Territory, district, county, city, parish, township, school district, municipality, or other territorial subdivision, shall be entitled and allowed to vote at all such elections, without distinction of race, color, or previous condition of servitude; any constitution, law, custom, usage, or regulation of any State or Territory, or by or under its authority, to the contrary notwithstanding.

The provision is clearly targeted at preventing discrimination in voting on the basis of race, color, or previous condition of servitude, which Plaintiffs do not allege here. However, even setting that aside, to state a claim against the County, Plaintiffs would have to allege that

---

[16] Plaintiffs' intentions are also unclear with regard to their attempt to plead a claim under the "Help America Vote Act" of 2002 ("HAVA"), 42 U.S.C. §1481. Plaintiffs caption Count I as against all defendants. But with regard to HAVA, they allege only that they requested *Defendant Schmidt* to direct a hand count, Am. Compl. ¶ 95, that *Defendant Schmidt* has authority to act on Plaintiffs' request pursuant to HAVA, Am. Compl. ¶ 97, and that *Defendant Schmidt* refused to direct the examination of the ballots per the Plaintiffs' request, which they maintain constituted a Violation HAVA, Am. Compl. ¶¶ 98-99. Plaintiffs do not plead any conduct by Allegheny County or the other county defendants violated HAVA. To the extent that in captioning Count I as against all party defendants the Plaintiffs are attempting to state a claim under this act against Allegheny County, they have failed to make any allegations in support of such claim. Allegheny County also joins Defendant Secretary Schmidt's argument that Plaintiffs have failed to state a claim under HAVA, as HAVA contains no private right of action. *See* Brief of Secretary Schmidt in Support of Motion to Dismiss, pp. 20-22.

the County did not allow them to "vote," as defined by the statute. For purposes of this section, "the word 'vote' includes all action necessary to make a vote effective including, but not limited to, registration . . ., casting a ballot, and having such ballot counted and included in the appropriate totals . . . ." 52 U.S.C § 10101(a)(3)(A); 52 U.S.C § 10101(e).

Plaintiffs have failed to allege they were prevented from registering, casting a ballot, or having their ballot counted. Instead, they have merely alleged that certain numbers of votes were reported at specific times, and that largely unexplained statistical analyses detected differences from past voting patterns. Even if this were sufficient to support an allegation that fraudulent votes were included in the tally—which it is not—it would still be insufficient to make out an allegation that Plaintiffs were not allowed to vote, as is required to state a claim under 52 U.S.C § 10101(a). As such, Plaintiffs have failed to state a claim under 52 U.S.C § 10101(a).

## V.    CONCLUSION

The Amended Complaint is legally deficient for the reasons detailed above. First, Plaintiffs fail to satisfy each of the three prongs of Article III standing. Second, they fail to plausibly alleged claims sufficient to show that they are entitled to relief, as required by Rule 8. Finally, Plaintiffs have not (and cannot) plead any facts to show they are entitled to relief under any cause of action they allege. The County has already pointed out these deficiencies in its prior motion to dismiss, and Plaintiffs have already had an opportunity to remedy them through amendment. It is clear that these fundamental flaws in Plaintiffs' theory cannot be remedied and the Amended Complaint should thus be dismissed with prejudice.

Respectfully submitted,

Date:  February 23, 2026

*/s/ Lisa G. Michel*
Lisa G. Michel
Assistant County Solicitor
Pa. I.D. #59997

24

ALLEGHENY COUNTY LAW DEPARTMENT
445 Fort Pitt Boulevard, #300
Pittsburgh, PA 15219
(412) 350-1167
Lisa.Michel@alleghenycounty.us