**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

ELECTION TRUTH ALLIANCE, JENNIFER REESE, CHRISTOPHER MACK, and GRACE HOHMAN,

Plaintiffs

v.

AL SCHMIDT, in his official capacity as Secretary of the Commonwealth of Pennsylvania; BOARD OF ELECTIONS OF CAMBRIA COUNTY; ELECTION SYSTEMS & SOFTWARE, LLC; and JOHN DOE, Defendants

Case No.: 1:25-cv-00329

FOURTH AMENDED COMPLAINT

Filed on behalf of: Plaintiffs

Counsel of Record:

Timothy D. McNair, Esquire
PA ID No.: 34304
tmcnair@mcnairlaw.com

McNair Law Offices, PLLC
821 State Street
Erie, PA 16501
Phone: (814) 452-0700
Fax: (814) 454-2371

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ELECTION TRUTH ALLIANCE, JENNIFER REESE, CHRISTOPHER MACK, and GRACE HOHMAN, | : | Case No.: 1:25-cv-00329 |
| Plaintiffs | : | FOURTH AMENDED COMPLAINT |
| v. | : | |
| AL SCHMIDT, in his official capacity as Secretary of the Commonwealth of Pennsylvania; BOARD OF ELECTIONS OF CAMBRIA COUNTY; ELECTION SYSTEMS & SOFTWARE, LLC; and JOHN DOE, | : | *Electronically Filed* |
| Defendants | : | |

**FOURTH AMENDED COMPLAINT**

NOW COME the Plaintiffs, Election Truth Alliance, Jennifer Reese, Christopher Mack, and Grace Hohman, by counsel, and bring this Complaint for redress of violations of 42 U.S.C. § 1983 and other statutes, respectfully representing:

# INTRODUCTION

The voting systems and practices used in the Cambria County in the General Election of November 2024 deprived voters of equal protection under the law arising out of use and misuse of voting equipment and methods of administering elections which resulted in the failure to count or in permitting the overriding of Plaintiffs' votes. If not remedied, the next election will again be manipulated and Plaintiffs' votes again rendered nugatory.

In Cambria County, there was a failure to properly certify and secure the voting system. This failure was exploited to permit alteration of the count of the votes and to arrive at inaccurate conclusions as to the winners of several contests, as demonstrated by patterns of votes that were inconsistent with a fair election. The software used to count and report votes enabled manipulation of the counting and reporting of votes to favor the party opposed by Plaintiffs.

Individual Plaintiffs are three Cambria County, Pennsylvania electors who voted in person in the 2024 general election, who intend to vote in person in the November 3, 2026 general election in the same counties, and who will cast those votes on voting systems supplied by Defendant Election Systems & Software, LLC ("ES&S") running the ES&S EVS Version 6 software family, together with the organization with which they volunteer.

Public records generated by state certification authorities in Texas and New York document specific, unremediated deficiencies in the software-integrity verification mechanism and source code of the ES&S EVS Version 6 software family. The same software family was deployed in Cambria County in the November 5, 2024 general election and, upon information and belief, remains certified and scheduled for use in those counties in the November 3, 2026 general election.

Accordingly, Plaintiffs seek a declaration of their rights and narrowly drawn injunctive relief directing three independent examinations before the November 3, 2026 general election: (a) a forensic audit of the ES&S EVS Version 6 software (and any other version within the same software family deployed in the target counties); (b) a physical inspection of the ES&S hardware deployed in the target counties for remote-access capability, including installed cellular modems; and (c) a forensic audit of the election management systems used in Cambria County, including verification of claimed air-gap and connectivity controls.

Plaintiffs seek prospective injunctive relief to prevent a repeat of the deprivations of equal protection arising from the inaccurate counting of their votes to the unfair advantage of candidates they opposed, and to ensure that election systems will not again be exploited and unlawfully manipulated, thus ensuring that Plaintiffs' constitutional rights to equal protection under the law that their votes for candidates they support will not be overridden by manufactured or switched votes.

## PARTIES

1. Plaintiff Election Truth Alliance ("ETA") is a Nevada nonprofit corporation comprised of individual citizens who are registered voters in the various states, including Pennsylvania.

2. Plaintiff Election Truth Alliance ("ETA") is a nonprofit organization whose mission includes protecting the integrity and security of elections in the United States. ETA sues in its own right and on behalf of its volunteer members, including Plaintiffs Hohman, Mack, and Reese, each of whom is an individual member with standing to sue in their own right, whose interests in casting an effective vote on a verified voting system are germane to ETA's purpose, and whose participation is not required for the prospective relief sought.

3. The ETA members who are plaintiffs in this case were denied the equal protection of the laws when, on November 5, 2024, their votes in the 2024 general election were not counted for the candidates they voted for and were overridden and offset by manufactured votes not cast by legitimate electors. The mission of ETA is to protect and enhance the integrity of elections as required by the Constitution and laws of the United States and the States, including the Commonwealth of Pennsylvania.

4. ETA seeks to vindicate the rights of its members, all of whom will suffer a deprivation of Equal Protection to the unfair advantage of candidates they oppose if elections were not properly administered.

5. ETA has diverted and continues to divert its own organizational resources — volunteer time, data-analysis capacity, and public-records-request capacity — to investigating, documenting, and responding to the voting-system conditions described in this Complaint in Cambria County. That diversion is a direct consequence of Defendants' failure to examine or remediate those conditions and will continue so long as the conditions persist.

6. Plaintiff Jennifer Reese is an adult citizen residing in and registered to vote in Cambria County, Pennsylvania, who attempted to cast a vote on an ES&S voting machine in the 2024 General Election at Richland Township Precinct #3 at the Solomon Run Fire Department Building in that County. She is a member of Election Truth Alliance. As the result of improper manipulation of the counting and reporting of votes, Plaintiff Reese's vote was not counted or was offset by manufactured votes, to the unfair advantage of candidates she opposed.

7. Plaintiff Christopher Mack is an adult citizen residing in and registered to vote in Cambria County, Pennsylvania. He is registered to vote in Cambria County and in 2024, voted in Richland Township precinct 7 at the Solomon Run fire Company on an ES&S voting machine in the 2024 General Election in that County. He is a member of Election Truth Alliance. As the result of improper manipulation of the counting and reporting of votes, Plaintiff Mack's vote was not counted or was offset by manufactured votes, to the unfair advantage of candidates he opposed.

8. Plaintiff Grace Hohman is an adult citizen residing in and registered to vote in Cambria County, Pennsylvania, who attempted to cast a vote on an ES&S voting machine in the 2024 General Election in Richland Township Precinct #6 at Arbutus Church of the Brethren in that County. She is a member of Election Truth Alliance. As the result of improper manipulation of the counting and reporting of votes, Plaintiff Hohman's vote was not counted and was offset by manufactured votes, to the unfair advantage of candidates she opposed.

9. Defendant Al Schmidt ("Secretary Schmidt," or "SOC") is the Secretary of the Commonwealth of Pennsylvania, having been appointed Acting Secretary of the Commonwealth by Governor Shapiro on January 17, 2023, and confirmed as Secretary of the Commonwealth on June 29, 2023. He is sued in both his individual and official capacities. Defendant Schmidt is charged with:

a. The duty to "examine and reexamine voting machines, and ...not approve any voting machine for any election, Federal or State, in this Commonwealth, that does not comply with the requirements of section 301 of the Help America Vote Act of 2002 (Public Law 107-252, 42 U.S.C. § 15481). ((b) amended July 14, 2009, P.L. 86, No. 20)". PA Election Code § 201(b);

b. The duty to "receive from county boards of elections information on voting system errors or difficulties or other election data pursuant to regulation." Id. at § 201(e.1);

c. To receive such reports from county boards of elections as are required by the Election Code, and to demand such additional reports on special matters as he may deem necessary. PA Election Code § 201(e.1);

d. The duty to receive from county boards of elections information on voting system errors or difficulties or other election data pursuant to regulation. PA Election Code § 201(e);

e. The duty to "compute the votes cast for candidates "…to proclaim the results of such primaries and elections." *Id.* at § 201(f);

f. The duty to order a county board to conduct a recount or recanvass of an election under Section 1404 for a public office which appears on the ballot in every election district in this Commonwealth or for a ballot question which appears on the ballot in every election district in this Commonwealth. PA Election Code § 201(f.2); and

10. Defendant SOC's refusal to examine any ballot boxes, to order the county boards of elections to submit additional reports, or to order from the county boards their reports of system errors and difficulties, violates the Plaintiffs' right to Equal Protection guaranteed by the Fifth and Fourteenth Amendments of the U.S. Constitution, the Help America Vote Act, and the PA Election Code.

11. Defendant, Cambria County Board of Elections ("Cambria"), is a County Board of Elections established pursuant to 25 P.S. 2641, having jurisdiction over the conduct of primaries and elections in such county, in accordance with the provisions the Pennsylvania Election Code, 25 P.S. 2600 *et seq*. Cambria has the following duties:

a. To select and equip polling places that meet the requirements of the Election Code, PA Election Code §302(b);

b. To ascertain any errors in vote counting, and "[i]f any error is detected, the cause of it shall be ascertained and corrected and an errorless count shall be made and certified to by the county board of elections prior to election day." Id. at §1401-A(a) (modified);

c. The duty to "compare the signature on [a] provisional ballot envelope with the signature on [an] elector's registration form and, if the signatures are determined to be genuine, shall count the ballot if the county board of elections confirms that the individual did not cast any other ballot, including an absentee ballot, in the election. Id. at § 1210(a.3)(5)(1); and

d. The duty to "investigate election frauds, irregularities, and violations of [Pennsylvania's Election Code], and to report all suspicious circumstances to the district attorney. Id. at § 302.

**I. DEFENDANT ELECTION SYSTEMS & SOFTWARE, LLC ("ES&S") IS, UPON INFORMATION AND BELIEF, A LIMITED LIABILITY COMPANY ORGANIZED UNDER THE LAWS OF THE STATE OF DELAWARE WITH ITS PRINCIPAL PLACE OF BUSINESS AT 11208 JOHN GALT BOULEVARD, OMAHA, NEBRASKA 68137. ES&S DESIGNS, MANUFACTURES, SELLS, LICENSES, INSTALLS, SERVICES, AND SUPPORTS THE EVS ELECTION SOFTWARE AND THE ASSOCIATED TABULATION AND BALLOT-MARKING HARDWARE DEPLOYED IN CAMBRIA COUNTY. ES&S CONTRACTS DIRECTLY WITH PENNSYLVANIA COUNTIES, SUBMITS ITS SYSTEMS TO THE PENNSYLVANIA DEPARTMENT OF STATE FOR CERTIFICATION, AND PROVIDES OPERATIONAL GUIDANCE AND TECHNICAL SUPPORT TO COUNTY ELECTION OFFICIALS IN THE CONDUCT OF PENNSYLVANIA ELECTIONS.**

12. Defendant John Doe is a person whose identity is presently unknown to Plaintiffs and who, upon information and belief, possessed or obtained access to one or more of the voting systems or election management systems at issue. Plaintiffs plead John Doe as a supplementary defendant only. As set forth below, the causal chain between the conduct of each named Defendant and the injury Plaintiffs face in the November 3, 2026 general election is complete without reference to John Doe or to the act of any unnamed third party. Plaintiffs will amend to substitute John Doe's true name if and when it is ascertained.

## JURISDICTION AND VENUE

13. This Court has jurisdiction of this matter pursuant to 28 U.S.C. §1343, which provides for original jurisdiction in all suits authorized by 42 U.S.C. §1983 for redress of deprivation under color of state law of Constitutional rights, privileges, or immunities or of rights under federal law, including the right to vote. *Meisel v. Kremens*, 405 F. Supp. 1253, 1254 (E.D. Pa. 1975).

14. Citizens have a "constitutionally protected right to participate in elections," which is protected by the Equal Protection Clause. *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972). The franchise is the guardian of all other rights. *Reynolds v. Sims*, 377 U.S. 533, 562 (1964).

15. This Court further has jurisdiction of this matter pursuant to 28 U.S.C. §1331, since this case arises under the Constitution, treaties, and laws of the United States and in particular the Fifth and Fourteenth Amendments to the Constitution of the United States and the Civil Rights Act of 1871, 42 U.S.C. §1983.

16. This Court has jurisdiction under 28 U.S.C. § 2201(a), because Plaintiffs are requesting a declaration of rights and other legal relations, especially regarding an actual controversy regarding the conduct of the vote count in counties located within the Western District of Pennsylvania and the denial of the Equal Protection of the laws occasioned by depriving Plaintiffs' attempted votes their appropriate weight and the threat that the deprivation will occur again.

17. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in counties in this District.

18. Venue is proper in this District per 28 U.S.C. § 1391(b)(1) because all Plaintiffs reside in the Western District of Pennsylvania, and Cambria County resides in this District.

19. Defendant Schmidt is a "person acting under color of state law" in that he exercises his duties and acts pursuant to the laws of Pennsylvania. He is sued in both his individual and official capacities

20. Defendant Cambria County Board of Elections is a "person acting under the color of state law" in that as a Pennsylvania County Board of Elections, it acts pursuant to the authority conferred by a state statute. See *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690–91 (1978) (recognizing § 1983 claim against units of local government); *Rogin v. Bensalem Twp.*, 616 F.2d 680, 686 (3d Cir. 1980) (same).

21. Defendant ES&S is a person acting under color of state law for purposes of 42 U.S.C. § 1983. The tabulation of votes is a function traditionally and exclusively reserved to the sovereign, and the Commonwealth and its counties have delegated the mechanics of that function to ES&S. ES&S is a willful participant in joint action with the county boards: it programs election definitions, supplies and validates the software that counts ballots, instructs county officials on required testing and on the handling of software-integrity warnings, and — as alleged below — directed county officials in the treatment of ballots during the November 5, 2024 general election. In the alternative, and only if the Court concludes that ES&S does not act under color of state law, ES&S is joined as a party necessary to afford complete relief under Fed. R. Civ. P. 19(a)(1)(A), because ES&S possesses and controls the source code, build records, engineering change records, and hardware documentation without which the examinations sought cannot be performed.

22. Defendant John Doe is a person acting under color of state law in that he is an individual to whom the state has permitted access to its voting systems in the conduct of elections.

## IV. STANDING OF EACH NAMED PLAINTIFF

23. Each individual Plaintiff alleges below, without reliance on conclusory assertion, the facts establishing that Plaintiff's concrete and particularized injury-in-fact: the county and precinct in which the Plaintiff voted in 2024; what happened to that Plaintiff's own ballot; the specific election-day conditions that Plaintiff personally experienced or observed; the Plaintiff's intent to vote in the identified November 3, 2026 general election in the same county; that the precinct in which the Plaintiff will vote will use the same or comparable ES&S equipment; and the Plaintiff's volunteer relationship with ETA. Each Plaintiff's allegations are supported by that Plaintiff's affidavit, attached and incorporated by reference under Fed. R. Civ. P. 10(c).

24. The November 3, 2026 general election is an identified, scheduled election. It is not a hypothetical or speculative future event. Pennsylvania will elect a Governor, a Lieutenant Governor, all members of its delegation to the United States House of Representatives, and members of the Pennsylvania General Assembly at that election. Each individual Plaintiff will be eligible to vote in that election and intends to do so in person.

### A. The Nature of the Injury Each Plaintiff Asserts

25. Each individual Plaintiff asserts three injuries. They are cumulative: the first is a certainty, the second is a quantified probability, and the third is the prospective injury for which relief is sought.

26. Dilution of that Plaintiff's own ballot, which is certain rather than probabilistic. If the statistical deviation alleged below reflects votes that were not lawfully cast, then the effect on each Plaintiff's ballot is not a matter of chance. Adding votes to a precinct total diminishes the weight of every lawful ballot in that precinct, including the Plaintiff's. Each of the 662 ballots cast in Plaintiff Mack's precinct was diminished in relative weight by the approximately 235 excess votes recorded there; the same is true, in the amounts stated below, in each Plaintiff's precinct. No Plaintiff needs to identify a particular altered ballot to suffer this injury, because the injury falls on every lawful ballot in the precinct simultaneously and by arithmetic necessity.

27. Prospective unverifiability - the prospective injury for which relief is actually sought. Each Plaintiff will cast a ballot on November 3, 2026 on the same voting system, whose software-integrity verification mechanism has been documented as unreliable and which has never been independently examined. That injury does not depend on what happened to any ballot in 2024. It is the reason the relief requested is examination of the systems rather than any remedy directed at a past result.

28. Plaintiffs do not allege that they know their own 2024 ballots were altered. They allege that they cannot know, and that the records by which they could have known — the ballot-duplication record, the chain-of-custody documentation, the ballot-accounting records, and a software-integrity verification mechanism capable of detecting unauthorized modification — were either never created or have never been produced. The deprivation of the ability to verify that one's own vote was counted as cast is itself a concrete and particularized injury, and it is an injury Defendants' own conduct created.

## B. Plaintiff Jennifer Reese (Cambria County)

29. Plaintiff Reese is registered to vote in Cambria County and voted in person on Election Day, November 5, 2024, in the Richland Township No. 3 precinct, whose polling place is the Solomon Run Fire Company building.

30. Plaintiff Reese personally experienced the county-wide ballot-scanning failure described below. She was unable to scan her own completed ballot at her polling place, and she observed printing defects in the ballots issued at her precinct.

31. Because Plaintiff Reese's own ballot could not be scanned, her ballot was necessarily among the ballots that Cambria County thereafter duplicated in order to tabulate them. The ballot that was counted in place of hers was a copy prepared by a person whose identity Cambria County did not record, and no record exists by which that copy can be compared to the ballot she marked. This is not an inference from statistics. It follows from what Plaintiff Reese personally experienced and from Cambria County's own account of what it did with ballots that could not be scanned.

32. Plaintiff Reese intends to vote in person on Election Day in the November 3, 2026 general election, in Cambria County, in every race in which she is eligible to vote.

33. The precinct in which Plaintiff Reese will vote in the November 3, 2026 general election will use the same or comparable ES&S voting equipment, running the same ES&S EVS Version 6 software family, as was used in that precinct on November 5, 2024. Upon information and belief, Cambria County has not replaced its ES&S voting system, has not migrated to a different vendor, and has no plan to do so before the November 3, 2026 general election.

34. Independent statistical analysis of the official certified precinct-level returns for the November 5, 2024 general election identifies Plaintiff Reese's precinct as exhibiting the statistical indicators described below. That precinct recorded 83.8% turnout on 497 ballots cast, and the vote share recorded for the winning presidential candidate exceeded the share predicted for that turnout level by approximately 16.9 percentage points, corresponding to approximately 84 votes. The deviation is statistically significant after correction for multiple comparisons. If that deviation reflects votes not lawfully cast, then Plaintiff Reese's ballot was diluted by those 84 votes with certainty.

35. Plaintiff Reese is an active volunteer with ETA. Her volunteer activities have included seeking, verifying and providing information concerning Cambria County, Assisting in the gathering of election data, and filing and pursuing requests for government records.

**C. Plaintiff Christopher Mack (Cambria County)**

36. Plaintiff Mack is registered to vote in Cambria County and voted in person on Election Day, November 5, 2024, in the Richland Township No. 7 precinct, whose polling place is the Solomon Run Fire Company.

37. Plaintiff Mack personally observed that the scanning equipment at his polling place was not functioning and that voters' completed ballots were left in an unattended, unsecured open box sitting on top of the scanning machines.

38. Plaintiff Mack's own ballot was cast at a polling place where the scanning equipment was not functioning. His ballot was therefore necessarily among the ballots Cambria County duplicated in order to tabulate them, and the ballot counted in place of his was a copy prepared by an unrecorded person, with no record permitting comparison to the ballot he marked. In addition, the completed ballots at his polling place were left in an unsecured open container that no election official was attending. Plaintiff Mack does not know whether his own ballot was among those left in that container, and Cambria County created no record from which he could learn the answer.

39. Plaintiff Mack intends to vote in person on Election Day in the November 3, 2026 general election, in Cambria County, in every race in which he is eligible to vote, including the down-ballot races.

40. The precinct in which Plaintiff Mack will vote in the November 3, 2026 general election will use the same or comparable ES&S voting equipment, running the same ES&S EVS Version 6 software family, as was used in that precinct on November 5, 2024.

41. Independent statistical analysis of the official certified precinct-level returns identifies Plaintiff Mack's precinct as the most anomalous of the precincts at issue in this action, and as among the ten most anomalous of the 125 precincts in Cambria County. That precinct recorded 87.3% turnout on 662 ballots cast, and the vote share recorded for the winning presidential candidate — 82.2% — exceeded the share predicted for that turnout level by approximately 35.4 percentage points, corresponding to approximately 235 votes. The deviation corresponds to a robust z-score of 6.30 and remains statistically significant after correction for multiple comparisons. If that deviation reflects votes not lawfully cast, then Plaintiff Mack's ballot was diluted by those 235 votes with certainty.

42. Plaintiff Mack is an active volunteer with ETA. His volunteer activities have included providing information concerning Cambria County, helping gather election data, and records requests.

## D. Plaintiff Grace Hohman (Cambria County)

43. Plaintiff Hohman is registered to vote in Cambria County and voted in person on Election Day, November 5, 2024, in the Richland Township No. 6 precinct, whose polling place is the Arbutus Church of the Brethren.

44. Since the November 5, 2024 general election, Plaintiff Hohman has moved within Cambria County to Southmont Borough. She will vote in the November 3, 2026 general election in the Southmont Borough No. 1 precinct, whose polling place is the Southmont Borough Municipal Building. Both her former and her current precincts are in Cambria County, and both use ES&S voting equipment running the ES&S EVS Version 6 software family supplied to Cambria County. Her change of precinct therefore does not change the equipment on which her vote will be counted.

45. On November 5, 2024, Plaintiff Hohman was handed a ballot and instructed to complete it. She was not informed that the scanning equipment was inoperable until after she had fully completed her ballot. She was then told that she could either return later, when the machines were working, or leave her completed ballot at the polling place for poll workers to insert at some later time.

46. Plaintiff Hohman's own completed ballot could not be scanned when she cast it, because the equipment at her polling place was inoperable. Her ballot was therefore necessarily among the ballots Cambria County duplicated in order to tabulate them. The ballot counted in place of hers was a copy prepared by a person whose identity Cambria County did not record, and no record exists by which that copy can be compared to the ballot she marked. Plaintiff Hohman was moreover told, by an election worker at her own polling place, that her completed ballot would be inserted into a machine by someone else at some later time and outside her presence.

47. Plaintiff Hohman intends to vote in person on Election Day in the November 3, 2026 general election, in Cambria County, in every race in which she is eligible to vote.

48. Independent statistical analysis of the official certified precinct-level returns identifies both of Plaintiff Hohman's precincts as exhibiting the statistical indicators described below. Her 2024 precinct recorded 85.1% turnout on 296 ballots cast, with a deviation of approximately 24.6 percentage points above the predicted vote share, corresponding to approximately 73 votes. Both deviations remain statistically significant after correction for multiple comparisons. If those deviations reflect votes not lawfully cast, then Plaintiff Hohman's 2024 ballot was diluted with certainty, and the precinct in which she will vote in 2026 exhibits a larger deviation than the one in which she voted in 2024.

49. Plaintiff Hohman is an active volunteer with ETA. Her volunteer her involvement with ETA began in September 2025, and her responsibilities have included providing information concerning Cambria County, helping gather election data, and records requests.

## G. Standing of Election Truth Alliance

50. ETA has associational standing because at least one of its members — each of Plaintiffs Reese, Mack, and Hohman — has standing to sue in their own right, because the interests ETA seeks to protect are germane to its purpose of protecting election integrity, and because the prospective declaratory and injunctive relief sought does not require the participation of individual members. Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977). Plaintiffs note that the arithmetic pled at ¶ 30 independently satisfies the first Hunt element on the probabilistic theory alone: the likelihood that at least one ETA member among the Cambria Plaintiffs had their ballot affected exceeds fifty percent.

51. ETA independently has organizational standing on account of the diversion of its own resources as set forth below.

## STATEMENT OF FACTS

### Software Vulnerabilities Exploited

52. Cambria utilizes election equipment provided by Elections Systems and Software ("ES&S"), consisting of machines ("hardware") operated by software programs provided exclusively by ES&S., specifically ES&S EVS version 6.1.1.0, which is part of the ES&S EVS 6.x software family discussed throughout this Complaint.

53. Dominion and ES&S closely guard the substance of the software operating the hardware they provide. The software is not made available for testing of its accuracy and fairness except by business entities recognized by the Commonwealth to do so, and then only on a limited basis.

54. The software utilized by ES&S and Dominion and provided to Pennsylvania counties is certified by Pro V&V and SLI Compliance, "testing laboratories" accredited by the Election Assistance Commission ("EAC"). These entities are supposed to determine if the machines and software provided by vendors such as ES&S and Dominion accurately tabulate and report the results of voter choices at the various polling places and identify if vulnerabilities exist and could be exploited.

55. ES&S Voting systems machines continue to run ECO for EVS Version 6 , a software system known to be vulnerable to manipulation. New York State testing of EVS 6.3.0.1, conducted by SLI Compliance, identified 430 source code vulnerabilities which a knowledgeable vendor insider could exploit. These exploits would allow modification of memory, privilege escalation, removal of logs, and would allow the ability to manipulate the counting and recording of votes.

56. ES&S systems are designed to be verified by a hash-validation process. That process is intended to confirm that the software actually installed and running on a voting device matches the software that was certified. It is the mechanism on which election officials rely to detect unauthorized modification of election software.

57. Texas voting-system examiners, acting in their official capacity in the course of the Texas certification process, identified deficiencies in that hash-validation process in ES&S EVS versions 6.0.2.0, 6.0.3.0, and 6.1.1.0. Among the identified deficiencies was that, when the trusted reference hash file was absent altogether, the verification script nonetheless reported a successful match. See Exhibit A (Mechler examiner report, April 17, 2023);

58. The Texas examiners documented concerns that a person with sufficient access to and knowledge of the system could cause unauthorized modifications to avoid detection by that verification process. See Exhibit B.(Email "Re: Vendor Responses to Examiner Questions")

59. Texas examiner Brian Mechler documented concerns regarding ES&S's customer guidance on hash mismatches — specifically, that customers were instructed to disregard a mismatch reported by the verification process, with the consequence that "if customers are being told to ignore it, there is nothing to be flagged."

60. The same class of deficiency was documented in later versions of the same software family. Texas examiner reports for EVS 6.2.0.0 identified continuing concerns with the verification process.

61. Texas certified EVS 6.3.0.0 in 2023. Texas examiners subsequently determined that they had certified EVS 6.3.0.0 without having received complete hash-validation documentation from ES&S, and that certain security procedures had never been provided to the examiners or to the Texas Secretary of State's office.

62. On or about February 1, 2024, Texas examiners conducted a further examination of the EVS 6.3.0.0 verification mechanism and documented three specific deficiencies: (a) the verification script is stored in plain text and can therefore be rewritten; (b) the system is capable of verifying itself, so that software already resident on the device can generate a passing verification result; and (c) five files are exempt from verification altogether.

63. On or about May 13, 2024, the lead Texas examiner warned in writing that the plain-text verification script needed to be converted to binary form or otherwise obfuscated to prevent tampering, and stated that the validation process "needs improvement in these areas."

64. Plaintiffs have identified no public record showing that the deficiencies described in paragraphs 78 through 85 were remediated in the code of EVS 6.3.0.0 or of any later version certified for use in Pennsylvania.

65. In or about January 2024, in response to inquiry regarding the missing hash-validation documentation, ES&S submitted Engineering Change Order 1167 ("ECO-1167").

66. As initially submitted, ECO-1167 characterized the changes it described as specific to Texas.

67. On or about April 9, 2024, ES&S removed the Texas-specific characterization from ECO-1167. The change order as revised updated documentation. It did not alter the underlying verification code to address the deficiencies the Texas examiners had identified.

68. Characterizing a change order addressing a software-integrity deficiency as applicable only to a single state has the practical effect of withholding notice of that deficiency from the other jurisdictions running the same software. Pennsylvania is one of those jurisdictions.

69. Plaintiffs have identified no record that ES&S disclosed the deficiencies identified by the Texas examiners, or the substance of ECO-1167, to the Pennsylvania Department of State, to Cambria County.

**<u>Documented Source-Code Findings in EVS 6.3.0.1 (New York)</u>**

70. In 2023, the New York State Board of Elections commissioned NYSTEC to conduct an independent testing-oversight review of ES&S EVS version 6.3.0.1. NYSTEC engaged Cyber Castellum to review and validate the source-code assessment performed by SLI Compliance, one of two EAC-accredited voting system test laboratories. NYSTEC issued its public report on May 31, 2023. (Exhibit C)

71. The static analysis of the EVS 6.3.0.1 source code produced 43,218 findings. Of those, 43,211 were classified as not exploitable. Four hundred thirty (430) findings remained on the potential-vulnerability review list at the conclusion of testing, and were recorded as open discrepancies. No defect tickets were created for those 430 findings.

72. The exploit potential of those findings was classified as requiring "extensive knowledge of the system or a Vendor Insider."

73. The categories at issue identified include modification of memory stored on the machines, escalation of the privileges required to alter software, removal of audit-log records, and alteration of vote storage.

74. The reviewing subcontractor recorded that it had "not experienced such a high false positive rate with such tools," and noted that none of the findings had been confirmed as a true positive.

75. NYSTEC recorded the following recommendation: "Several issues were found by SLI during their review of the source code. However, it remains that the risk associated with these issues is being mitigated through controls present on the devices where the code is installed. As a best practice in software development, code should not rely on external environmental controls for security, therefore, NYSTEC recommends that ES&S remediate these issues in their code, along with the list of issues they agreed to address, in a future build."

76. EVS 6.3.0.1 remained certified following that review.

77. The NYSTEC report does not specify what changed between EVS 6.3.0.0 and EVS 6.3.0.1, and Plaintiffs have located no public release note, change log, or engineering record that does so.

78. EVS 6.3.0.0 and EVS 6.3.0.1 are adjacent versions within the same software family, differing at the fourth version level. Absent a public record of what changed between them, it is a reasonable inference that findings in the 6.3.0.1 source code may be present in the 6.3.0.0 source code deployed in Pennsylvania. That inference can be confirmed or dispelled only by comparing the two code bases — which is one of the examinations Plaintiffs seek.

79. The reviewing laboratory's stated basis for declining to remediate was that risk was mitigated by "controls present on the devices where the code is installed." The deficiencies documented by the Texas examiners are deficiencies in precisely such a device-level control. The two records read together support the inference that the mitigation relied upon has not been shown to function as assumed.

## Connectivity and Remote-Access Capability

80. The EVS 6.3.0.0 software includes a module designated "Regional Results" that transmits election results data over a wide-area network or virtual private network.

81. Election systems of the type at issue have been documented in public reporting as having been equipped with cellular modems and as having had remote-access software installed. Public reporting has placed the number of ES&S scanners equipped with cellular modems and identifiable online at between approximately 14,000 and 33,000; has identified 35 backend election management systems reachable over the internet across 11 states; and has reported ES&S's acknowledgment of remote-access software installed on election systems in at least 300 jurisdictions. Plaintiffs plead these figures as the content of public reporting.

82. Transmission of election results by cellular means is not within the scope of EAC certification.

83. The presence of a results-transmission module in the certified software, together with the documented deployment of cellular modems and remote-access software on systems of this type, warrants jurisdiction-specific physical examination of the hardware actually deployed in Cambria County. Whether any particular device in that county contains a cellular modem or has remote-access software installed cannot be determined from public records and is not presently known to Plaintiffs. That is precisely why inspection is sought.

## The Removable-Media Pathway

84. Election systems of the type at issue, including systems represented as air-gapped, require removable physical media — USB devices and flash cards — for ballot definition, software installation and update, and transfer of precinct results.

85. The EAC investigated concerns, before the 2020 general election, that USB devices containing software not corresponding to a certified configuration could bypass the intended verification procedures on ES&S systems, and that the affected systems were deployed in multiple states. The EAC issued technical instructions for verifying USB installations but did not require states to follow them.

86. Physical media that crosses a security boundary is a recognized pathway for the introduction of unauthorized software into an otherwise isolated system. Where, as documented, the mechanism intended to detect unauthorized software on the far side of that boundary has itself been documented as unreliable, the pathway and the detection failure compound one another.

87. Pennsylvania's June 9, 2011, Use Directive, incorporated as a binding condition of the EVS Version 6 certification, requires physical removal or disabling of all wireless modems before delivery to counties.

88. ES&S withdrew the modem-equipped DS200 from EAC certification before testing was completed. Only the modem-less version is certified.

89. ES&S admitted to NBC News in February 2020 that 14,000 DS200s with active modems were in use nationally. Cambria County has not verified that the ES&S machines it uses are without functioning modems.

90. The EAC formally admonished ES&S on March 20, 2020, for falsely marketing the modem version as EAC-certified.

91. The modem configuration has never undergone any security assessment by an EAC-approved lab.

92. Despite the requirement of the Pennsylvania Department of State that voting machines must not have a modem or that the modems be disabled, there has been no examination of the machines or documentation to verify the absence of functioning modems in light of the report of thousands of machines being “in the wild” with functioning modems. Cambria County has admitted that no such examination has occurred. Plaintiff ETA has requested records verifying examination of the machines from the Defendant Board of Elections, the Department of State, the EAC, and the manufacturer, but no record verifying the absence of functioning modems has been provided.

93. In Lake Township in Missaukee County, Michigan, ES&S DS200 machines tabulators were removed from County offices and taken to hotels and rental properties in Oakland County where they were broken into, and election management software was copied. The copying of the software enables exploitation of the machines to manipulate the reported vote counts.

94. In Roscommon county, Michigan, ES&S equipment was breached, allowing the software to be copied and vulnerabilities to be identified and exploited to be used on other machines. The newer version of the ES&S software runs on Windows 10. Identification of vulnerabilities in the software copied allows manipulation of the newer versions.

95. These breaches and vulnerabilities make it plausible that malign actors with physical access to the machines or related peripheral equipment, including USB drives, caused the reported vote results of the 2024 election to be manipulated, causing Plaintiffs’ votes to be not counted and offset by manufactured votes, to the unfair advantage of candidates they opposed.

96. The pattern of votes recorded and reported proves that the systems were exploited and that the counting and reporting functions of the election systems in all three Defendant Counties were manipulated to the advantage of Republican candidates opposed by Plaintiffs.

**Cambria County Certification and Machine Issues**

97. On September 28, 2024, Cambria County officials claimed to have certified completion of the Logic & Accuracy ("L&A") testing certifying that all voting equipment had been tested and verified as functioning properly. The certification explicitly stated the Central Count Scanner as well as its backup were tested. That statement was not true in that the Central Count Scanner and Express Vote scanners were never tested.

98. No Express Vote cards were ordered prior to election day.

99. Cambria has not disclosed the number of ballots tabulated using Express Vote machines on Election Day.

100. Cambria did not provide ballot accounting or chain of custody documentation despite statutory obligations. Coupled with the statistical discrepancies noted below, the vote tabulation in Cambria County was inaccurate and did not accurately record or report the votes of the Plaintiffs or of voters voting differently from the Plaintiffs.

101. On Election Day, November 5, 2024, Cambria was unable to scan any printed ballots completed by voters due to the absence of "TIS" marks which provide for alignment of the ballot to the counting equipment allowing the ballot reader to locate and identify filled-in ovals on the ballot. This issue affected all precincts within the County and was not corrected until the newly printed ballots were received in the afternoon at which time scanning was enabled.

102. Cambria requested and was granted an order of court extending poll closures from 8 PM to 10 PM. Some voters who showed up to the polls were told to either return later or were told to give their completed ballots to poll workers to be scanned at a later time.

103. Poll workers were instructed to store the completed, unscannable ballots in "emergency storage bins," meant to hold ballots in the event of an emergency. However, when these bins reached their capacity, the poll workers removed the ballots. No chain of custody documentation was completed for these ballots. This introduced inaccuracies into the recording and reporting of Plaintiffs' votes.

104. In response to the unscannable ballots, Cambria ordered an additional 74,075 ballots with the TIS marks. These arrived at Cambria's election headquarters in the afternoon of Election Day, where volunteers assisted in dividing and packing them for transport to individual precincts. No chain of custody documentation was provided for these ballots.

105. After the closure of the polls, Board officials began to hand-count the ballots that could not be read. However, the decision was ultimately made to duplicate all unscannable ballots onto ballots that could be scanned. According to Cambria BOE, there is no record as to which ballots were individually copied or how many ballots this affected.

106. Cambria has not publicly documented a tally of how many ballots cast were unable to be scanned on Election Day versus how many ballots were able to be scanned successfully.

107. The failure of Cambria County to adhere to the requirements of the law resulted in the miscounting of the votes of the Plaintiffs by inaccurately reporting their votes and by permitting the introduction and counting of nonexistent votes offsetting Plaintiffs' votes to the unfair advantage of candidates Plaintiffs opposed.

**Cambria County Miscounted Votes**

108. Independent statistical analysis was performed on the official certified precinct-level returns for the November 5, 2024 general election in Cambria County. The method fits a baseline relationship between turnout and candidate vote share using precincts below a 60% turnout threshold, extrapolates that baseline above the threshold, measures each precinct's deviation from the extrapolated baseline, scales the deviations robustly, and applies the Benjamini-Hochberg false-discovery-rate correction at $\alpha = 0.05$ to control for multiple comparisons. Upon information and belief, these discrepancies resulted from the improper programming of the voting machines and the manipulation of the counting and reporting mechanisms and affected Plaintiffs' votes, and the failure of Cambria County to protect their voting systems from manipulation.

109. The patterns in the reported votes establish that Cambria County failed to prevent its election system from being compromised to the unfair advantage of candidates Plaintiffs opposed.



110. As the result of the improper programming of the voting machines and tabulators, the exploitation of software weaknesses, and the other irregularities set forth above, Plaintiffs' attempted votes were not counted and were offset by manufactured votes, depriving Plaintiffs of the Equal Protection of the laws in violation of the statutes cited above to the unfair advantage of candidates they opposed.

111. These discrepancies resulted from improper programming of the voting machines and manipulation of the voting and reporting processes resulting from manipulation of the software and hardware used and the failure of Cambria County to protect its voting system from manipulation as required by the Pennsylvania Election Code to the unfair advantage of candidates Plaintiffs opposed.

112. Plaintiffs plead the results of that analysis as facts about the certified returns. Plaintiffs do not allege that a statistical indicator is itself proof that any vote was altered. The methodologies employed identify deviations from expected distributions; standing alone they identify patterns warranting examination of physical ballots, chain-of-custody records, and system records, and they do not establish manipulation. That is why Plaintiffs seek examination rather than any remedy directed at past results.

113. In Cambria County, 111 of 125 precincts were flagged after false-discovery-rate correction.

114. Every precinct in which a named Plaintiff voted in 2024, and every precinct in which a named Plaintiff will vote in 2026, was flagged by this analysis, with the deviations set out above. In each such precinct the deviation runs in the same direction.

115. The flagged precincts are not distributed at random with respect to Plaintiffs. The particular precincts in which these Plaintiffs' votes were counted, and in which their votes will be counted in November 2026, are precincts exhibiting the indicators. The general condition of the voting systems is therefore connected to these Plaintiffs' particularized circumstances, and not merely to the electorate at large.

**No Examination Has Occurred and the Same Systems Are Scheduled for Use**

116. No independent forensic audit of the ES&S EVS Version 6 software as deployed in Cambria County has been performed.

117. No physical inspection of the ES&S hardware deployed in Cambria County for remote-access capability, including installed cellular modems, has been performed.

118. No independent forensic audit of the election management systems used in Cambria County, including verification of claimed air-gap and connectivity controls, has been performed.

119. Upon information and belief, the ES&S EVS Version 6 software family remains certified for use in Pennsylvania, remains deployed in Cambria County, and is scheduled for use in those counties in the November 3, 2026 general election.

120. Secretary Schmidt has not re-examined the ES&S EVS Version 6 software family under 25 P.S. § 3031.5, has not rescinded or conditioned its certification, and has not required ES&S to remediate the documented deficiencies as a condition of continued use, despite his knowledge of the deficiencies and security vulnerabilities of the software. His decision to ignore these vulnerabilities is knowing and willful and results in the denial of Equal Protection of the Laws to Plaintiffs.

## CAUSATION: THE CONDUCT OF EACH NAMED DEFENDANT

### A. Defendant ES&S

121. ES&S designed, built, and licensed the EVS Version 6 software family, including the hash-validation mechanism whose deficiencies the Texas examiners documented. That mechanism is ES&S's own product; its condition is the direct result of ES&S's own design and engineering choices.

122. ES&S had actual knowledge of the deficiencies. They were identified to ES&S in the course of the Texas certification process, in examiner reports directed to ES&S's certification application, and in the exchange concerning ECO-1167.

123. ES&S did not remediate the deficiencies in the code. It updated documentation instead.

124. ES&S characterized the change order addressing the deficiency as specific to Texas, and, upon information and belief, did not disclose the deficiencies to the Pennsylvania Department of State, or to Cambria County, which was, at the time, a purchaser or user of the same software family.

125. ES&S continues to supply, license, service, and support that software and the associated hardware in Cambria County for use in the November 3, 2026 general election.

126. ES&S's own conduct — building the mechanism, learning of its deficiencies, declining to remediate them, withholding notice of them from Pennsylvania purchasers, and continuing to supply the affected systems — is what places Plaintiffs' November 2026 votes on an unverified system. No act of any third party is required to complete that chain.

## B. Defendant Schmidt

127. Secretary Schmidt holds the exclusive statutory authority under 25 P.S. § 3031.5 to determine whether an electronic voting system may lawfully be used in Pennsylvania, and holds the continuing authority to re-examine a certified system and to rescind or condition its approval.

128. Secretary Schmidt certified or maintains the certification of the ES&S EVS Version 6 software family for use in Pennsylvania. But for that certification, the systems at issue could not lawfully be used to count Plaintiffs' votes in the November 3, 2026 general election.

129. The records establishing the deficiencies described are public records of the certification authorities of Texas and New York. They were and are discoverable by the officer charged with examining the same software for use in Pennsylvania.

130. Secretary Schmidt has knowledge of the software deficiencies and vulnerabilities described above, and willfully refuses to acknowledge them or to take any action to determine their impacts on Pennsylvania elections despite evidence demonstrating the effects.

131. Secretary Schmidt has not re-examined the software, has not rescinded or conditioned its certification, and has not required remediation, verification, or independent examination as a condition of its continued use in Pennsylvania.

132. Secretary Schmidt's own exercise of, and failure to exercise, his certification authority is an independent and sufficient link between his conduct and the threatened injury: it is his certification that authorizes the use of these systems in November 2026, and his continuing authority that could condition that use on examination. Prospective relief directed to him would redress the injury regardless of the conduct of any other party.

## C. Defendant Cambria BOE

133. Cambria BOE acquired, programmed, tested, held custody of, deployed, and operated the ES&S systems used in Plaintiffs Reese's, Mack's, and Hohman's precincts, and will do so again in the November 3, 2026 general election.

134. Cambria BOE certified on September 28, 2024 that L&A testing of all equipment, specifically including the Central Count Scanner, had been completed, when the Central Count Scanner had not been tested. It then processed duplicated Election Day ballots through that untested device.

135. Cambria BOE conducted a county-wide ballot-duplication process without creating any record of which ballots were duplicated, without chain-of-custody documentation for the ballots involved, and without records identifying or authorizing the individuals who handled and transported them.

136. Cambria BOE has not produced the ballot-accounting and chain-of-custody records it is required by 25 Pa. Stat. §§ 2971 and 3154 to create and retain, notwithstanding an order of the Pennsylvania Office of Open Records directing production.

137. Cambria BOE has taken no step to have the systems in its custody examined before the November 3, 2026 general election, and intends to deploy the same systems in that election.

138. Cambria BOE's own conduct — the inaccurate testing certification, the processing of duplicated ballots on the untested device, the failure to create and retain the records by which accuracy could be verified, and the decision to redeploy the same unexamined systems — independently causes the threatened injury to Plaintiffs Reese, Mack, and Hohman.

**F. Defendant John Doe**

139. Plaintiffs plead Defendant John Doe as a supplementary defendant relevant to the statistical indicators alleged in and to the scope of relief, and not as a necessary link in the causal chain.

140. Because the deficiencies documented are of a kind whose exploitation would be difficult or impossible to detect after the fact using the records that exist, the identity of any such person cannot be ascertained without examination of system access logs, election management system user records, and audit logs. Plaintiffs seek that examination as part of the relief requested.

**THREAT OF RECURRENCE**

141. The threat that Plaintiffs' votes will again be cast and counted on unverified systems in the November 3, 2026 general election is not speculative. It rests on four facts, each pled above and each independent of any prediction about human conduct.

(a) The same software family is still certified. Secretary Schmidt has not re-examined, rescinded, or conditioned the certification of EVS Version 6 . See ¶¶ 131–132.

(b) The same systems are still deployed. Cambria County which retains and intend to use the same ES&S systems.

(c) The documented deficiencies have not been remediated. No public record shows that the verification deficiencies documented by the Texas examiners, or the source-code findings recorded in the New York review, were corrected in code. See ¶¶ 86, 91, 99, 135.

(d) No examination has occurred. None of the three examinations Plaintiffs seek has ever been performed on the systems deployed in these counties. See ¶¶ 116–118.

142. Each Plaintiff has alleged an intent to vote in that identified election, in the same county, in person, on the same or comparable equipment. The recurrence is therefore not merely possible but scheduled: absent relief, these Plaintiffs will vote on these systems on November 3, 2026.

143. The 2024 conditions in Cambria County described above are pled as concrete past injury supporting the threat of recurrence. Nothing about those conditions has been remediated in a way that would prevent their recurrence: the testing failure has not been shown to be corrected, the records that would permit verification were never created, and the same equipment and vendor remain in place.

144.

**COUNT I – ELECTION TRUTH ALLIANCE, JENNIFER REESE, AND GRACE HOHMAN V. AL SCHMIDT IN HIS OFFICIAL CAPACITY AS THE SECRETARY OF COMMONWEALTH OF PENNSYLVANIA, BOARD OF ELECTIONS OF CAMBRIA COUNTY, 42 U.S.C. §1983 – VIOLATION OF THE RIGHT TO THE EQUAL PROTECTION OF THE LAWS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION**

145. Plaintiffs incorporate by reference the averments of the preceding paragraphs.

146. Plaintiffs ETA, Jennifer Reese, and Grace Hohman have the right to vote and to have their votes accurately tabulated and reported, so that their votes be given the same effect no matter where they reside, as guaranteed by the U.S. Constitution Amendments V and XIV, in violation of 42 U.S.C. §1983.

147. ETA requested the SOC to direct a hand count of ballots, under the authority vested in him by PA Election Code § 201(e.1), of the precincts in which Plaintiffs voted. Such an examination is authorized by Section 201 (e.1) of the Election Code and would have demonstrated that the anomalies identified above resulted from improper programming or manipulation of the voting and counting machines to the unfair advantage of candidates Plaintiffs opposed.

148. The anomalies presented by the analysis of the vote statewide including the precincts in which Plaintiffs live result from the improper programming of the voting, counting, and reporting machines used in the election in which they voted, or attempted to vote. This deprived Plaintiffs of their right to the Equal Protection of the laws in that their votes were not counted for the candidates they supported and were offset by manufactured votes.

149. Unless the cause of the discrepancies in counting is identified and corrected, the next election in which Plaintiffs vote will be just as compromised, and it is likely that the same manipulation will occur. When the cause of the discrepancies is identified, Defendant Schmidt should be required to act pursuant to his statutory duty under Section 301 of the Help America Vote Act of 2002 (Public Law 107-252, 42 U.S.C. § 15481) ((b) amended July 14, 2009, P.L. 86, No. 20) PA Election Code § 201(b), and this Court's general equitable powers, to ensure that the voting machines used in the districts in which Plaintiffs vote, and the machines in other districts whose votes will be tallied against Plaintiffs comply with the requirements of Section 301 of the Help America Vote Act, since machines that do not tabulate Plaintiffs' votes, or permit Plaitniffs' votes to be offset with manufactured votes, to the unfair advantage of candidates they opposed, do not comport with the requirements of the Constitution that mandate that citizens be given the Equal Protection of the Laws.

150. Defendant SOCs' refusal to examine any ballot boxes, to order the County Boards of Elections to submit additional reports, or to order from the County Boards their reports of system errors and difficulties to identify and correct the causes of the inaccuracies in tabulation and reporting of votes, violates the Plaintiffs' right to Equal Protection guaranteed by the Fifth and Fourteenth Amendments of the U.S. Constitution, the Help America Vote Act, and the PA Election Code, in that their votes will not accurately be counted and reported, to the unfair advantage of candidates they oppose.

151. Defendant Schmidt's refusal to direct the examination of any ballot boxes, to order the County Boards of Elections to submit additional reports, to require the Defendant Counties to identify the cause of the inaccurate reports of votes cast, or to order from the county boards their reports of system errors and difficulties, violates the Plaintiffs' right to Equal Protection guaranteed by the Fifth and Fourteenth Amendments of the U.S. Constitution, the Help America Vote Act, and the PA Election Code because those actions prevent the correction of errors affecting the votes Plaintiffs attempted to register, which will deprive plaintiffs of the ability to cast an effective vote in the upcoming election.

152. If the cause of the miscounting is not identified and corrected, the Plaintiffs will again be deprived of the Equal Protection of the Laws, since the manner and effectiveness of their votes will be dependent on where they live to the unfair advantage of candidates they oppose. Voters in precincts with lower voter turnout will be treated more favorably than Plaintiffs in that their votes will accurately be counted and reported.

153. The Defendants will deprive Plaintiffs of the Equal Protection of the Laws in violation of 42 U.S. C. §1983 by failing fully to determine the cause of the miscounting in past elections and to fully examine and correct the counting and tabulating equipment and associated software used to count the votes in the next election. If the counting and tabulating systems and software are not corrected, the votes Plaintiffs attempt to cast in the next election will not be counted, and will be offset by manufactured votes, to the unfair advantage of candidates they oppose.

154. As a result of their actions and inactions in failing fully to test and verify the accuracy of the counting machinery and to identify the causes of the inaccurately reported results, Defendant County Board of Elections for Cambria will permit the manufacture, disappearance, manipulation and/or theft of votes in the 2026 election in which Plaintiffs will again attempt to vote, offsetting and rendering null and void the votes they will attempt to cast to the unfair advantage of candidates they oppose.

155. As a result of all of their actions and inactions, Plaintiffs will be caused harm and deprivation of their constitutionally protected right to have their vote weighed equally against all others in the election to the unfair advantage of candidates they oppose.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court grant the following relief forthwith pursuant to its statutory authority and its general equitable powers:

a. That the Court declare that the counting and reporting systems used by Defendants in the 2024 general election and planned to be used in the 2026 general election are not capable of accurately counting and reporting the votes cast;

b. That Defendant SOC and all Defendants BOEs failed to follow proper procedures in conducting the 2024 general election which failures affected the weight of the votes attempted to be cast by Plaintiffs which absent intervention by this Court will result in the failure to count votes cast by Plaintiffs or will result in their votes being offset by manufactured votes;

c. That the Court mandate and require the Defendant SOC to determine the cause of the discrepancies between votes cast and votes reported and take all necessary steps to avoid a repetition of the inaccurate recording and reporting of votes in the 2026 general election;

d. direct the Defendant County Boards of Elections to perform such examination including, if necessary, the hand counting of ballots from the precincts in which Plaintiffs voted to demonstrate the accuracy of the equipment used when compared to the tabulation created by the voting apparatus;

e. That the Court require that the Defendant BOEs determine the cause of the discrepancies between votes actually cast and votes reported and take all necessary steps to avoid a repetition of the inaccurate recording and reporting of votes in the 2026 general election;

f. That the Court require that the Defendant BOEs explain the mismatches and disappearances of ballots in the 2024 presidential election and enjoin the Defendant BOEs to undertake all necessary steps to avoid repetition of the conditions that led to the inaccurate recording and reporting of votes in the 2024 election;

g. That the Court enjoin the Defendant SOC and all Defendant BOEs to ensure compliance with the statutes and laws regarding vote counting in all counties in future elections; and

h. That the Court grant the Plaintiffs their attorney fees, expert witness fees, and costs in this action, and such other and further relief that the Court deems just.

**COUNT II. ELECTION TRUTH ALLIANCE, JENNIFER REESE, CHRISTOPHER MACK, AND GRACE HOHMAN V. AL SCHMIDT IN HIS OFFICIAL CAPACITY AS THE SECRETARY OF THE COMMONWEALTH AND CAMBRIA COUNTY BOARD OF ELECTIONS 42 U.S.C. § 1983 – VIOLATION OF THE RIGHT TO EQUAL PROTECTION OF THE LAWS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION**

156. Plaintiffs incorporate by reference the preceding averments of this Complaint as though fully set forth at length.

157. Defendant Cambria BOE filed a false Logic and Accuracy certification in the 2024 Election.

158. Defendant Cambria BOE used untested election machinery and equipment in the 2024 election.

159. Upon information and belief, Defendant Cambria BOE did not create or maintain documentation regarding handling and custody of ballots and votes in the 2024 Election.

160. Defendant Cambria BOE did not scan all provisional ballots submitted in the 2024 Election.

161. Defendant Cambria BOE did not explain ballot discrepancies in the 2024 Election.

162. Defendant Cambria BOE inexplicably ordered 88,472 more ballots than registered votes in the 2024 Election.

163. The votes reported by Defendant Cambria BOE evidenced manipulation and did not reflect the actual votes cast in the County.

164. Defendant SOC failed sufficiently to validate security of voting machinery equipment and software used by Defendant Cambria BOE in the 2024 Election, in particular by failing to ensure the integrity of the software used and in failing to ensure the absence of modems in the equipment used by the Counties which it approved.

165. The false L&A certification, untested equipment, missing chain of custody documentation, unscanned provisional ballots, unexplained ballot discrepancies, ordering of 88,472 more ballots than registered voters, statistical precinct-level divergence patterns, vote-turnout clustering, and failure to count and report Plaintiffs' votes or permitting them to be offset by manufactured votes demonstrates that Cambria will deprive voters of their rights under 42 U.S.C. §1983 to have ballots counted and included in appropriate totals if the conditions that led to the inaccurate reporting are not identified and corrected.

WHEREFORE, Plaintiffs respectfully demand that this Honorable Court:

a. Require Defendant Cambria to determine the cause of the incorrect reporting of votes and, if necessary, examine the software used, the devices used and if necessary, hand count a sufficient number of ballots to enable a determination of the accuracy of the reported vote count, and to take such steps as are necessary to prevent a recurrence of the miscounting;

b. Enjoin and require Defendants SOC and Cambria BOE to conduct a full hand recount of all ballots cast in the precincts in which Plaintiffs voted in the 2024 general election in Cambria County and, if such examination shows manipulation of recording or reporting of votes, of the other precincts in the County;

c. Enjoin Defendants SOC and Cambria BOE to determine the accuracy of all vote counts and reports in the precincts in which Plaintiffs voted in Cambria County in the 2024 election and if inaccuracies are found, the balance of the County;

d. Enjoin and require that Defendants SOC and Cambria BOE implement procedures satisfactory to the Plaintiffs and to the Court that will ensure all vote counts and reports will be accurate in the future; and

e. Grant Plaintiffs their attorney fees, expert witness fees and costs in this action, and such other and further relief that the Court deems just.

166. COUNT III — 42 U.S.C. § 1983: Joint Action and Public Function

**ALL PLAINTIFFS AGAINST DEFENDANTS ES&S AND JOHN DOE**

167. The tabulation of votes in a public election is a function traditionally and exclusively reserved to the State. The Commonwealth and its counties have delegated the mechanics of that function to ES&S.

168. ES&S is a willful participant in joint action with the county boards in the conduct of Pennsylvania elections. It programs election definitions, supplies and validates the software that counts ballots, instructs county officials on required testing and on the treatment of software-integrity warnings, and directed Cambria County officials in the handling of ballots during the November 5, 2024 general election.

169. .ES&S therefore acts under color of state law, and its conduct threatens Plaintiffs' federally protected right to have their November 3, 2026 votes accurately counted.

170. Defendant John Doe, if and to the extent that person exercised access to the systems at issue, likewise acted under color of state law by exercising authority over the mechanics of a public election.

171. Plaintiffs seek only prospective relief under this Count, including the production and examination of the source code, build records, engineering change records, hardware documentation, and access and audit logs necessary to the examinations requested.

172. In the alternative, if the Court determines that ES&S does not act under color of state law, Plaintiffs plead ES&S as a party necessary to complete relief under Fed. R. Civ. P. 19(a)(1)(A) on the ground pled in ¶ 24.

## COUNT IV — DECLARATORY JUDGMENT, 28 U.S.C. §§ 2201–2202

173. An actual, substantial, and immediate controversy exists between Plaintiffs and Defendants concerning whether the voting systems scheduled for use in Cambria County in the November 3, 2026 general election may be used to count Plaintiffs' votes without prior independent examination of the deficiencies documented in this Complaint.

174. The controversy is definite and concrete, touches the legal relations of parties with adverse legal interests, and is capable of resolution through a decree of conclusive character.

175. Plaintiffs are entitled to a declaration of their rights under 28 U.S.C. § 2201(a), and to such further necessary or proper relief as the Court may grant under 28 U.S.C. § 2202.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A. DECLARE that the continued use, in the November 3, 2026 general election, of the ES&S EVS Version 6 software family and associated hardware in Cambria County, without prior independent examination and correction of the deficiencies documented in this Complaint, will result in the deprivation of Plaintiffs' rights under the Fourteenth Amendment and 52 U.S.C. § 10101;

B. ORDER, sufficiently in advance of the November 3, 2026 general election to permit remediation, an independent forensic audit of the ES&S EVS Version 6 software as deployed in Cambria County— and of any other version within the same software family deployed in that county — to determine whether the software-integrity verification deficiencies documented by the Texas examiners and the source-code findings recorded in the New York review are present in the deployed code and have been remediated;

C. ORDER an independent physical inspection of the ES&S hardware deployed in Cambria County to determine whether any device has remote-access capability, including any installed cellular modem or other wireless communications component;

D. ORDER an independent forensic audit of the election management systems used in Cambria County, including verification of claimed air-gap and network-isolation controls, examination of network configuration and access-control records, and examination of system and audit logs;

E. ORDER that the examinations directed in paragraphs B through D be conducted by one or more examiners independent of ES&S and of the EAC-accredited laboratories that performed the certification testing at issue, on terms and with a scope, protocol, protective order, and reporting schedule to be fixed by the Court;

F. ORDER Defendants to preserve, pending those examinations, all cast vote records, ballot images, audit logs, election management system event logs, removable media used in pre- and post-election operations, Logic and Accuracy testing records, software update and installation records, chain-of-custody records, and modem and connectivity configuration records relating to the systems at issue;

G. ORDER Defendant ES&S to produce to the Court-appointed examiner the source code, build records, engineering change orders (including ECO-1167 and any successor), vulnerability and remediation records, and hardware bills of materials necessary to the examinations directed above, subject to an appropriate protective order;

H. GRANT leave to conduct expedited, narrowly tailored discovery directed solely at ascertaining the identity of Defendant John Doe;

I. RETAIN jurisdiction to enforce and, if warranted by the results of the examinations, to modify the relief granted;

J. AWARD Plaintiffs their reasonable attorneys' fees and costs as permitted by 42 U.S.C. § 1988; and

K. GRANT such other and further relief as the Court deems just and proper.

Plaintiffs expressly do not seek, and this Court is not asked to grant, any relief that would set aside, alter, recount, decertify, or otherwise disturb the certified results of the November 5, 2024 general election or of any other past election.

Respectfully submitted,

MCNAIR LAW OFFICES, PLLC

By: *s/ Timothy D. McNair*
Timothy D. McNair, Esquire
Pa. ID# 34304
821 State Street
Erie, PA 16501
(814) 452-0700
(814) 454-2371 (fax)
tmcnair@mcnairlaw.com