**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ELECTION TRUTH ALLIANCE, *et al.*,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**AL SCHMIDT, in his official capacity as Secretary of Commonwealth of Pennsylvania,** et al,<br>**Defendants.** | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | **ELECTRONICALLY FILED**<br>**CIVIL NO. 1:25-cv-00329**<br><br>**HONORABLE SUSAN PARADISE BAXTER** |

**SECRETARY SCHMIDT'S OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO AMEND**

Defendant, Secretary of the Commonwealth Al Schmidt, by and through his undersigned counsel, hereby files this Opposition to Plaintiffs' motion for leave to file a fourth amended complaint. Pls. Mot. for Leave, Dkt. No. 77. Plaintiffs' proposed fourth amended complaint continues to suffer from many of the same defects as his first and second amended complaints, which this Court previously dismissed on the basis of standing. Op., Dkt. No. 67.[1]

## I. INTRODUCTION

Plaintiffs challenge Cambria County's election system, based on a statistical analysis of the certified 2024 election results in that county and alleged problems found in other states. They are now on their fifth attempt to file a legally sufficient complaint. The current attempt is no better. It fails to adequately allege standing and fails to state a claim for which relief can be granted. In addition, the Secretary of State is immune from their suit. For these reasons, this Court should deny Plaintiffs' motion for leave to file a fourth amended complaint.

---

[1] For the same reasons herein, this Court should also dismiss Plaintiffs' third amended complaint. Defendants' response to that complaint is due on September 14. Order, Dkt. No. 70.

## II. BACKGROUND

Plaintiff Election Truth Alliance ("ETA") claims a mission to "protect[] the integrity and security of elections" and purports to have an interest in ensuring that its members "cast an effective vote on a verified voting system."' Proposed Fourth Amended Complaint ("Prop. Fourth Am. Compl."), Dkt. No. 77-1 ¶ 2. Three individual Plaintiffs reside in Cambria County, and each claims that their votes in the 2024 General Election were "not counted for the candidates they voted for and were overridden and offset by manufactured votes not cast by legitimate electors." *Id.* ¶ 3. Plaintiffs allege there to be an "actual controversy regarding the conduct of the vote count in counties located within the Western District of Pennsylvania." *Id.* ¶ 16. Yet absent from the 175-paragraph proposed Complaint is any plausible injury-in-fact, let alone one that was caused by the named Defendants or that can be remedied. Instead, Plaintiffs vaguely assert that there are various security issues with the election systems, and claim without any supporting factual basis that the vote count was manipulated by an unknown Defendant John Doe and that county election officials either incorrectly duplicated their ballots or failed to count them. They then claim that "independent statistical analysis" establishes "discrepancies" in the vote totals. *Id.* ¶ 108.

Plaintiffs put forth four counts, the first two of which are for violations of Equal Protection under the Fifth and Fourteenth Amendments, pursuant to 42 U.S.C. § 1983. Count I alleges that Secretary Schmidt and the Cambria County Board of Elections ("BOE") failed to take action that would have resulted in the alleged vote manipulation being discovered. *Id.* at 34-37. Count II alleges that the Cambria County BOE used "untested election machinery and equipment," among other things, and that the Secretary "failed sufficiently to validate security" of the equipment and software used by Cambria BOE. *Id.* at 38-39. Count III alleges that the electronic voting system vendor ES&S and John Doe acted under color of state law, or in the alternative that ES&S is a

necessary party to this lawsuit. *Id.* at 40. It is styled solely as a Section 1983 claim, with no underlying federal right alleged to have been violated. *Id.* Finally, Count IV is a claim pursuant to the Declaratory Judgment Act, with no underlying cause of action. *Id.* at 41.

Plaintiffs seek a variety of retrospective and prospective relief, including but not limited to: declarations as to the conduct of the 2024 General Election, *id.* at 37; investigation of the 2024 results, including potential hand counting of ballots, *id.* at 37, 39; an injunction to comply with the law, *id.* at 37; an "independent forensic audit" and "physical inspection" of various aspects of the election system used in Cambria County, *id.* at 41-42; and the preservation and production of certain documents, *id*.

## III. STANDARD OF REVIEW

A court "should freely give leave [to amend] when justice so requires." Fed. R. Civ. Pro. 15(a)(2). "Nevertheless, leave to amend is not an absolute right," *Plouffe v. Cevallos*, 777 Fed. Appx. 594, 602 (3d Cir. 2019) (citing *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 259 (3d Cir. 2014)), and "the ultimate decision to grant or deny opportunity to amend is within the discretion of the court." *Cresci v. City of Bayonne*, No. 23-1342, 2024 WL 94099, *2 (3d Cir. Jan. 9, 2024) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). In denying leave to amend, however, a court must provide a reason for the denial. *Foman*, 371 U.S. at 182.

Courts have provided non-exhaustive lists and examples of reasons that courts may give for denying leave. *See, e.g.*, *Foman*, 371 U.S. at 182; *Mullin v. Balicki*, 875 F. 3d 140, 149-50 (3d Cir. 2017). Among these factors are futility. *Foman*, 371 U.S. at 182. "Amendment of the complaint is futile if the amendment will not cure the deficiency in the original [pleading] or if the amended [pleading] cannot withstand a renewed motion to dismiss." *Citizens Bank of Pa. v. Reimbursement Tech., Inc.*, 609 Fed. Appx. 88, 95 (3d Cir. 2015) (quoting *Jablonski v. Pan*

*American World Airways, Inc.*, 863 F.2d 289, 292 (3d Cir. 1988)).

Accordingly, courts have examined futility based on any number of factors, including (as relevant here) standing, mootness, immunity, and failure to state a claim upon which relief can be granted. A number of courts have examined whether a proposed amended complaint established standing. *See, e.g.*, *Veritas Recovery Center, LLC v. City of South Amboy*, No. 23-2420, 2025 WL 3470731, *4 (D.N.J. Dec. 3, 2025); *Cole v. Encapera*, No. 15-104, 2016 WL 1461909, *3 (W.D. Pa. Apr. 14, 2016); *Hvizdak v. Citizens Bank of Pa.*, No. 14-406, 2015 WL 4878639, *10 (W.D. Pa. Aug. 6, 2015). Courts have also granted motions to dismiss for lack of standing, and held in the same order that amendment would be futile because plaintiffs could not adequately plead standing or had not done so in their proposed amended complaint. *See, e.g.*, *Walsh v. Luzerne Cnty.*, No. 4:24-cv-01878, 2025 WL 1222745, *8 (M.D. Pa. Apr. 28, 2025); *Forman v. Schmidt*, No. 2:24-cv-266, 2025 WL 1207739, *3 (W.D. Pa. Apr. 25, 2025), *aff'd per curiam* No. 25-2013, 2026 WL 810648 (3d Cir. Mar. 25, 2025); *Hollis v. Commw. of Pa.*, No. 3:08-CV-1452, 2009 WL 3633724, *5 (M.D. Pa. Oct. 30, 2009).

Courts have also considered whether amendment would be futile because the Defendant allegedly has immunity. *See, e.g.*, *B.P. by and through L.P. v. North Allegheny School District*, 579 F. Supp. 3d 713, 731-732 (W.D. Pa. 2022); *Shippensburg Urban Developers v. United States*, 510 F. Supp. 3d 284, 288-92 (E.D. Pa. 2020); *Harris v. Steadman*, 160 F. Supp. 3d 814, 819-820 (E.D. Pa. 2016). Similarly, some courts have denied leave to amend as futile due to mootness. *See, e.g.*, *Roman v. Harry*, No. 3:25-786, 2025 WL 2918973, *6, *8 (M.D. Pa. Oct. 14, 2025); *B.P. by and through L.P.*, 579 F. Supp. 3d at 724, 732.

Finally, "[a]mendment would be futile if the amended complaint would not survive a motion to dismiss for failure to state a claim." *Budhun*, 765 F.3d at 259 (citing *Travelers Indem.*

*Co. v. Dammann & Co.*, 594 F.3d 238, 243 (3d Cir. 2010)). "A complaint fails to state a claim upon which relief can be granted where the plaintiff is unable to plead 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Although the Court must accept the amended complaint's factual allegations as true and draw all reasonable inferences in Plaintiffs' favor, *Odd v. Malone*, 538 F.3d 202, 207 (3d Cir. 2008), it "need not accept bald assertions or inferences drawn by the plaintiff if they are unsupported by the facts set forth in the complaint," nor "accept legal conclusions set forth as factual allegations." *Peltz v. State Farm Mutual Automobile Ins. Co.*, 538 F. Supp. 3d 498, 503 (W.D. Pa. 2021) (citing *Cal. Pub. Employees' Ret. Sys. v. The Chubb Corp.*, 394 F.3d 126, 143 (3d Cir. 2004) and *Twombly*, 550 U.S. at 555). "Thus, . . . a complaint is properly dismissed under Fed. R. Civ. P. 12(b)(6) where the factual content does not allow the court 'to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

## IV. ARGUMENT

### A. Plaintiffs lack standing.

The Proposed Fourth Amended Complaint is futile because Plaintiffs do not adequately allege standing. Inquiry into standing "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Standing is a threshold jurisdictional question which a court must address prior to and independent of the merits of a party's claims. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998). Thus, a court only has jurisdiction over a case if the plaintiff has standing to sue. *See Kerchner v. Obama*, 612 F.3d 204, 207 (3d Cir. 2010).

To establish standing, the plaintiff must show he has suffered or will suffer an injury in fact that is caused by the conduct of the defendant and that can be redressed by the court. *Berg v. Obama*, 586 F.3d 234, 239 (3d Cir. 2009) (citing *Taliaferro v. Darby Tp. Zoning Bd.*, 458 F.3d 181, 188 (3d Cir. 2006)). An "injury in fact" is "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal citations and quotations omitted).

1. Individual Plaintiffs have not remedied the injury-in-fact deficiencies identified in their prior complaints.

In dismissing Plaintiffs' first and second amended complaints, this Court explained that "[w]here a voter can demonstrate that his or her specific ballot was, as a concrete and non-speculative matter, miscounted or not tabulated at all as a result of identifiable government action, a particularized injury exists to support standing. However, the allegation of such a personal injury must rest on factual content sufficient to permit the inference to be drawn[.]" Op., Dkt. No. 67 at 10. Plaintiffs' fourth amended complaint fails to meet this standard, as it simply repeats many of the same previously made allegations with little more of substance.

Both the second and fourth amended complaints contain a variety of allegations about problems with the election system used during the 2024 general election. *See* Prop. Second Am. Compl., Dkt. No. 45-1 ¶¶ 22-41; Prop. Fourth Am. Compl., Dkt. No. 77-1 ¶¶ 52-96. However, although the fourth amended complaint contains more details, the allegations in each complaint are of the same general nature and do nothing to establish an inference that each individual Plaintiff's "specific ballot was . . . miscounted or not tabulated." Op., Dkt. No. 67 at 10. In fact, Plaintiffs admit that they do *not* allege their 2024 ballots were altered. Prop. Fourth Am. Compl., Dkt. No. 77-1 ¶¶ 28, 112.

Both the second and fourth amended complaints also contain "statistical analysis." *See*

Prop. Second Am. Compl., Dkt. No. 45-1 ¶¶ 68-72; Prop. Fourth Am. Compl., Dkt. No. 77-1 ¶¶ 108-15. This Court previously dismissed such analysis as "concern[ing] aggregate voting patterns at the county or precinct level." Op., Dkt. No. 67 at 10-11. The fourth amended complaint does appear to include new information that 111 of 125 precincts in Cambria County are alleged to show evidence of vote manipulation, and that the three named plaintiffs voted in 2024 and will vote in 2026 in a flagged precinct. Prop. Fourth Am. Compl., Dkt. No. 77-1 ¶¶ 113-115; *see also id.* ¶¶ 26, 34, 41, 48 (providing more detail about the individual Plaintiffs' counties). But Plaintiffs admit that their analysis only identifies "deviations from expected distributions" and does not "establish manipulation." *Id.* ¶ 112. Thus, this addition to the fourth amended complaint still does not adequately allege "that the specific precinct in which [the individual Plaintiffs] voted was identified as one in which tabulation errors occurred." Op., Dkt. No. 67 at 10.[2]

Moreover, even if the individual Plaintiffs had alleged that their specific precincts had tabulation errors or vote manipulation, that would not establish that their "specific ballot[s were], as a concrete and non-speculative matter, miscounted or not tabulated at all." Op., Dkt. No. 67 at 10. Rather, it would still "boil down to a claim that improperly counted ballots diluted the weight of the individual Plaintiffs' lawfully cast votes" in their own precincts and more than 100 other precincts in the County. Op., Dkt. No. 67 at 11. *See also* Prop. Fourth Am. Compl., Dkt. No. 77-1 ¶¶ 26, 34, 41, 48 (alleging that the individual Plaintiffs' votes were diluted). As this Court properly noted, the Third Circuit has already rejected this theory of standing. *Id. See also Wood v.*

[2] Plaintiffs' allegations also do not lead to a plausible inference that "deviations" between a candidate's actual vote share and their "predicted vote share" is the result of fraud. At most, the analysis in Plaintiffs' fourth amended complaint provides information about what happened but not why it happened. Changes in vote share may be attributable to any number of more plausible things, including but not limited to: changes in the partisan composition of the electorate (registered or actual), relatively strong or weak get-out-the-vote efforts, and changes in the political environment or in voters' issues of concern. That is why we have elections.

*Raffensperger*, 981 F.3d 1307, 1314-15 (11th Cir. 2020) (dismissing claim based on interest that "only lawful ballots are counted" as generalized grievance insufficient for standing); *Forman v. Schmidt*, No. 2:24-CV-266, 2025 WL 1207739, *2 (W.D. Pa. Apr. 25, 2025) (dismissing claim that plaintiff had to vote on "illegal" voting machines as generalized, where plaintiff did not claim that she was prevented from voting or that her vote was not counted), *aff'd per curiam* No. 25-2013, 2026 WL 810648 (3d Cir. Mar. 24, 2026); *Samuel v. Virgin Islands Joint Bd. of Elections*, Civ. No. 2012-0094, 2013 WL 842946, at *4-5 (D. V.I. March 7, 2013) (dismissing claims regarding alleged failure to use non-certified voting machine).

The individual Plaintiffs attempt to plead around this by alleging that "their votes in the 2024 general election were not counted for the candidates they voted for *and* were overridden and offset by manufactured votes not cast by legitimate electors." Prop. Fourth Am. Compl., Dkt. No. 77-1 ¶ 3 (emphasis added). As described immediately above, their support for the second part of the allegation has previously been held inadequate and should be again. As to the first part of the allegation, their supporting allegations are that each individual Plaintiff was unable to scan their completed ballot at their polling place, and that their ballot was later duplicated as a result. *Id.* ¶¶ 30-31, 37-38, 45-46. But the individual Plaintiffs admit that they "do not allege that they know their own 2024 ballots were altered." *Id.* ¶ 28. And even if they did actually allege that their individual ballots were altered, such an allegation would not be plausible. Pennsylvania law requires duplication of ballots that cannot be read by tabulating equipment. 25 P.S. § 3031.13(3).[3]

[3] Pennsylvania is far from alone in providing for the duplication of ballots. For example, the National Conference of State Legislatures reports that 42 states (as well as DC, Guam, and the Northern Mariana Islands) have procedures for ballot duplication. National Conference of State Legislature, "Ballot Duplication," https://www.ncsl.org/elections-and-campaigns/ballot-duplication (see Introduction).

There is nothing inherently nefarious in such a process. Nor can this Court plausibly infer—without specific allegations, which are missing here—that County election staff either failed to duplicate and scan the individual Plaintiffs' ballots or altered their votes during the duplication process. Accordingly, the "factual allegations" in the proposed fourth amended complaint "do not support the inference that any individual Plaintiff's specific ballot was miscounted or miscategorized." Op., Dkt. No. 67 at 12.[4]

2. Plaintiffs do not adequately allege causation.

"It is axiomatic that a Section 1983 action . . . employs the principle of proximate causation.'" *Barr v. County of Clarion*, 417 Fed. Appx. 178, 181 (3d Cir. 2011) (cleaned up). Although this traditionally refers to "'wrongful conduct which is a substantial factor in bringing about harm to another . . . an intervening act of a third party which actively operates to produce harm after the first person's wrongful act has been committed, is a superseding cause which prevents the first person from being liable for the harm which his antecedent wrongful act was a substantial factor in bringing about.'" *Id.* (citing *Egervary v. Young*, 366 F.3d 238, 246 (3d Cir. 2004). In other words, even assuming *arguendo* that the Secretary engaged in a wrongful act under Section 1983, there is no causation where a subsequent wrongful act by someone else actively created the harm alleged by Plaintiffs. That is precisely the situation alleged here.

---

[4] Even if the allegations against John Doe and the Cambria County BOE were plausible, it is unclear what they have to do with each other. Plaintiffs do not, for example, appear to suggest that they colluded with each other. Perhaps the most likely answer is that, as a result of confusion surrounding duplication efforts, John Doe was allegedly able to manufacture votes in place of ballots that did not get duplicated and counted. *See* Prop. Fourth Am. Compl., Dkt. No. 77-1 ¶ 110 ("As the result of the improper programming of the voting machines and tabulators, the exploitation of software weaknesses, and the other irregularities set forth above, Plaintiffs' attempted votes were not counted and were offset by manufactured votes[.]"). But if that is Plaintiffs' theory, then it is not plausible that the situation will repeat itself in 2026, because it is not plausible that the Cambria County BOE will once again accidentally order ballots that cannot be scanned.

With regard to Plaintiffs' allegations that the ES&S election systems were manipulated, the alleged manipulation itself by Defendant John Doe is the active cause of any related injury. Even assuming that ES&S' election systems were faulty, Prop. Fourth Am. Compl., Dkt. No. 77-1 at ¶¶ 121-126, that the Secretary of the Commonwealth wrongly certified or failed to decertify the systems, *id.* ¶¶ 127-132, and that the Cambria County BOE wrongly certified the system, ¶¶ 133-138, (none of such assumptions having any basis in fact or law) Plaintiffs' alleged injury would not exist if Defendant John Doe had not (allegedly) acted to manipulate the election system. Thus, as to any alleged injury related to manipulation of the election system, there is no causation with regard to the Secretary, the Cambria County BOE, or ES&S. This is consistent with this Court's previous finding that the first and second amended complaints did "not describe with any specificity how any named Defendant was involved in the alleged manipulation," Op., Dkt. No. 67 at 13, because the fourth amended complaint also does not describe how the Secretary, the Cambria County BOE, or ES&S manipulated the election system's alleged security vulnerabilities.

As to Plaintiffs' allegations that their ballots were either not counted or miscounted as part of the duplication process, Plaintiffs allege that the ballots were unable to be scanned because they were missing certain alignment marks. Prop. Fourth Am. Compl., Dkt. No. 77-1 ¶ 101. This is unrelated to the election system's alleged security vulnerabilities, and therefore unrelated to the alleged actions of the Secretary and ES&S. However, assuming *arguendo* that there were some causal connection between (a) the Secretary's certification of the election system and ES&S providing that system, (b) Cambria County BOE's alleged improper count of ballots, and (c) the alleged dilution of Plaintiffs' voted, then the alleged improper count of ballots would constitute an intervening act between the Secretary and ES&S on the one hand and Plaintiffs' alleged injury on the other.

3. Individual Plaintiffs' alleged injury-in-fact cannot be redressed by the Court

This Court has already held that retrospective relief—"including orders requiring hand recounts, forensic audits of voting equipment, and judicial determination of the accuracy of reported vote totals in the 2024 General Election"—"is not redressable for multiple reasons." Op., Dkt. No. 67 at 13. Yet Plaintiffs continue to seek retrospective relief, including: a declaration that the election system used in 2024 was not capable of accurately counting and reporting the votes cast, and that Defendants failed to follow proper procedures in 2024; a hand count of the 2024 ballots; an explanation of the alleged "mismatches and disappearances of ballots in the 2024 presidential election"; an order that Defendants "determine the accuracy of all vote counts and reports in the precincts in which Plaintiffs voted in Cambria County in the 2024 election and if inaccuracies are found, the balance of the County"; and an "independent forensic audit" and "physical inspection" of Cambria County's election system. Prop. Fourth Am. Compl., Dkt. No. 77-1 at 37-42. In accordance with its prior opinion, this Court should dismiss Plaintiffs' requested retrospective relief as moot. Op., Dkt. No. 67 at 13-14.

As for the requested prospective relief, as explained above, Plaintiffs' proposed fourth amended complaint once again fails to contain "sufficient factual allegations" to show "a plausible, non-speculative threat of future injury traceable to the Defendants' conduct . . . [and] that injunctive relief would meaningfully prevent that injury from recurring." Op., Dkt. No. 67 at 14. *See also* *Walsh v. Luzerne County*, No. 4:24-CV-01878, 2025 WL 1222745, *6 (M.D. Pa. Apr. 28, 2025) ("[W]ith no injury-in-fact to begin with . . . any fear of future injury in the 2026 election [becomes] both conjectural and not ripe.").[5]

[5] As a practical matter, the November 2026 general election is less than two months away. Although Plaintiffs' current iteration of their complaint focuses solely on Cambria County, 39 Pennsylvania counties use the ES&S EVS version 6 software family, representing nearly 60% of

4. Election Truth Alliance lacks standing.

ETA lacks associational or representational standing on behalf of its members. As to associational standing, because the individual Plaintiffs lack standing for the reasons described above, "ETA's associational standing fails as a matter of law." Op., Dkt. No. 67 at 14.

As to organizational standing, ETA alleges that its mission is to "protect and enhance the integrity of elections." Prop. Fourth Am. Compl., Dkt. No. 77-1 ¶ 3. It further alleges that it has "divert[ed] its own organizational resources – volunteer time, data-analysis capacity, and public-records-request capacity – to investigating, documenting, and responding to the voting-system conditions described in this Complaint in Cambria County," *id.* ¶ 5, that it has "requested records verifying examination of the machines," *id.* ¶ 92, and that it has "requested the SOC to direct a hand count of ballots." *Id.* ¶ 147. This is substantially the same language found in Plaintiffs' proposed second amended complaint. *Compare* Dkt. No. 45-1 ¶ 1 ("Its mission is to protect and enhance the integrity of elections"); *id.* ("ETA and its members have expended substantial resources in Pennsylvania to investigate, respond to, and publicize election irregularities"); *id.* at ¶ 99 ("ETA requested the SOC to direct a hand count of ballots"). But this Court has already held that these allegations are not sufficient, and that ETA must "plead facts establishing that ETA's concrete programmatic activities have been frustrated by any specific act of any named Defendant, as distinguished from ETA's own decision to investigate and litigate the claims at issue." Op., Dkt. No. 67 at 14-15. Accordingly, "[a]s pled, Plaintiffs have failed to adequately allege facts sufficient to support standing of ETA." *Id.* at 14.

---

both the Commonwealth's counties and its registered voters. Any relief granted by this Court based on Plaintiffs' allegations pertaining to the version 6 software family would necessarily create upheaval across the state.

**B. The Eleventh Amendment Bars Any Claims Against Secretary Schmidt.**

It has been long established that the Eleventh Amendment of the United States Constitution bars all private lawsuits against non-consenting states in federal court. *Karns v. Shanahan*, 879 F.3d 504, 512 (3d Cir. 2018) (citing *Hans v. Louisiana*, 134 U.S. 1 (1890)). Eleventh Amendment immunity "is designed to preserve the delicate and 'proper balance between the supremacy of federal law and the separate sovereignty of the States.'" Id. (quoting *Alden v. Maine*, 527 U.S. 706, 757 (1999)). This immunity bars suits against the states and state agencies "regardless of the relief sought." *Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993). A claim against a state government official, in his or her official capacity, is "no different from a suit against the State itself" because it "is not a suit against the official but rather is a suit against the official's office." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).

A plaintiff can overcome Eleventh Amendment immunity in three ways. First, a state may consent to be sued. *Downey v. Pa. Dep't of Corr.*, 968 F.3d 299, 310 (3d Cir. 2020). Pennsylvania, however, has generally withheld its consent to be sued. *Lavia v. Pa. Dep't of Corr.*, 224 F.3d 190, 195 (3d Cir. 2000) (citing 42 Pa. C.S. § 8521(b)). There is no colorable argument here that Pennsylvania has consented to suit.

Second, Congress can, as part of the statute enabling a particular cause of action in certain circumstances, abrogate the states' immunity pursuant to Section 5 of the Fourteenth Amendment. *Downey*, 968 F.3d at 310. Any such abrogation must be done via a clear legislative statement from Congress and pursuant to a valid exercise of Congress's power over the states. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 55, 58 (1996). However, Section 1983—the vehicle through which all of Plaintiffs' claims here are brought—does not abrogate state officials' Eleventh Amendment immunity, because "states and state officials sued in official capacities are not 'persons' capable

of being sued for civil rights violations under § 1983." *Robinson v. Pennsylvania Dep't of Corr.*, 851 Fed. Appx. 289, 291 (3d Cir. 2021) (citing *Will*, 491 U.S. at 71).

Third, under the *Ex parte Young* doctrine, a plaintiff can pursue certain kinds of forward-looking injunctive relief against state officials, notwithstanding Eleventh Amendment immunity, to stop a current violation of federal law. *Will*, 491 U.S. at 71 n.10. This judicially-created doctrine provides a "narrow exception" to Eleventh Amendment immunity. *Seminole Tribe*, 517 U.S. at 76. A claim under the *Ex parte Young* exception allows only prospective declaratory or injunctive relief addressing an ongoing violation of federal law. *MCI Telecomm. Corp. v. Bell Atl. Pa.*, 271 F.3d 491, 506 (3d Cir. 2001). It does not apply to suits for retroactive relief, *Edelman v. Jordan*, 415 U.S. 651, 678 (1974), suits based in state law, *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984), or "where Congress has prescribed a detailed remedial scheme for the enforcement against a State" of the claimed federal right, *Seminole Tribe*, 517 U.S. at 74.

Here, much of Plaintiffs' requested relief is retrospective, and therefore does not fall within the *Ex Parte Young* exception. *See supra* at 11. But even the prospective relief sought is not tied to a current and ongoing violation of any Plaintiff's constitutional rights. The 2024 General Election is long over, and the election systems for the 2026 General Election are not currently in use by voters. Neither the facts alleged nor relief sought concern ongoing conduct.[6]

Plaintiffs attempt to plead around immunity by speculating that a hand recount of 2024 ballots *might* reveal an issue, and that issue *might* reoccur in future elections. For example, they

[6] Plaintiffs seek an order "to ensure compliance with the statutes and laws regarding vote counting in all counties in future elections," *see* Dkt. No. 77-1 at 37, and to "ensure all vote counts and reports will be accurate in the future." *Id.* at 39. Aside from being untethered to any alleged ongoing conduct, this vague request for injunctive relief is inappropriate and should be denied. *Louis W. Epstein Family P'ship v. Kmart Corp.*, 13 F.3d 762, 771 (3d Cir. 1994) (noting that "[b]road, non-specific language that merely enjoins a party to obey the law" does not comply with Rule 65).

aver that they "requested [Secretary Schmidt] to direct a hand count of ballots," which they believe "would have demonstrated that the anomalies . . . resulted from improper programming or manipulation of the voting and counting machines." Prop. Fourth Am. Compl., Dkt. No. 77-1, ¶ 147. And they further contend that "when the cause of the discrepancies is identified, [Secretary] Schmidt should be required to . . . ensure that the voting machines . . . comply with the requirements of [federal law]." *Id.* ¶ 149. But speculation about possible ongoing harm is not sufficient for purposes of the *Ex parte Young* exception to immunity. *See* *Rothermel v. Dauphin Cnty.*, No. 1:16-cv-1669, 2017 WL 4347522, at *6 (M.D. Pa. Sept. 29, 2017) (allegation "postulating that 'some type of breakdown must have occurred'" to allow prior harm did not "articulate an ongoing constitutional harm").

Plaintiffs have attempted to end-run around Eleventh Amendment immunity before by alleging that past harm will be repeated in the future, but courts have consistently rejected such attempts. For example, in *Haagensen v. Pennsylvania State Police*, a plaintiff sought an injunction against a harassment statute that had been used to prosecute her previously and, she alleged, would be used against her again in violation of her First Amendment rights. No. 08-cv-727, 2009 WL 3834007 (W.D. Pa. Oct. 22, 2009), *report and recommendation adopted as modified*, 2009 WL 3834004 (W.D. Pa. Nov. 16, 2009), *aff'd*, 490 Fed. Appx. 447 (3d Cir. 2012). Dismissing on Eleventh Amendment immunity grounds, the Court held that the plaintiff failed to sufficiently aver that she faced an ongoing threat of prosecution of First Amendment protected conduct and thus there was no "ongoing practice for the Court to enjoin." *Haagensen*, 2009 WL 3834007, at *14-15. More recently, in *Diamond v. Pennsylvania State Education Association*, the Court dismissed a constitutional challenge to a statute requiring teachers to pay union dues in light of new Supreme Court case law, holding that the challengers had "not alleged that Commonwealth Defendants have

enforced or continue to enforce [the challenged statute] in an unconstitutional manner." 399 F.Supp.3d 361, 379 (W.D. Pa. 2019), *aff'd* 972 F.3d 262 (3d Cir. 2020). The consistent thread in these cases is that the requirement that harm is ongoing should be read strictly; it requires more than allegations of past harm combined with a belief of future similar harm.[7] So too here. Although Plaintiffs allege past problems in the 2024 election and request relief to avoid the same in the 2026 election, *see, e.g.*, Prop. Fourth Am. Compl., Dkt. No. 77-1 ¶ 154-55, they have not sufficiently averred that they face an ongoing threat that the same alleged problems will repeat themselves absent relief. Nor could they. This is particularly true because Plaintiffs' allegations are apparently wrapped up in Cambria County's inadvertent use of non-scannable ballots and the consequent necessary corrective step it took to duplicate completed ballots so that they could be tabulated. *See id.* ¶¶ 30-31, 37-38, 45-46, 100-107. There is no reason to expect the County to repeat that same mistake.

Because of longstanding constitutional limits, federal courts can only enjoin ongoing state conduct that is actively interfering with a plaintiff's rights. Plaintiffs have presented no such ongoing conduct here, so this Court lacks jurisdiction over their complaint against state actors.

**C. Plaintiffs fail to state a claim for which relief can be granted.**

1. Plaintiffs fail to state an Equal Protection claim.

Shortly before the 2020 General Election, the Western District of Pennsylvania rejected an Equal Protection claim that it characterized as: "[I]f one 'qualified elector' casts a lawful ballot, but a fraudulent voter casts ten ballots, then that elector's vote will . . . be diluted by a magnitude of ten—resulting in differential treatment." *Donald J. Trump for President, Inc. v. Boockvar*, 493

[7] Further, stopping another end-run around this end-run, a plaintiff cannot revive a challenge to state conduct that is no longer ongoing by using the "capable of repetition yet evading review" exception to mootness. *See* Surina v. S. River Bd. of Educ., No. 20-2804, 2022 WL 264464, at *3 (3d Cir. Jan. 27, 2022).

F. Supp. 3d 331, 390-91 (W.D. Pa. 2020). The Court then explained that "[t]he problem with this theory is that there does not appear to be any law to support it. Indeed, if this were a true equal-protection problem, then it would transform every violation of state election law (and, actually, every violation of every law) into a potential federal equal-protection claim requiring scrutiny of the government's "interest" in failing to do more to stop illegal activity. This is not the law." *Id.* at 391.

A month later, the Third Circuit quoted the Western District's opinion with approval. *Bognet v. Sec'y Commw. of Pa.*, 980 F.3d 336, 355 (3d Cir. 2020) ("[V]ote dilution under the Equal Protection Clause is concerned with votes being weighed differently. . . . [I]f dilution of lawfully cast ballots by the 'unlawful' counting of invalidly cast ballots 'were a true equal-protection problem, then it would transform every violation of state election law . . . into a potential federal equal-protection claim requiring scrutiny of the government's 'interest' in failing to do more to stop the illegal activity.' That is not how the Equal Protection Clause works.") (citation omitted).

Plaintiffs' argument here suffers from the same problem. Plaintiffs claim that their votes are worth less due to the counting of fraudulent ballots. Prop. Fourth Am. Compl., Dkt. No. 77-1 ¶¶ 26, 34, 41, 48. Both this District and the Third Circuit have already rejected such a basis for an Equal Protection claim.

2. Plaintiffs Equal Protection claim fails under both the traditional *prima facie* and "class of one" tests.

Even if Plaintiffs did bring a type of case that could constitute an Equal Protection claim, their claim would still fail. The Fifth and Fourteenth Amendments' equal protection obligations are treated as indistinguishable. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 217 (1995). "[I]n any equal protection case," plaintiffs must "prove the existence of purposeful discrimination"

and "demonstrate that they received different treatment from that received by other individuals similarly situated." *Batson v. Kentucky*, 476 U.S. 79, 93 (1986); *Chambers ex rel. Chambers v. Sch. Dist. of Philadelphia Bd. of Educ.*, 587 F.3d 176, 196 (3d Cir. 2009). "To meet the *prima facie* elements, [a p]laintiff must allege that he was: (1) a member of a protected class; (2) similarly situated to members of an unprotected class; and (3) treated differently from members of the unprotected class." *Green v. Chester Upland Sch. Dist.*, 89 F. Supp. 3d 682, 693 (E.D. Pa. 2015) (citing *Oliveira v. Twp. Of Irvington*, 41 Fed. Appx. 555, 559 (3d Cir. 2002); *Keenan v. City of Philadelphia*, 983 F.2d 459, 465 (3d Cir. 1992)), *aff'd sub nom.* *A.G. v. Chester Upland Sch. Dist.*, 655 F. App'x 125 (3d Cir. 2016).

Alternatively, a "class of one" theory is available where a plaintiff does not allege membership in a class or group. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). In that case a plaintiff must at least allege that "(1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment." *Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006). *See also* *Tatel v. Mt. Lebanon Sch. Dist.*, 637 F. Supp. 3d 295, 330-31 (W.D. Pa. 2022) (applying the same elements in a "class of one" case involving a fundamental right); *Donald J. Trump for President, Inc.*, 493 F. Supp. 3d at 391 (applying rational basis where the Secretary's failure to take certain action did not "directly infringe or burden Plaintiffs' rights to vote"); *Id.* at 393 (noting that the *Anderson-Burdick* test is "ill-fitted" where "Plaintiffs complain that Pennsylvania has indirectly burdened the right to vote through *inaction*").

Plaintiffs' proposed fourth amended complaint fails to allege a claim under either theory. As to a *prima facie* claim, none of the Plaintiffs allege that they are members of a protected class, that they are similarly situated to members of an unprotected class, and that they are treated

differently from members of the unprotected class. Nor does the proposed fourth amended complaint contain allegations that would allow this Court to infer any of the same, as even if all allegations in it were true, residency in a particular state, county, or precinct does not create membership in a protected class. Neither does voting for a particular candidate create membership in a protected class.

Plaintiffs also fail to adequately plead the "class of one" theory, because they do not allege that any of the Defendants treated them differently from others similarly situated, let alone intentionally and without rational basis. Taking Count I first, Prop. Fourth Am. Compl., Dkt. No. 77-1 ¶¶ 145-55, Plaintiffs claim that "Voters in precincts with lower voter turnout will be treated more favorable than Plaintiffs in that their votes will accurately be counted and reported." *Id.* ¶ 152. But Plaintiffs do not allege that the Cambria BOE treated them differently than voters in lower turnout precincts, let alone that they did so intentionally and without rational basis. They do not allege, for example, that the Cambria BOE intentionally used voting systems that added false votes for certain candidates and only in certain precincts, or that they intentionally placed specific compromised machines only in certain precincts. Nor do Plaintiffs allege any action or inaction by Secretary Schmidt that treated voters in different precincts differently, as his certification of the election system used in Cambria County applies to all precincts (just as decertification would).

At best, Plaintiffs' voting systems allegations boil down to the idea that Defendant John Doe took advantage of alleged software vulnerabilities to corrupt the ballot count in a way that affected only certain precincts and to the benefit of specific candidates, and that the various Defendants failed to stop that from happening or to identify after the fact that it had happened. Again, even taking Plaintiffs' theory as true, Plaintiffs allege that an unnamed actor treated them differently, but they do not allege that any of the Defendants treated them differently than voters

in other precincts, that they did so intentionally, or that there was no rational basis for such treatment. The closest Plaintiffs get is their complaint that Secretary Schmidt did not "under the authority vested in him by PA Election Code § 201(e.1)," direct a hand count in their precincts. *Id.* ¶ 147. But this does not constitute an allegation of unequal treatment, as there is no allegation that Secretary Schmidt did direct a hand count of ballots in other precincts. Moreover, Section 201 of the Pennsylvania Election Code neither authorizes nor requires hand counts; indeed, it does not mention hand counts at all.[8] Accordingly, Secretary Schmidt had a rational basis for declining to exercise an authority not granted to him by statute.

Similarly, Plaintiffs complain that Secretary Schmidt has "refus[ed] to examine any ballot boxes, to order the County Boards of Elections to submit additional reports, or to order from the County Boards their reports of system errors and difficulties to identify and correct the causes of the inaccuracies in tabulation and reporting of votes[.]" *Id.* ¶ 150. But again, the Election Code does not mention or require hand counts, so a failure to conduct one cannot be said to lack a rational basis. As for the reports, the duty that Section 201(e) confers on the Secretary to receive information from counties on voting system errors or difficulties is not the same as a duty to demand such reports. And Section 201(e.1)'s duty to receive additional reports "as [the Secretary] may deem necessary" is permissive rather than mandatory. *See, e.g.*, *U.S. v. Geiser*, 527 F.3d 288, 294 (3d Cir. 2008) ("When determining a statute's plain meaning, our starting point is 'the ordinary meaning of the words used.'"); *A. Scott Enterprises, Inc. v. City of Allentown*, 142 A.3d 779, 787-88 (Pa. 2016) (holding that use of the word "may" is generally permissive, except where the "ends

[8] Plaintiffs' reliance on Section 201(e.1) is misplaced. That subsection pertains to receiving information from the county boards "pursuant to regulation." 25 P.S. § 2621(e.1). Receiving information is not the same thing as directing a county to take action, and in any event, there are no Department of State regulations that pertain to hand counting ballots.

of justice' or "constitutional requirements" demand otherwise). Neither the "ends of justice" nor "constitutional requirements" justify finding that the Fifth and Fourteenth Amendments impose a duty on the Secretary to require special reports upon receiving vague, unsubstantiated, and untimely allegations of "statistical anomalies" caused by unspecified actors.[9]

As to Counts II and III, Plaintiffs allege various wrongdoing by the Cambria County BOE and ES&S throughout their proposed fourth amended complaint, but again, at no point do they plausibly allege that either Defendant treated them differently from other voters whenever undertaking the alleged actions, that Defendants intended to treat them differently, or that there was no rational basis for an alleged difference in treatment. For example, the section titled "Cambria County Certification and Machine Issues" makes a number of allegations about failure to test scanners, unscannable ballots, voters being turned away at the polls, lack of chain of custody, and a failure to record certain information. Prop. Fourth Am. Compl., Dkt. No. 77-1 ¶¶ 97-107. The section then concludes by alleging that this "resulted in the miscounting of the votes of the Plaintiffs by inaccurately reporting their votes and by permitting the introduction and counting of nonexistent votes offsetting Plaintiffs' votes to the unfair advantage of candidates Plaintiffs opposed." *Id.* ¶ 107. But at no point do Plaintiffs allege any facts that would support an inference that the Cambria County BOE or its poll workers took any action that affected only the individual Plaintiffs, or only the individual Plaintiffs' precincts. Instead, the only inference to be drawn here (however implausibly) is that the Cambria County BOE took actions that affected

---

[9] Furthermore, to the extent that Plaintiffs are functionally making an Equal Protection claim against the Secretary based on a violation of state law, the claim is invalid. "It is well-established that even violations of state election laws by state officials . . . do not give rise to federal constitutional claims except in unusual circumstances." *Donald J. Trump for President, Inc.*, 493 F. Supp. 3d at 391. *See also* Bognet, 980 F.3d at 354-55 ("Violation of state election laws by state officials . . . is not always amenable to a federal constitutional claim.").

voters throughout the county, which in turn enabled Defendant John Doe to introduce false counts into the system without notice. Similarly, Plaintiffs allege that ES&S knew about security vulnerabilities in its election system but supplied it to Cambria County anyway. *Id.* ¶¶ 121-126. But at no point do Plaintiffs allege any facts that would support an inference that ES&S supplied faulty machines to some precincts but not to others, let alone that it did so intentionally.

Accordingly, this Court should strike Counts I through III.

3. Plaintiffs fail to state a claim under Section 1983 against Secretary Schmidt.

Section 1983 does not provide any substantive rights to individuals. Rather, it authorizes a person to file a private cause of action against those acting under color of state law for deprivation of rights protected by a federal statute or the U.S. Constitution. *See* Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

"Garden variety election irregularities" are not actionable under Section 1983. *See* Acosta v. Democratic City Comm., 288 F.Supp.3d 597, 643-44 (E.D. Pa. 2018) (collecting cases). Only intentional acts or "willful conduct [that] 'undermines the organic process by which candidates are elected'" can be held to violate Section 1983. Id. at 644. Plaintiffs claim that Secretary Schmidt's refusal to do certain acts, such as examining ballot boxes and ordering additional reports, deprived them of their right to Equal Protection guaranteed by the Fifth and the Fourteenth Amendments of the U.S. Constitution. Prop. Fourth Am. Compl., Dkt. No. 77-1 ¶¶ 150-51, 164. But as explained *supra* at 20, Secretary Schmidt only stands accused of failing to take actions that either the Pennsylvania Election Code does not empower him to take or that it leaves to his discretion. This does not rise to the level of deprivation of rights. And none of the Defendants, including Secretary Schmidt, are plausibly alleged to have treated Plaintiffs differently than anyone else, let alone to have done so intentionally or willfully. Accordingly, this Court should again strike Counts I

through III.

4. Section 1983 is not sufficient by itself to state a claim.

Unlike Counts I and II, Count III is brought pursuant to Section 1983 alone. Prop. Fourth Am. Compl., Dkt. No. 77-1 at 40. But "Section 1983 is not a source of substantive rights." *Hall-Wadley v. Maint. Dep't*, 386 F. Supp. 3d 512, 516 (E.D. Pa. 2019) (citing *Groman v. Twp. of Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995)). Rather, it is "merely a means of vindicating violations of federal constitutional and statutory rights committed by state actors." *Id.* To state a claim under Section 1983, a plaintiff must allege a violation of a right established by the Constitution or a federal statute. *See, e.g.*, *Forman v. Schmidt*, No. 25-2013, 2026 WL 810648, *2 (3d Cir. Mar. 24, 2026) (quoting *Berg v. Cnty. of Allegheny*, 219 F.3d 261, 268 (3d Cir. 2000) (per curiam); *Hall-Wadley*, 386 F. Supp. 3d at 516 (citing *City of Rancho Palos Verdes, Cal. v. Abrams*, 544 U.S. 113, 119-20 (2005)); *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). Accordingly, to the extent that this Court interprets Count III as not also encompassing an Equal Protection claim, this Court should again strike Count III.

5. The Declaratory Judgment Act does not create a cause of action.

Count IV purports to bring a claim pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202. Prop. Fourth Am. Compl., Dkt. No. 77-1 at 41. However, the Declaratory Judgment Act does not create a right or a cause of action; it merely creates a form of relief. *See, e.g.*, *Malhan v. Sec'y U.S. Dep't of State*, 938 F.3d 453, 457 n.3 (3d Cir. 2019); *Merrill Iron & Steel, Inc. v. Blaine Const. Corp.*, 2014 WL 2993774, *4 (W.D. Pa. July 2, 2014); *Woolley v. Groft*, 653 F. Supp. 3d 171, 179 (M.D. Pa. 2023); *Kelerchian v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 655 F. Supp. 3d 334, 344-45 (E.D. Pa. 2023). Accordingly, this Court should strike Count IV.

## V. CONCLUSION

Plaintiffs have yet again failed to file a legally sufficiently complaint. They have not fixed the standing problems identified in this Court's prior opinion, they continue to sue the Secretary of the Commonwealth despite his immunity from their claims, and they fail to state a viable Equal Protection claim. The amendment is futile, and this Court should deny the motion for leave.

Respectfully submitted,

Date: September 8, 2026

*/s/ Michelle Rupp*

Kathleen A. Mullen (Pa. 84604)
Executive Deputy Chief Counsel
Michelle Rupp (Pa. 337463)
Assistant Counsel
Pennsylvania Department of State
306 North Office Building
Harrisburg, PA 17120
Tel: 717-783-0736
Fax: 717-214-9899
Email: kamullen@pa.gov
mirupp@pa.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on September 8, 2026, I caused the foregoing document to be filed with the United States District Court for the Western District of Pennsylvania via the Court's CM/ECF system, which will provide electronic notice to all counsel and parties of record.

*/s/ Michelle Rupp*
Michelle Rupp